**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 15 |
| MtGox Co., Ltd. (a/k/a MtGox KK), | Case No. 14-31229-sgj-15 |
| Debtor in a Foreign Proceeding. | |

**DECLARATION OF NOBUAKI KOBAYASHI IN SUPPORT OF THE**
**AMENDED VERIFIED PETITION FOR RECOGNITION AND CHAPTER 15 RELIEF**

I, Nobuaki Kobayashi (the "Petitioner"), in my capacity as the bankruptcy trustee and foreign representative of MtGox Co., Ltd., a/k/a MtGox KK (the "Debtor" or "MtGox"), pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America that the following is true and correct to the best of my knowledge and belief, including based upon my review of the books, records and documents of the Debtor and interviews of the relevant personnel of the Debtor:

1.      I am a resident of Japan and, after receiving an L.L.B. from Chuo University in 1979, have been registered to practice law in Japan since 1983. I am currently a partner at Nagashima Ohno & Tsunematsu ("NO&T"), a Japan-based law firm engaged in the provision of corporate reorganization, insolvency and related services in Japan. Since becoming an attorney at law, I have been a member of the Insolvency Law Study Group of the Tokyo Bar Association, and I was appointed Chairperson in 2002. Since 2013, I have been Chairperson of the Study Committee on the Bankruptcy Law System of the Japan Federation of Bar Associations. I have lectured in a variety of programs and institutions and have delivered lectures on insolvency practice hosted by the Training and Research Institute for Court Officials of the Supreme Court of Japan and attended by Japanese judges. From 2007 to March 2014, I was a Visiting Professor

in insolvency law at Chuo University Law School in Tokyo, Japan. In 2012, I was ranked the fourth most valuable business law attorney in Japan based on a survey conducted by Nikkei.

2. In addition, I have extensive experience in each of Japan's three types of insolvency proceedings, namely: (i) bankruptcy proceedings under the Bankruptcy Act of Japan (the "Bankruptcy Act"); (ii) civil rehabilitation proceedings under Japan's Civil Rehabilitation Act (*Minji Saisei Ho*) (the "JCRA"); and (iii) reorganization proceedings under Japan's Corporate Reorganization Act (*Kaisha Kosei Ho*). Specifically, I have served as: (i) the bankruptcy trustee in approximately 40 Japan bankruptcy proceedings involving companies; (ii) the supervisor in approximately 30 Japan civil rehabilitation proceedings; and (iii) the reorganization trustee in approximately 10 Japan reorganization proceedings.[1] As such, I am fully familiar with Japanese insolvency law and with MtGox's Japan Proceeding (as described below).

3. On April 24, 2014, I was appointed as the bankruptcy trustee of MtGox. As explained in more detail below, MtGox is the subject of a bankruptcy procedure (the "Japan Proceeding") under the Bankruptcy Act,[2] currently pending before the Twentieth Civil Division of the Tokyo District Court in Japan (the "Tokyo Court").

---

[1] I note that I served as the co-trustee and co-foreign representative of Elpida Memory, Inc. ("Elpida") in its reorganization proceedings in Japan and related Chapter 15 case in the U.S. Bankruptcy Court for the District of Delaware. In 2012, the Delaware Bankruptcy Court recognized the Elpida reorganization proceeding as a foreign main proceeding. See In re Elpida Memory, Inc., Case No. 12-10947 (CSS) (Bankr. D. Del. Apr. 24, 2012) [Docket No. 65].

[2] An English translation of the Bankruptcy Act, which was prepared by the Ministry of Justice in Japan, is available at: http://www.japaneselawtranslation.go.jp/law/detail/?re=01&dn=1&x=0&y=0&co=1&ia=03&yo=&gn=&sy=&ht=&no=&bu=&ta=&ky=%E7%A0%B4%E7%94%A3%E6%B3%95&page=29. English translations of the relevant provisions of the Bankruptcy Act referenced in this Declaration are attached hereto as **Exhibit 1**.

4.    I submit this declaration in support of the Amended Verified Petition for Recognition and Chapter 15 Relief (the "Amended Petition"),[3] which I, in my capacity as bankruptcy trustee and foreign representative of MtGox, have contemporaneously filed with this Court seeking recognition of the Japan Proceeding as a "foreign main proceeding" or, in the alternative, a "foreign nonmain proceeding," and related relief under Chapter 15 of title 11 of the United States Code (the "Bankruptcy Code"). The facts hereinafter set forth in this declaration are based upon my personal knowledge or, as indicated below, based upon my investigation of the books, records and documents of MtGox and interviews of the relevant personnel of the Debtor.

5.    I respectfully seek entry of an order (the "Recognition Order") recognizing the Japan Proceeding as a "foreign main proceeding" as defined in 11 U.S.C. §§ 1502(4) and 1517(b)(1) or, in the alternative, a "foreign nonmain proceeding" as defined in 11 U.S.C. §§ 1502(5) and 1517(b)(2). I also request that this Court grant me, as the bankruptcy trustee and foreign representative of the Debtor, (i) authority to conduct necessary discovery pursuant to 11 U.S.C. § 1521(a)(4) and (ii) entrustment of the administration and realization of all of the Debtor's assets within the territorial jurisdiction of the United States, pursuant to 11 U.S.C. § 1521(a)(5). Under the auspices of the Tokyo Court and with the ancillary assistance of this Court, the ultimate goals of the Japan Proceeding are to liquidate the assets of MtGox in a manner that maximizes the recoveries for all creditors, wherever located, and to determine the current claims that exist to those assets and to make distributions to creditors in accordance with applicable Japanese law. To effectuate this goal, I respectfully request that this Court grant the relief requested in the Amended Petition.

---

[3]    Any capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Amended Petition.

6.      I am advised by counsel that Chapter 15 recognition requires that a petition be brought by a "foreign representative" of a "foreign proceeding" as such terms are defined in, respectively, sections 101(24) and 101(23) of the Bankruptcy Code. I am further aware that in order to be recognized under Chapter 15 as a foreign main proceeding or a foreign nonmain proceeding, sufficient evidence must be shown that the foreign proceeding is either pending in the debtor's "center of main interests" ("COMI") or where the debtor has an "establishment," in each case as these requirements have been interpreted for purposes of Chapter 15 recognition.

7.      Part I of this declaration provides evidence regarding the corporate structure of the Debtor, its corporate governance, an overview of its historical business operations and dealings with customers, and the background leading to the commencement of the Japan Proceeding. Part II provides evidence regarding the Debtor's assets and liabilities and an overview of the claims and causes of action pending against the Debtor. Part III provides an explanation of the Debtor's need for recognition and the relief being requested. Part IV highlights the evidence in support of a determination that I am the Debtor's duly authorized foreign representative and that the Japan Proceeding is a foreign proceeding. Part V highlights the key evidence supporting a determination that the Debtor's COMI is in Japan.

I.      **BACKGROUND TO THE DEBTOR'S JAPAN PROCEEDING**

A.      **MtGox's Corporate Structure**

8.      On August 9, 2011, the Debtor was organized as a corporation under the laws of Japan for the purpose of constructing, developing and operating information technology systems and Internet websites. See MtGox's Corporate Registry, attached hereto as **Exhibit 2**. The Debtor's status as a corporation registered under Japanese law has never changed.

4

9.      The Debtor is a subsidiary of Tibanne Co., Ltd, a/k/a Tibanne KK ("Tibanne"), a Japanese corporation organized in 2009.  See Tibanne's Corporate Registry, attached hereto as **Exhibit 3**.  Tibanne holds an 88% equity interest (440 shares) in the Debtor.  As of the date of the Japan Petition, the remaining 12% equity interest (60 shares) in the Debtor was held by Jed McCaleb, who is believed to have started the Website (defined below) in 2010 and sold it to Tibanne in 2011.  See Agreement and Plan of Acquisition dated February 3, 2011, attached hereto as **Exhibit 4**.  Subsequently, the Debtor was responsible for operating the Website.

10.     Based on the Debtor's documents and my discussions with the relevant personnel of the Debtor, the Debtor also has two wholly-owned direct subsidiaries – MtGox North America Inc. ("MtGox NA") and MtGox Poland Inc. Sp. z o.o ("MtGox Poland") – and one wholly-owned indirect subsidiary – MtGox Inc., a direct subsidiary of MtGox NA.  A copy of the Debtor's corporate organization chart is attached hereto as **Exhibit 5**.

11.     Based upon the Debtor's books and records, MtGox NA is a New York corporation organized on August 26, 2011.  It is my understanding and belief that MtGox NA was initially established as a joint venture with a provider of internet-related business services based in the state of Indiana, which joint venture developed MtGox's business by managing the marketing and sales of MtGox's business in the United States.[4]  The relevant joint venture agreement was governed by the laws of both Japan and the state of Indiana.  Based upon my discussions with relevant MtGox personnel, it is my understanding and belief that MtGox NA opened a U.S. bank account at JP Morgan Chase Bank in 2011 and only accepted money from U.S. customers for one month, but since then has not conducted any other business activities.

---

[4]     The joint venture agreement, as well as certain other agreements referenced herein (including the Outsourcing Agreements (defined below)), are subject to non-disclosure and confidentiality provisions.  As to those agreements, I will provide herein general references to the subject matter and governing law, which I understand is the information that may, in certain circumstances, be relevant for purposes of Chapter 15 recognition.

12.     Based upon the Debtor's books and records, MtGox Inc. is a Delaware corporation organized on June 11, 2013. It is my understanding and belief that MtGox Inc. was established for the purpose of registering with the U.S. Financial Crimes Enforcement Network ("FinCEN") as a money transmitter and obtaining necessary state licenses for money transmission. According to the FinCEN registration website, MtGox Inc. received its money services business license from FinCEN on June 27, 2013 but, based on my discussions with the Debtor's relevant personnel, has not yet obtained any state money transmission licenses and has never conducted any business activities.

13.     Based upon the Debtor's books and records, it is my understanding and belief that MtGox Poland is a Polish corporation organized on November 8, 2011. It is my further understanding and belief that MtGox Poland was established in order to own bank accounts for MtGox customers in Europe, and that the only assets of MtGox Poland were those bank accounts. As of the date of this Declaration, substantially all of the funds held in accounts owned by MtGox Poland have been transferred to an account in Japan managed by me, in my capacity as the Debtor's bankruptcy trustee.

**B.     The Debtor's Head Office and Corporate Governance**

14.     The Debtor's registered office and corporate headquarters (the "Head Office") is located at 2-11-5, Shibuya, Shibuya-ku, Tokyo, Japan, and has been at this location since September 2, 2013.[5] See MtGox Corporate Registry, attached hereto as **Exhibit 2**. The Debtor subleases this office space from Tibanne. See Japan Petition (defined below) § 2, ¶ 3, attached

---

[5]     According to the Debtor's Corporate Registry, the Debtor's Head Office has been located at 2-11-5 Shibuya, Shibuya-ku, Tokyo, Japan since September 2, 2013. Although it is not reflected in the Debtor's Corporate Registry, it is my understanding and belief based upon of the relevant agreement that the Debtor's Head Office was temporarily moved back to the Cerulean Tower (defined below) in February 2014. However, this plan was not completed and the Debtor returned to its current location after only one week at the Cerulean Tower.

hereto as **Exhibit 6**. Since the Debtor's inception, the Debtor's Head Office has been located at two other addresses in Tokyo, Japan.[6] See id. Tibanne's registered office has always coincided with the Debtor's Head Office, and is currently located at the Debtor's Head Office. See Tibanne Corporate Registry, attached hereto as **Exhibit 3**. The Debtor does not have any offices or places of business other than the Head Office.

15.     At all times, the Debtor has maintained its statutory books and records at its Head Office in Japan. The Debtor does not have a registered agent, as such agents are not provided for under applicable Japanese corporate laws.

16.     The Debtor's founder, sole director and representative director is, and has always been, Robert Marie Mark Karpeles. See MtGox Corporate Registry, attached hereto as **Exhibit 2**. Mr. Karpeles is also the sole director and representative director of Tibanne. Since the Debtor's inception, Mr. Karpeles has lived at three different addresses, all of which are in Japan.[7] Mr. Karpeles's current address is located at 3-6-28-302 Aobadai, Meguro-ku, Tokyo, Japan. See id. From its inception, the Debtor has been structured as a corporation with a sole director and representative director and has never had a board of directors. As such, there were no board meetings or board communications and all corporate decisions emanated from Mr. Karpeles, in his capacity as the Debtor's sole director and representative director. Under Japanese corporate law, where, as is the case here, a Japanese corporation has only one director and no board of directors, the sole director and representative director of the corporation has the power and

---

[6]     According to the Debtor's Corporate Registry, the Debtor's Head Office was initially located at Cerulean Tower 15F, 26-1 Sakuragaoka-cho, Shibuya-ku, Tokyo, Japan (the "Cerulean Tower") from the date of its establishment to June 24, 2012. From June 25, 2012 through September 1, 2013, the Debtor's Head Office was located at Round-Cross 5F, 2-11-6 Shibuya, Shibuya-ku, Tokyo, Japan.

[7]     According to the Debtor's Corporate Registry, Mr. Karpeles' address was located at 5-24-30 Kugayama, Suginami-ku, Tokyo, Japan from the date of the Debtor's establishment to October 9, 2011. From October 10, 2011 through January 18, 2014, Mr. Karpeles' address was located at Akatsutsumi Terrace House C1, 5-28-8, Akatsutsumi, Setagaya-ku, Tokyo, Japan. Since January 19, 2014, Mr. Karpeles' address has been located at 3-6-28-302 Aobadai, Meguro-ku, Tokyo, Japan.

authority with respect to any matter in relation to the business of the corporation, except such matters that require shareholder approval.

17. The Debtor's financial statements were prepared (but not audited) by Aoyama & Partners ("A&P"), a Japan-based accounting firm, pursuant to an Advisor Agreement dated February 16, 2010, which agreement is governed by Japanese law. Under the Corporate Act of Japan, the Debtor is not legally obligated to have financial statements audited by a third party.

**C.   Employees**

18. The Debtor does not have, and has never had, any direct employees. Instead, the Debtor's workforce is supplied by the Debtor's parent, Tibanne, through a certain services agreement between the Debtor and Tibanne, dated April 1, 2013 (the "Services Agreement"). A copy of the Services Agreement is attached hereto as **Exhibit 7**. As of the date of commencement of the Japan Proceeding, the Debtor utilized approximately 29 Tibanne employees to perform work on behalf of the Debtor pursuant to the Services Agreement. Those Tibanne employees provided operational services to the Debtor, including: (i) customer support; (ii) business development and marketing; (iii) implementation of anti-money laundering procedures; (iv) website development; (v) monitoring of bitcoin and fiat currency transfers; and (vi) various administrative services, including secretarial, financial, accounting, legal and human resource services. However, since the commencement of the Japan Proceeding, the number of employees working for the Debtor has significantly decreased. Based upon my discussions with the Debtor's relevant personnel, it is my understanding and belief that all of the Tibanne employees that have ever worked for the Debtor performed their work in Japan.

19. In addition, the Debtor has hired independent contractors to provide certain customer support services pursuant to two outsourcing and service agreements (the "Outsourcing

Agreements"). Based upon my review of the Outsourcing Agreements and my discussions with the Debtor's relevant personnel, the Outsourcing Agreements consist of: (i) an agreement with a U.K.-based firm that is governed by Japanese law, pursuant to which two individuals perform work for the Debtor in the United Kingdom; and (ii) an agreement with an India-based firm that is governed by Indian law, pursuant to which approximately 30-40 individuals perform work for the Debtor in India.[8] Additionally, it is my understanding and belief that the Debtor has also utilized the services of an individual who works as an independent contractor in Peru.

**D.    Other Contracts**

20.    In addition to the Services Agreement and the Outsourcing Agreements, other contracts of the Debtor relating to its business include:

- An agreement for "anti-money laundering" services with an England-based company, which agreement is governed by the law of England; and

- An agreement with a Canada-based company for services relating to the design and development of a marketing website, which agreement is governed by the law of the Province of Ontario, Canada.

**E.    The Debtor's Business Operations Prior to the Shutdown of Its Exchange**

21.    The Debtor's main business is the operation of an online exchange (the "MtGox Exchange") for the purchase and sale of bitcoin through the Debtor's website with the domain name http://www.mtgox.com (the "Website"). It is my understanding and belief that the software and Website used to operate the MtGox Exchange were first developed in 2010 by Jed McCaleb, who sold the software, Website domain name rights, and then-existing customer accounts to Tibanne on February 3, 2011. See Agreement and Plan of Acquisition. Based on the

---

[8]    The contracts referenced herein are subject to certain non-disclosure and confidentiality provisions. To the extent that this Court finds it necessary to review these contracts, we can submit them to the Court under seal.

Debtor's records and documents, it is my understanding and belief that Tibanne thereafter granted MtGox the right to operate the MtGox Exchange.

22.    Based upon available public information, it is my understanding and belief that at one time MtGox was reported to be the largest online bitcoin exchange in the world, handling over 80% of all bitcoin trade worldwide, but that is no longer the case.

23.    It is my understanding that bitcoin is a form of digital currency that reportedly was first conceived of in 2008 by a person or group going by the name of Satoshi Nakamoto. Reportedly, the first actual bitcoin was created or "mined" in 2009. I understand there are several ways in which a person can obtain bitcoin, including the following:

- Bitcoins are "created" through a computer software algorithm which, at any point in time, resides on thousands of computers on the Internet. Persons who certify bitcoin transactions over the bitcoin peer-to-peer network are remunerated by the issuance of a fixed number of bitcoins which evolves over time. The certification is done by the solving of an "algorithm" with the use of ever-more powerful computers. These persons are called "miners" and the process of obtaining bitcoin in this fashion is called "mining."

- A person can also obtain bitcoins that have already been mined by buying them from another. These transactions can consist of "one-to-one" transactions between a buyer and seller. In addition, a person can buy or sell bitcoin through an online exchange, such as the MtGox Exchange operated by MtGox on the mtgox.com website. In these exchange transactions, the buyer and seller create accounts at the exchange and then fund the account with currency funds, bitcoin or both. The user can then enter a buy or sell order online and the website will match the buy or sell order with one or more sell or buy orders. The buyer receives an increase in bitcoin in his/her account and the seller receives an increase in currency in his/her account. The bitcoin exchange receives a fee or commission for the transaction.

- A person can also obtain and use bitcoin through commercial or merchant transactions; that is, a person can use bitcoin in certain circumstances to pay for goods and services.

24.    According to a customer list provided to me by the Debtor, the Debtor has approximately 120,000 customers who had a balance in their bitcoin or fiat currency account as of the date of the Japan Petition, and those customers reside in approximately 175 countries

around the world. As of the date of this Declaration, I currently have information on the location of approximately 80,000 customers. Of that amount, I have determined that approximately 30,701 customers are located in the United States, approximately 6,103 are located in the United Kingdom, approximately 5,921 are located in Germany, approximately 2,458 are located in Canada, approximately 2,416 are located in France, approximately 2,284 are located in China, and approximately 1,095 are located in Japan.

25. The MtGox exchange allowed persons with MtGox accounts to buy and sell bitcoin among themselves. It is my understanding and belief that using the MtGox Exchange generally consisted of a five-step process: (i) opening an account; (ii) verifying the account; (iii) adding funds to the account; (iv) buying and selling bitcoins; and (v) withdrawing funds.[9] To open and use a MtGox account, a prospective customer would fill out an application on the Website. Based upon my discussions with the Debtor's relevant personnel, it is my understanding and belief that after completing the application, the Website would display standard terms and conditions for use of the MtGox Exchange and the customer would need to click a button indicating that he or she agreed to those terms and conditions before creating an account. Once the account was created, the customer was assigned an account number. When a customer wanted to start buying or selling bitcoin on the MtGox Exchange, he or she would need to fund the account by depositing currency, bitcoin, or both into the account. The Website's "General Information" page (the "General Information Page")[10] answered frequently asked

---

[9] Copies of the Website screenshots describing each step are attached hereto as **Exhibit 8**, as they appeared on February 21, 2014 and were obtained through the website archiving service known as "Wayback Machine" located at http://www.archive.org.

[10] A copy of the General Questions Page is attached hereto as **Exhibit 9**, as it appeared on May 1, 2013 and was obtained through the website archiving service known as "Wayback Machine" located at http://www.archive.org.

11

questions regarding setting up a MtGox account and identified the Debtor as a company based in Japan.

26. It is my understanding and belief that the MtGox Exchange permitted customers to choose into what kind of account they wanted to transfer their funds, including accounts with payment transfer companies or traditional consumer banks. Once the account was "funded," the account holder would have a "currency balance" in the account, corresponding to the amount of currency he or she had a right to withdraw; and, a "bitcoin balance" in the account, corresponding to the amount of bitcoin he or she had a right to withdraw. Each customer could view his or her account statement on the Website, and it is my understanding and belief, based upon my discussions with the Debtor's relevant personnel, that the Debtor did not deliver paper-based account statements to its customers.

27. In addition, the account holder would be subject to certain "anti-money laundering" ("AML") procedures. Based upon previous iterations of the Website, the Debtor's AML procedures generally required the verification of customer accounts through the customer's submission of identification documents. The Website's "AML Account Statuses" page (the "AML Page") setting forth the AML verification requirements instructed customers wishing to upgrade their accounts to a "premium account" to mail their identification documents to the Tokyo address of the Debtor's Head Office.[11]

28. According to the General Questions Page, customers were directed to contact the Debtor for user support issues through the Website at its "Contact Us" page located at http://mtgox.com/contact-us. The General Questions Page also stated that there may be delays in the response time to some user support inquiries because the Debtor is based in Japan.

_____

[11] A copy of the AML Page is attached hereto as **Exhibit 10**, as it appeared on February 21, 2014 and obtained through the website archiving service known as "Wayback Machine" located at http://www.archive.org.

F.    **Trade Creditors**

29.    Based upon the discussions with the Debtor's appropriate personnel, the Debtor has at least 10 trade creditors, who are owed money for providing goods or services to the Debtor prior to the filing of the Japan Petition. Of these trade creditors, approximately five have offices located in Japan. The remaining trade creditors are located in various jurisdictions, including the United States, the United Kingdom, Poland and India.

G.    **Communications with Customers, Creditors and Other Parties**

30.    Based upon my discussions with the Debtor's relevant personnel and my review of the Debtor's records, the Debtor historically communicated with its customers through electronic means, usually either by e-mail or through the Website. Furthermore, it is my understanding that the Debtor would send various notices to its customers to provide updates related to its services, such as new options for depositing funds in their MtGox account. These notices were generally sent to each customer via e-mail and posted to the Website, but it is my understanding and belief that such notices were not delivered by postal mail, telephone or facsimile.

31.    Prior to the shutdown of the MtGox Exchange in February 2014, the Website clearly communicated to customers and other parties that the Debtor is a Japanese company that is located in Japan. For example, the Website's "Terms of Use" page (the "Terms of Use Page") referred to the Debtor as "a company incorporated under the laws of Japan" and disclosed the address of its Head Office in Tokyo, Japan.[12] Similarly, the Website's "Privacy Policy" page (the "Privacy Policy Page") also noted the Tokyo address of the Debtor's Head Office along with

---

[12]    A copy of the Terms of Use Page is attached hereto as **Exhibit 11**, as it appeared on February 15, 2014 and obtained through the website archiving service known as "Wayback Machine" located at http://www.archive.org.

the Debtor's Tokyo phone number.[13] In addition, the Website's "About Us" page (the "About Us Page") contained a link to the Debtor's official registration at the Tokyo Chamber of Commerce.[14]

32.     Following the shutdown of the MtGox Exchange and filing of the Japan Petition, as described in more detail below, the Debtor continued to use the Website to communicate with customers, creditors and other parties.  On February 28, 2014, the Debtor posted a notice regarding the Debtor's application for commencement of a civil rehabilitation proceeding (the "Civil Rehabilitation Notice").  The Civil Rehabilitation Notice provided the address of the Debtor's Head Office, announced the establishment of a call center (the "Call Center") with a Tokyo telephone number and hours of operation from 10 a.m. to 5 p.m. (Japan time), and urged all creditors to direct their inquiries to the Call Center.  On March 26, 2014, the Debtor posted a notice regarding consultations with local investigating authorities on the disappearance of bitcoins (the "Disappearance Notice").  On March 28, 2014, the Debtor posted a notice regarding the extension of the deadline to submit the examiner's report (the "Examiner's Report Notice"). On April 16, 2014, the Debtor posted a notice regarding dismissal of the Japan Civil Rehabilitation (defined below) (the "Debtor's Dismissal Notice").  Each of the Disappearance Notice, Examiner's Report Notice and Dismissal Notice set forth the address of the Debtor's Head Office in Tokyo, Japan.[15]

---

[13]   A copy of the Privacy Policy Page is attached hereto as **Exhibit 12**, as it appeared on February 15, 2014 and obtained through the website archiving service known as "Wayback Machine" located at http://www.archive.org.

[14]   A copy of the About Us Page is attached hereto as **Exhibit 13**, as it appeared on April 25, 2013 and obtained through the website archiving service known as "Wayback Machine" located at http://www.archive.org.

[15]   A copy of each of the Disappearance Notice, Examiner's Report Notice and Debtor's Dismissal Notice are attached hereto as **Exhibits 14, 15 and 16**, respectively.

33. Upon my appointments as the Debtor's provisional administrator and then as the Debtor's bankruptcy trustee, as described in more detail below, I continued the Debtor's prior practice of communicating to customers, creditors and other parties through the Website. On April 16, 2014, I posted a notice of the Tokyo Court's order dismissing the Japan Civil Rehabilitation and provided answers to frequently asked questions regarding the status of the Debtor's insolvency proceedings in Japan (the "FAQ Notice").[16] In the FAQ Notice, I stated that additional information regarding the Debtor's Japan Proceeding would be posted to the Website and that interested parties should direct their inquiries to the Call Center, which remained at the Tokyo telephone number with operating hours between 10 a.m. and 5 p.m. (Japan time). On April 24, 2014, I posted a notice that the Japan Proceeding had commenced in the Tokyo Court and provided answers to additional frequently asked questions regarding the Japan Proceeding (the "Japan Proceeding Notice").[17] In the Japan Proceeding Notice, I reiterated that interested parties should direct their inquiries to the Call Center, which remained at the Tokyo telephone number with operating hours between 10 a.m. and 5 p.m. (Japan time). Also on April 24, 2014, I posted to the Website a copy of the Bankruptcy Order (defined below) that, among other things, identified my location, as bankruptcy trustee, as being at the location of the Debtor's Head Office in Tokyo, Japan.

34. Additionally, the Debtor's Articles of Incorporation state that the Debtor shall provide "public notice"[18] by publication in the Official Gazette, an official Japanese government

---

[16] A copy of the FAQ Notice is attached hereto as **Exhibit 17**.

[17] A copy of the Japan Proceeding Notice is attached hereto as **Exhibit 18**.

[18] Under applicable Japanese corporate law, certain matters need to be disclosed through a "public notice" as provided in a company's articles of incorporation – in the Debtor's case, the Official Gazette. Generally, these matters include notices of a merger, corporate split and decrease in capital, among other things.

newsletter that provides information related to governmental and corporate actions. See MtGox Articles of Incorporation, Art. 4, attached hereto as **Exhibit 19**.

### H.    The Debtor's Business Challenges

35.    Since the Debtor began operation of the MtGox Exchange several years ago, it is my understanding, based upon discussions with the Debtor's relevant personnel, that the Website has been subject to numerous attempts to breach its security, create denial of service situations, or to otherwise "hack" the system. In certain circumstances such attempts have led to the Debtor shutting down the Website for periods at a time.

36.    According to the Japan Petition (defined below), on or about February 10, 2014, MtGox halted all bitcoin withdrawals by its customers after MtGox was subject to a massive theft or disappearance of bitcoins held by MtGox both on behalf of its customers and itself.

37.    Also according to the Japan Petition, MtGox suspended all trading on February 24, 2014 after internal investigations discovered a loss of approximately 850,000 bitcoins. After filing the Japan Petition, the Debtor conducted an investigation into the bitcoin theft and in the process rescanned certain old-format wallets which were used prior to June 2011. See Announcement Regarding Found Bitcoins, dated March 20, 2014, attached hereto as **Exhibit 20**. On March 7, 2014, the Debtor confirmed that one of these old-format wallets held approximately 200,000 bitcoins and reported the finding to the Tokyo Court and me on March 10, 2014. See id. Taking into account the 200,000 bitcoins that were found, the total number of bitcoins that have disappeared is now estimated to be approximately 650,000. It is my understanding and belief that this loss of bitcoins caused, among other things, MtGox to become insolvent and ultimately led to the Japan Proceeding.

**I.    Events Leading to MtGox's Japan Proceeding**

38.    On February 28, 2014, the Debtor, through its prior foreign representative, Mr. Karpeles, filed a petition (the "Japan Petition") for the commencement of a civil rehabilitation proceeding (the "Japan Civil Rehabilitation") in the Tokyo Court pursuant to Article 21(1) of the JCRA, reporting that the Debtor had lost almost 850,000 bitcoins. The Japan Petition is attached hereto as **Exhibit 6**.

39.    The JCRA is intended to streamline proceedings for the rehabilitation and reorganization. The JCRA defines its purpose as:

> [B]y formulating, for debtors in financial difficulties, rehabilitation plans as consented to by a number of their creditors and confirmed by the court, to appropriately coordinate the relationships of rights under civil law between such debtors and creditors, with the aim of ensuring the rehabilitation of the debtors' business or economic life.

See JCRA, Art. 1. As such, the Japan Civil Rehabilitation was commenced with the purpose to formulate a rehabilitation plan as consented to by a requisite number of creditors and confirmed by the court, to appropriately coordinate the relationships of rights between creditors and the debtor, with the aim of ensuring rehabilitation of the Debtor's business or economic life.

40.    In addition to the Japan Petition, the Debtor contemporaneously filed applications for a temporary restraining order and a comprehensive prohibition order, which the Tokyo Court granted by separate orders dated February 28, 2014 (the "Additional Relief Orders"). Also on February 28, 2014, the Tokyo Court entered two separate orders (the "Supervisor and Examiner Orders") appointing me as the Debtor's supervisor and examiner. Under the Additional Relief Orders, the Debtor was not permitted, among other things, to dispose of its assets, excluding transactions in the ordinary course of business. Further, under the Supervisor and Examiner Orders, the Debtor was not permitted, among other things, to dispose of its assets, excluding

transactions in the ordinary course of business, without my consent as the supervisor and examiner. On March 9, 2014 (March 10, 2014 in Japan), pursuant to the powers conferred upon me by the Supervisor and Examiner Orders, I issued a consent allowing the Debtor to hire Baker & McKenzie LLP to file a Chapter 15 petition for recognition of the Japan Civil Rehabilitation in the United States. That same day, the Tokyo Court approved the Debtor's retention of Baker & McKenzie LLP in order to commence this Chapter 15 case.

41.    On March 9, 2014 (the "Chapter 15 Petition Date"), the Debtor, through its then foreign representative, Mr. Mark Marie Robert Karpeles, commenced this Chapter 15 case by filing a petition in this Court for recognition of the Japan Civil Rehabilitation as a foreign main proceeding and for related relief under Chapter 15.

42.    Since the filing of the Japan Petition, the Debtor commenced an investigation with regard to the circumstances that led to the Japan Civil Rehabilitation. However, in mid-April 2014, the Debtor filed a notice (*joshin-sho*) with the Tokyo Court stating that the investigation would take a long period of time, that there was no specific plan to restart the Debtor's business, and that partly due to the status of the investigation, the process for seeking a buyer in relation to a sale of the Debtor's assets had not commenced, and therefore the Debtor would be unable to prepare a rehabilitation plan. On April 16, 2014, in my capacity as supervisor and examiner, I submitted my own notice (*joshin-sho*) in response to the Debtor's notice, stating that the Debtor's statements were not unreasonable, and that in my opinion it would not be appropriate to grant an order commencing the Japan Civil Rehabilitation. After the Tokyo Court received my notice, the Tokyo Court decided to dismiss the Japan Petition pursuant to Article 25(3) of the JCRA, recognizing that under the circumstances it would be very difficult for the Debtor to

successfully prepare and approve a rehabilitation plan or otherwise successfully carry out the Japan Civil Rehabilitation.

43.     Under Article 251(1) of the JCRA, a Japanese court may, by its own authority, grant a provisional administration order when the Japanese court enters an order to dismiss an application for commencement of a civil rehabilitation proceeding.   Additionally, when a Japanese court's order dismissing an application for commencement of a civil rehabilitation becomes final and binding, the court may, by its own authority, decide to commence a bankruptcy procedure against the debtor under the Bankruptcy Act pursuant to Article 250(1) of the JCRA.

44.     As a result, by separate orders dated April 16, 2014, the Tokyo Court entered judgments placing the Debtor in a provisional administration by: (a) dismissing the Japan Petition; (b) appointing me as the Debtor's provisional administrator; (c) prohibiting certain actions by creditors with regard to properties of the Debtor during the interim period following the dismissal and prior to the commencement of a bankruptcy procedure for the Debtor; and (d) prohibiting me, in my capacity as the provisional administrator, from undertaking certain actions with respect to the Debtor's debt, properties and claims.

45.     Subsequently, on April 24, 2014, the Tokyo Court entered an order formally commencing the Debtor's Japan Proceeding and appointing me as bankruptcy trustee (the "Bankruptcy Order").  A certified copy of the Bankruptcy Order along with its certified English translation is attached to the Amended Petition as Exhibit A.

46.     As set forth in Article 1 of the Bankruptcy Act, the purpose of a Japanese bankruptcy procedure under the Bankruptcy Act is to appropriately coordinate the interests of creditors and other interested persons with the aim of ensuring a proper and fair liquidation of the

debtor's property. Furthermore, pursuant to Article 31(1) of the Bankruptcy Act, a bankruptcy trustee is appointed at the same time as the decision to commence a bankruptcy procedure. Pursuant to Article 75 of the Bankruptcy Act, the bankruptcy trustee is under the supervision of the Japanese court. Additionally, Article 78(1) of the Bankruptcy Act provides that the right to administer and dispose of the property of the bankruptcy estate is vested solely in the bankruptcy trustee. Under Article 34(1) of the Bankruptcy Act, the bankruptcy estate encompasses all property held by the debtor at the time of commencement of the bankruptcy procedure, whether located inside or outside of Japan. In addition to the appointment of a bankruptcy trustee, Article 44(1) of the Bankruptcy Act provides that any pending lawsuits relating to the bankruptcy estate in which the debtor is a party are immediately stayed. Article 194(2) of the Bankruptcy Act provides that, distribution with regard to bankruptcy claims will be made on a *pro rata* basis in proportion to the amount of the respective claims. English translations of the Articles of the Bankruptcy Act referenced above are attached hereto as **Exhibit 1**.

47.     In order to fully carry out my duties as the Debtor's bankruptcy trustee, I am assisted by other attorneys at the NO&T Tokyo office, and certain of those attorneys have been appointed as deputy trustees.

## II.     THE DEBTOR'S ASSETS, LIABILITIES AND LITIGATION

48.     Due to the disruption in the affairs of the Debtor following the theft or disappearance of hundreds of thousands of bitcoins on the MtGox Exchange and notwithstanding my diligent (but preliminary) investigation efforts as bankruptcy trustee of the Debtor, a fully comprehensive and accurate description of the Debtor's assets and liabilities is not yet available. I am in the process of conducting an examination into the Debtor's books and records that are accessible to me and have met with relevant parties to obtain information, including the Debtor's

sole director and representative director, Mr. Karpeles, and related counsel who performed services for the Debtor in Japan. A summary of the present status of the assets and liabilities of the Debtor based on such information as is currently available is set forth below.

### A.     The Debtors Assets and Liabilities

49.     The Debtor reported to have approximately ¥6.5 billion ($63.9 million) in liabilities and approximately ¥3.8 billion ($37.7 million) of assets when it filed the Japan Petition. Subsequently, approximately 200,000 bitcoins were discovered in an old-format wallet. As bankruptcy trustee, I now have exclusive control over those bitcoins. I am currently leading an investigation into the precise amount of the Debtor's assets and liabilities, so these numbers are not yet final and subject to revision.

50.     MtGox has no secured debt.

51.     As of February 20, 2014, prior to filing the Japan Petition, the Debtor maintained 43 accounts at 14 different banks and payment service providers holding funds in various currencies in the total amount of approximately ¥502,705,438 or $4,912,754.[19] Of the Debtor's 43 bank accounts, 39 are located in Japan. In addition, based upon my discussions with the relevant personnel of the Debtor, it is my understanding and belief that (i) currently the Debtor's primary bank for its business operations is Japan Net Bank, Limited, which is located in Japan; and (ii) previously the Debtor's primary banks were Sumitomo Mitsui Banking Corporation and Mizuho Bank, which are also located in Japan. The Debtor's other accounts are located in the Caribbean, Europe and Australia.

---

[19]     In order to simplify reporting in this Declaration, all currencies are translated into Japanese Yen ("JPY") and then into United States Dollars ("USD") using the conversion rate as of February 20, 2014 at 1 USD = 102.3266 JPY.

52.    Since being appointed as the Debtor's bankruptcy trustee, I have made efforts to consolidate the Debtor's worldwide funds in Japan. As part of those efforts, I have opened up a bankruptcy trustee account with Tokyo-Mitsubishi UFJ bank in Tokyo (the "Trustee Account"). As of the date of this Declaration, the Trustee Account holds funds in the aggregate amount of approximately ¥764,985,789 or $7,550,913.    The funds in the Trustee Account include substantially all of the funds formerly held by the Debtor's subsidiary MtGox Poland in the aggregate amount of approximately $5 million, which funds I have repatriated to Japan.

53.    On or about May 14, 2013, the United States Department of Homeland Security ("DHS") seized approximately $5 million of cash held in the U.S. bank accounts of Mutum Sigillum LLC ("Mutum"). Based upon my discussions with relevant personnel of the Debtor, it is my understanding and belief that Mutum is not a parent or subsidiary of the Debtor. Instead, it is a company wholly owned by Mr. Karpeles for his personal business. It is my understanding that Mutum had U.S. accounts with Wells Fargo Bank and Dwolla, a payment service provider located in the United States. In order to facilitate trades on the MtGox Exchange, it is my understanding that Mutum funded its Dwolla account from its Wells Fargo account and, after a trade had been made, funds would be transferred from Mutum's Dwolla account to its Wells Fargo account. Based on my discussions with relevant personnel of the Debtor, (i) the funds in Mutum's Dwolla account are all MtGox funds, and (ii) it is unclear whether the funds in Mutum's Wells Fargo account were all MtGox funds, so some or all of those funds may belong to the Debtor. As the Debtor's bankruptcy trustee and foreign representative, I am considering my options for seeking to have these funds returned to the Debtor's bankruptcy estate for distribution to creditors.

54.     In addition to its cash and bitcoin assets, the Debtor owned, as of the date of the filing of the Japan Petition, the following tangible assets: (i) computer servers that were purchased from Dell and Violin Memory Inc.; (ii) laptop computers; and (iii) "one-time-purchase" or OTP cards and Yubikeys, which are used to keep user passwords secure. All of these assets are located in Japan.

55.     Other than the servers and laptops mentioned above, it is my understanding, based upon my review of the Debtor's books and records, that the Debtor does not own the computer systems or servers that are used in its business. Pursuant to the Services Agreement, Tibanne provided the Debtor with the servers and computer systems for the operation of the MtGox Exchange. It is my further understanding, based upon my consultation with the Debtor's former counsel at Baker & McKenzie LLP, that (i) the Tibanne-owned servers that were used to operate the MtGox Exchange were located in Japan; (ii) Tibanne also leased certain other servers for backup purposes and to assist in transferring bitcoin to and from the Website; (iii) these other servers were, as of the Chapter 15 Petition Date, located in: Dallas, Texas; St. Louis, Missouri; the United Kingdom; France; and Germany; and (iv) other server-related services were provided by Amazon (EC2) in Japan, Singapore, California and Oregon.

**B.      The U.S. Litigation Matters**

56.     MtGox has been named as a defendant in two pending lawsuits in the United States: (i) CoinLab, Inc. v. Mt.Gox KK, et al., Case No. 13-0777 (MJP) (W.D. Wash. May 2, 2013) (the "CoinLab Action"); and (ii) Greene v. MtGox Inc., et al., Case No. 14-01437 (GF) (N.D. Ill. Feb. 27, 2014) (the "Class Action," and together with the CoinLab Action, the "U.S. Litigation Matters"). The facts set forth below regarding the U.S. Litigation Matters are based on information supplied to me by my U.S. counsel.

### 1.    *The CoinLab Action*

57.    The CoinLab Action was filed in the United States District Court for the Western District of Washington (the "Washington Court") by CoinLab, Inc. ("CoinLab"). I have been advised that the claims asserted by CoinLab arise out of that certain Executive License Agreement for the USA & Canada (the "CoinLab Agreement"), dated November 22, 2012 and entered into between CoinLab on the one hand, and MtGox and Tibanne on the other. Under the CoinLab Agreement, CoinLab was granted a license to use MtGox's technology to provide bitcoin exchange services for customers in the U.S. and Canada. As part of the CoinLab Agreement, which is governed by the law of the state of Washington, CoinLab agreed to operate the services in compliance with all applicable laws.

58.    I have been further advised that the facts disclosed and alleged in the Coinlab Action indicate that: (i) prior to final implementation of the CoinLab Agreement, it was determined that CoinLab was not properly registered or licensed to perform the services called for under the CoinLab Agreement; and (ii) as a result of such nonperformance by CoinLab, MtGox ceased its own performance under the CoinLab Agreement, which was never fully implemented in the first place.

59.    I have also been advised that CoinLab is suing MtGox and Tibanne for alleged breach of the CoinLab Agreement and breach of the implied duty of good faith and fair dealing. CoinLab is seeking damages of $75,000,000, which includes $50,000,000 arising from a liquidated damages clause in the CoinLab Agreement, as well as accounting and restitution. In addition, I have been advised that the Debtor has asserted a counterclaim against CoinLab seeking to recover $5.2 million relating to CoinLab's conversion of customer funds.

### 2. *The Class Action*

60.    On February 28, 2014, individuals by the names of Gregory Greene and Joseph Lack, each individually and on behalf of a putative class of others similarly situated (collectively, the "Class Action Plaintiffs"), filed the Class Action against the Debtor and certain of its affiliates and officers in the United States District Court for the Northern District of Illinois (the "Illinois Court"). I have been advised that the Class Action complaint, as amended, asserts 15 causes of action against the Debtor, including: (i) consumer fraud; (ii) fraud in the inducement; (iii) negligence; (iv) breach of fiduciary duty; (v) breach of contract; (vi) unjust enrichment; (vii) preliminary injunction; (viii) permanent injunction; (ix) trespass to chattels; (x) conversion; (xi) accounting; (xii) constructive trust; (xiii) civil conspiracy; (xiv) breach of express trust; and (xv) breach of the RICO Act.

### III.   THE NEED FOR RECOGNITION

61.    In light of, *inter alia*, the U.S. Litigation Matters, I believe that recognition of the Japan Proceeding as a "foreign main proceeding" will enhance and facilitate my ability to fulfill my duties as the Debtor's bankruptcy trustee to realize and distribute the assets of the Debtor in a fair and orderly manner, in accordance with Japanese insolvency laws. Specifically, foreign main recognition under Chapter 15 will advance my efforts by, among other things: (i) staying litigation against the Debtor in the United States pursuant to the automatic stay of section 362 of the Bankruptcy Code, as made applicable by section 1520(a)(1) of the Bankruptcy Code; (ii) providing protection of the assets and recoveries in the United States that I may realize for creditors; and (iii) providing a means to ensure that assets and recoveries in the United States will be distributed in an orderly and equitable manner through the Japan Proceeding in accordance with the Bankruptcy Act.

## IV. THE PETITIONER AND THE JAPAN PROCEEDING MEET THE REQUIREMENTS OF "FOREIGN REPRESENTATIVE" AND "FOREIGN PROCEEDING" UNDER THE BANKRUPTCY CODE

### A. The Petitioner is a "Foreign Representative" Within the Meaning of Section 101(24) of the Bankruptcy Code

62.    I am advised by counsel that "foreign representative" is defined in section 101(24) of the Bankruptcy Code to mean:

> a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

63.    It is my opinion that my role as the bankruptcy trustee satisfies the above definition of "foreign representative." As the Debtor's court-appointed bankruptcy trustee, I am duly authorized and empowered by the Tokyo Court under the Bankruptcy Order to administer the liquidation of the Debtors' assets and affairs as well as to act as the duly authorized representative of the Japan Proceeding.

### B. The Japan Proceeding is a "Foreign Proceeding" Within the Meaning of Section 101(23) of the Bankruptcy Code

64.    I am advised by counsel that "foreign proceeding" is defined in section 101(23) of the Bankruptcy Code to mean:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the Debtors are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

65.    It is my opinion that the Japan Proceeding satisfies the above definition of "foreign proceeding." The Japan Proceeding is a judicial proceeding under the supervision of the

Tokyo Court, in which the rights of creditors vis-à-vis the Debtor will be determined. The Japan Proceeding was commenced pursuant to the Bankruptcy Act, which is a Japanese law relating to insolvency and the winding up of companies. Furthermore, the assets and affairs of the Debtor are subject to my full control and supervision as the court-appointed bankruptcy trustee, and my actions on behalf of the Debtor are subject to the supervision of the Tokyo Court for the purpose of liquidating the Debtor.

## V.    THE DEBTOR'S COMI IS IN JAPAN

66.    I am advised by counsel that, to obtain recognition of the Japan Proceeding as a "foreign main proceeding" under section 1502(4) of the Bankruptcy Code, it must be shown that Japan is the "center of main interests," or COMI, of the Debtors.

67.    I am further advised that an entity's COMI is equivalent to its principal place of business or central place of administration that is ascertainable by third parties. The Debtor's principal place of business is, and always has been, in Japan, and creditors and other third parties have been made aware of that fact. In addition, the Debtor has no place of business outside of Japan. I respectfully suggest that the following facts, among others, demonstrate that the Debtor's COMI is in Japan:

   a.    The Debtor is and has always been organized under the laws of Japan, and its registered office is and always has been located in Japan.

   b.    The Debtor's Head Office is and always has been located in Japan.

   c.    The Debtor's sole director and representative director, Mr. Karpeles, resides, and at all relevant times has resided, in Japan.

   d.    The Debtor's only business premises are physically located in Japan. The Debtor does not own, lease or maintain a place of business outside of Japan.

   e.    Most of the Debtor's bank accounts are located in Japan, including the primary account for operating its business.

27

f.    The Debtor's books and records are located at its Head Office in Japan.

g.    The Debtor's parent company, Tibanne, provides operational and administrative services to the Debtor, including the provision of the Debtor's primary workforce, in Japan.

h.    The Debtor's Website clearly disclosed to customers and other third parties that the Debtor is a Japanese corporation that is located in Japan.

i.    The Debtor's Website directed customers to communicate with, and send verification documents to, the Debtor through a Tokyo address.

j.    The notices published on the Debtor's Website regarding the Japanese insolvency proceedings prominently identified the Debtor's Tokyo address and requested that inquiries regarding those proceedings be directed to a Call Center located in Tokyo with a Tokyo phone number, and which operates on Japan time.

k.    Upon the filing of the Japan Petition, the Debtor commenced an investigation in Japan with regard to the circumstances that led to the Japan Civil Rehabilitation, which investigation was subject to the oversight of the Tokyo Court.

68.    I am also advised by counsel that, to obtain recognition of the Japan Proceeding as a "foreign nonmain proceeding" under section 1502(5) of the Bankruptcy Code, it must be shown that such proceedings are pending in a country where the debtor has an "establishment." I am further advised that an "establishment" is any place of operations where the debtor carries out nontransitory economic activity.    In the event that the Court does not recognize the Japan Proceeding as a foreign main proceeding, I refer the Court to the facts set forth above as demonstrating that the Debtor carries out nontransitory economic activity, and therefore has an establishment, in Japan.

WHEREFORE, I respectfully request that this Court enter an Order, substantially in the form attached to the Amended Petition as **Exhibit E**, granting the relief requested and such other and further relief as may be just and proper, and

**WHEREFORE**, I declare under penalty of perjury under the laws of the United States of America that the foregoing is, to the best of my knowledge, information and belief, complete, true and correct.

Executed on this $\underline{23}$ of May, 2014
in Tokyo, Japan.

Nobuaki Kobayashi

## Exhibit List

**Exhibit 1** – Bankruptcy Act of Japan (English translation of cited Articles)

**Exhibit 2** – MtGox Corporate Registry

**Exhibit 3** – Tibanne Corporate Registry

**Exhibit 4** – Agreement of Plan and Acquisition between Tibanne and McCaleb

**Exhibit 5** – Corporate Organizational Chart of MtGox

**Exhibit 6** – Japan Petition with English translation

**Exhibit 7** – Services Agreement between MtGox and Tibanne with English translation

**Exhibit 8** – 5 Steps to Create and Use a MtGox Account

**Exhibit 9** – General Questions Page of the MtGox Website as of May 1, 2013.

**Exhibit 10** – AML Account Statuses Page of the MtGox Website as of February 21, 2014

**Exhibit 11** – Terms of Use Page of the MtGox Website as of February 15, 2014

**Exhibit 12** – Privacy Policy Page of the MtGox Website as of February 15, 2014

**Exhibit 13** – About Us Page of the MtGox Website as of April 25, 2013

**Exhibit 14** – Disappearance Notice dated March 26, 2014

**Exhibit 15** – Examiner's Report Notice dated March 28, 2014

**Exhibit 16** – Debtor's Dismissal Notice dated April 16, 2014

**Exhibit 17** – Announcement of Provisional Administration and FAQs dated April 16, 2014

**Exhibit 18** – Announcement of Japan Proceeding and FAQs dated April 24, 2014

**Exhibit 19** – MtGox Articles of Incorporation

**Exhibit 20** – Announcement of Found Bitcoin dated March 20, 2014

# EXHIBIT 1

**Bankruptcy Act of Japan**
**(Provisions Cited in the Kobayashi Declaration)**

## Article 1

The purpose of this Act is, by specifying the proceedings for liquidation of property held by debtors who are unable to pay debts or insolvent, etc., to appropriately coordinate the interests of creditors and other interested persons and the relationships of rights between debtors and creditors, with the aim of ensuring proper and fair liquidation of debtors' property, etc. and securing the opportunity for rehabilitation of their economic life.

## Article 25

(3)     Where a comprehensive prohibition order is issued, the procedure for compulsory execution, etc. already initiated against the debtor's property (limited to such procedure that is to be prohibited by the comprehensive prohibition order) shall be stayed until an order is made on the petition for commencement of bankruptcy proceedings.

## Article 31

(1)     The court, upon making an order of commencement of bankruptcy proceedings, shall appoint one or more bankruptcy trustees and specify the following matters:

(i)     The period during which proofs of bankruptcy claims should be filed;

(ii)     The date of a creditors meeting that is to be convoked to report the status of the debtor's property (referred to as a "meeting for reporting the status of property" in paragraph (4), Article 136(2) and (3) and Article 158)

(iii)     The period for conducting an investigation of bankruptcy claims (or the date for conducting an investigation of bankruptcy claims in the case referred to in Article 116(2))

## Article 34

(1)     Any and all property that the bankrupt holds at the time of commencement of bankruptcy proceedings (irrespective of whether or not it exists in Japan) shall constitute the bankruptcy estate.

## Article 44

(1)     When an order of commencement of bankruptcy proceedings is made, any action relating to the bankruptcy estate in which the bankrupt stands as a party shall be discontinued.

**Article 75**

(1)    A bankruptcy trustee shall be supervised by the court.

(2)    The court, upon the petition of an interested person or by its own authority, may dismiss a bankruptcy trustee if the bankruptcy trustee does not appropriately perform the administration and disposition of property that belongs to the bankruptcy estate, or there are any other material reasons. In this case, the court shall interrogate the bankruptcy trustee.

**Article 78**

(1)    Where an order of commencement of bankruptcy proceedings is made, the right to administer and dispose of property that belongs to the bankruptcy estate shall be vested exclusively in a bankruptcy trustee appointed by the court.

**Article 194**

(2)    With regard to bankruptcy claims eligible for a liquidating distribution with the same priority, a liquidating distribution shall be made in proportion to the amount of each claim.

# EXHIBIT 2



# 履歴事項全部証明書

東京都渋谷区渋谷二丁目１１番5号
株式会社ＭＴＧＯＸ
会社法人等番号　０１１０−０１−０７０３５６

|  |  |  |
|---|---|---|
|  | 株式会社ＭＴＧＯＸ |  |
|  | 東京都渋谷区桜丘町２６番１号セルリアンタワー１３階 |  |
|  | 東京都渋谷区渋谷二丁目１１番６号ラウンド | 平成２４年　６月　日 |
|  |  | 平成２４年７月１日 |
|  | 東京都渋谷区渋谷二丁目１１番６号ラウンドクロス渋谷５階 |  |
|  | 東京都渋谷区渋谷二丁目１１番5号 | 平成２５年　9月　2日移転 |
|  |  | 平成２５年１０月 |
|  | 官報に掲載してする。 |  |
|  | 平成２３年８月９日 |  |
|  | １　ＩＴ（情報技術）システムの構築及びコンサルティング<br>２　インターネットのウェブコンテンツの開発、製作及び<br>３　コンピューター及びサーバーの企画、開発、設計<br>４　インターネットサイトの運営及び管理<br>５　前各号に附帯する一切の事業 |  |
|  | 1万株 |  |
|  | 発行済株式の総数　500株 |  |
|  | 金500万円 |  |
|  | 当会社の株式を譲渡により取得するには、株主総会の承認を受けなければならない。 |  |
|  | 取締役　カルプレス・マルク・マリ・ロベート |  |

整理番号　　　　　　　　　　　　　　　　　　　　　　１／２



東京都渋谷区渋谷五丁目１１番５号
株式会社Ｍ
会社法人等番号　０１１０－０１－０７０３５６

| | | |
|---|---|---|
| 東京都杉並区久我山五丁目２４番３０号 代表取締役 | カルプレス・マルク・マリ・ロベート | |
| 東京都世田谷区赤堤五丁目２８番８号赤堤テラ ハウスＣ１ 代表取締役 | カルプレス・マルク・マリ ロベート | 平成２４年　２月　日登記 |
| 東京都目黒区青葉台三丁目６番２８－３３０号 代表取締役 | カルプレス・マルク・マリ ロベート | 平成２６年　１月１９日住所 変更 平成２６年　２月　３日登記 |
| 登記記録に関する事項 | 設立 | 平成２０年　８月　日登記 |

これは、登記簿に記録されている閉鎖されていない事項の全部であることを証明
した書面である。
（東京法務局渋谷出張所管轄）
平成２６年　２月２８日
東京法務局
登記官　　　　　　　　　　　　　　杉　浦　直　紀

整理番号

２／２

Certificate of All Historical Records

2-11-5 Shibuya, Shibuya-ku, Tokyo
MtGox Co., Ltd.
Corporate registration no.: 0110-01-070356

| Trade name | MtGox Co., Ltd. | |
|---|---|---|
| Head office | Cerulean Tower 15F, 26-1 Sakuragaoka-cho, Shibuya-ku, Tokyo | |
| | Round-Cross 5F, 2-11-6 Shibuya, ku, Tokyo | Moved June 25, 2012 |
| | | Registered July 4, 2012 |
| | Round-Cross Shibuya 5F, 2-11-6 Shibuya, Shibuya-ku, Tokyo | |
| | | Corrected August 30, 2012 |
| | 2-11-5 Shibuya, Shibuya-ku, Tokyo | Moved September 2, 2013 |
| | | Registered September 29, 2013 |
| Method of public notice | By publication in the Official Gazette | |
| Date of Incorporation | August 9, 2011 | |
| Purpose | 1. Construction of, and consulting regarding, IT (information technology) systems;<br>2. Development and production of, and consulting for, web content for the Internet;<br>3. Planning, development and design or computers and servers;<br>4. Operation and management of Internet sites; and<br>5. Businesses ancillary to the foregoing. | |
| Total number of authorized shares | 10,000 shares | |
| Total number of outstanding shares, classification and number | Total number of outstanding shares: 500 shares | |
| Amount of capital | JPY5 million | |
| Share transfer restrictions | Acquisition of shares of the Company through share transfer requires the approval of the general shareholders meeting | |
| Matters concerning | Director: Robert Marie Mark Karpeles | |

| officers | Representative Director: Robert Marie Mark Karpeles<br><br>5-24-30 Kugayama, Suginami-ku, Tokyo | |
| | Representative Director: Robert Marie Mark Karpeles<br><br>Akatsutsumi Terrace House C1, 5-28-8 Akatsutsumi, Setagaya-ku, Tokyo | Moved address October 10, 2011<br>Registered February 1, 2012 |
| | Representative Director: Robert Marie Mark Karpeles<br>3-6-28-3302 Aobadai, Meguro-ku, Tokyo | Moved address January 19, 2014<br>Registered February 3, 2014 |
| Matters concerning registered record | Incorporation: Registered on August 9, 2011 | |

This document certifies that the foregoing represents all matters recorded on the commercial register that have not been closed.
(Tokyo Legal Affairs Bureau, Shibuya Branch)
February 28, 2014

Tokyo Legal Affairs Bureau
Secretary: Naoki Sugiura [seal]

Control no.: A 346905
Underlined areas are deleted matters.

# EXHIBIT 3

Information as of 09:52, 2014/05/12

2-11-5 Shibuya, Shibuya-ku, Tokyo
TIBANNE Co., Ltd.
Corporate registration no.: 0110-01-069784

| Trade name | TIBANNE Co., Ltd. | |
|---|---|---|
| Head office | Cerulean Tower 15F, 26-1 Sakuragaoka-cho, Shibuya-ku, Tokyo | |
| | Round-Cross 5F, 2-11-6 Shibuya, Shibuya-ku, Tokyo | Moved June 25, 2012 |
| | | Registered July 4, 2012 |
| | Round-Cross Shibuya 5F, 2-11-6 Shibuya, Shibuya-ku, Tokyo | |
| | | Corrected August 30, 2012 |
| | 2-11-5 Shibuya, Shibuya-ku, Tokyo | Moved September 2, 2013 |
| | | Registered September 19, 2013 |
| Method of public notice | By publication in the Official Gazette | |
| Date of Incorporation | October 29, 2009 | |
| Purpose | 1. Construction of, and consulting regarding, IT (information technology) systems; 2. Development and production of, and consulting for, web content for the Internet; 3. Planning, development and design or computers and servers; 4. Planning, development and operation of the Internet, mobile telephone network and a variety of information and communication services that utilize other communication service; and 5. Businesses ancillary to the foregoing. | |
| Total number of | 40,000 shares | |

| | | | |
|---|---|---|---|
| authorized shares | | | |
| Total number of outstanding shares, classification and number | Total number of outstanding shares: 10,490 shares | | |
| Amount of capital | JPY5 million | | |
| Share transfer restrictions | Acquisition of shares of the Company through share transfer requires the approval of the Company | | |
| Matters concerning officers | Director: Robert Marie Mark Karpeles | | |
| | Representative Director: Robert Marie Mark Karpeles<br><br>5-24-30 Kugayama, Suginami-ku, Tokyo | | |
| | Representative Director: Robert Marie Mark Karpeles<br><br>Akatsutsumi Terrace House C1, 5-28-8 Akatsutsumi, Setagaya-ku, Tokyo | Moved address October 10, 2011 | |
| | | Registered February 1, 2012 | |
| | Representative Director: Robert Marie Mark Karpeles<br>3-6-28-3302 Aobadai, Meguro-ku, Tokyo | Moved address January 19, 2014 | |
| | | Registered February 3, 2014 | |
| Matters concerning registered record | The head office was moved from 5-24-30 Kugayama, Suginami-ku, Tokyo: Registered on June 23, 2011 | | |

Underlined areas are deleted matters.

# EXHIBIT 4

AGREEMENT AND PLAN OF ACQUISITION

This AGREEMENT AND PLAN OF ACQUISITION (this "Agreement"), dated as of February 3, 2011, is entered into by and among Jed McCaleb, address of 509 E Branch Rd Patterson NY, USA ("Seller"), and K.K. Tibanne a Japanese Company with offices at 24-30, Kugayama 5-Chome, Suginami-ku, Tokyo 168-0082, Japan ("Buyer").

DEFINITIONS

Defined Terms. As used herein, the terms below shall have the following meanings. Any of such terms, unless the context otherwise requires, may be used in the singular or plural, depending upon the reference.

"**Bitcoin**" means a virtual digital store of value as defined by bitcoin.org

"**Revenue**" means any income minus any expense accrued from purchasing bitcoins for the purpose of immediate resale.

"**MTGOX** " means the mtgox.com business. This includes the mtgox.com domain name, the source code and database for the website, all the assets and liabilities of the website, the sum of the deposits in currency and bitcoins held for users of the website, and anything else that would reasonably be considered part of the mtgox.com business.
This term also applies to any website or business that uses any part of the existing mtgox.com business. For example if the domain name is changed and the code re-written but the user accounts remain this new site will still be considered "MTGOX" for the purposes of this agreement.

 "**New Gox**" means a corporation or entity formed by the Buyer under conditions defined by this agreement, that is capable of issuing shares.

"**Current Net Funds**" means the sum of currency and bitcoin deposits held by MTGOX for users minus US $50,000 (fifty thousand United States dollars). These sums are calculated at the time the buyer starts to run the live mtgox.com database.

TERMS

Seller agrees to transfer MTGOX to the Buyer according to the transfer terms below.

The Seller represents being the sole owner of MTGOX and having the sole authority to sell MTGOX within the terms defined by this contract.

Buyer agrees to:

- To the best of its ability ensure that MTGOX is operated in compliance with any and all applicable laws of any country or territory it does business in.

- Form New Gox within six months or before MTGOX reaches US $140,000 (one hundred fourty thousand United States dollars) in revenue.

- New Gox will acquire all of MTGOX, and will not charge the Seller any transaction fees. The Seller shall own 12% of New Gox at its formation.

- Not charge Seller transaction fees on MTGOX or New Gox.

- Pay Seller an "**earn out**" for an "**earn out period**".
  The earn out is defined as 50% of the revenue generated by MTGOX or New Gox. The earn out is paid on a monthly basis due 7 (seven) days after the end of each month.
  The earn out period lasts for a minimum of the first 6 months after this agreement. If after 6 months the earn out is less than US $60,000 (sixty thousand United States dollars) the earn out will continue until it has reached US $60,000 (sixty thousand United States dollars) in total.

- Allow Seller read only access to the Database used by MTGOX for auditing purposes until the earn out period is over.

- Pay any fees associated with the execution of this agreement such as domain transfer.


TRANSFER

All the elements of MTGOX will be transferred to the Buyer within 15 (fifteen) days after this agreement has been signed, with the exception of the Current Net Funds held by MTGOX. These will be transferred according to the following schedule:

33% of Current Net Funds within 15 (fifteen) days.
50% of Current Net Funds within 45 (fourty five) days.
75% of Current Net Funds within 75 (seventy five) days.
100% of Current Net Funds within 105 (one hundred and five) days.

If for some reason the net funds available at a given time on MTGOX are not enough to answer the needs of the service users, the buyer may require the seller to release more funds earlier for the only purpose of avoiding any service interruption.

Seller retains no control of MTGOX or New Gox after mtgox.com is transferred to the Buyer.


NO REPRESENTATION

Seller makes no representation about the regulatory status of mtgox.com or bitcoins in the US or anywhere else in the world. The Seller is uncertain if mtgox.com is compliant or not with any applicable US code or statute, or law of any country.


INDEMNIFICATION

Buyer agrees to indemnify Seller against any legal action that is taken against Buyer or Seller with regards to mtgox.com or anything acquired under this agreement.


**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement or caused this Agreement to be duly executed on their respective behalf, by their respective officers thereunto duly authorized, all as of the day and year first above written.

SELLER:

By: _____

Name:   _____Jed McCaleb_____

Date: 2/3/2011



BUYER:

K.K. Tibanne

By: _____

Name:   _____ Mark Karpeles _____

Title: _____

Date: _____

Seller makes no representation about the regulatory status of mtgox.com or bitcoins in the US or anywhere else in the world. The Seller is uncertain if mtgox.com is compliant or not with any applicable US code or statute, or law of any country.


INDEMNIFICATION

Buyer agrees to indemnify Seller against any legal action that is taken against Buyer or Seller with regards to mtgox.com or anything acquired under this agreement.


**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement or caused this Agreement to be duly executed on their respective behalf, by their respective officers thereunto duly authorized, all as of the day and year first above written.

SELLER:

By: _____

Name: _____Jed McCaleb_____

Date: 2/3/2011




BUYER:

K.K. Tibanne

By: _____

Name: _____Mark Karpeles_____

Title: _____CEO_____

Date: Feb 3rd 2011

# EXHIBIT 5





# EXHIBIT 6



再生手続開始申立書

平成２６年２月２８日

東京地方裁判所民事第２０部　民事再生係　御中

〒150‐0002　東京都渋谷区渋谷二丁目１１番５号
　　　　　　　申立人株式会社ＭＴＧＯＸ

　　　　　上記代表者代表取締役　カルプレス・マルク・マリ・ロベート

〒106‐0032　東京都港区六本木１－９－１０
　　　　　　　アークヒルズ仙石山森タワー２８Ｆ（送達場所）
　　　　　　　ベーカー＆マッケンジー法律事務所（外国法共同事業）
　　　　　　　上記申立人代理人弁護士　　山　本　英　樹
　　　　　　　　　同　　　　　　　　　　末　冨　純　子
　　　　　　　電話：　０３－６２７１－９９００（代表）
　　　　　　　ＦＡＸ：０３－５５４９－７７３６

〒100‐0005　東京都千代田区丸の内２－３－２
　　　　　　　郵船ビルディング４階
　　　　　　　弁護士法人淀屋橋・山上合同
　　　　　　　上記申立人代理人弁護士　　四　宮　章　夫
　　　　　　　　　同　　　　　　　　　　川　井　一　将
　　　　　　　電話：　０３－６２６７－１２４１
　　　　　　　ＦＡＸ：０３－６２６７－１２１０

添付書類

１．資格証明書（疎明資料甲２と共通）
１．取締役会決定書
１．委任状

1

EXHIBIT A

申　立　の　趣　旨

申立人について，再生手続を開始する。
との決定を求める。

申　立　の　理　由

第1　再生手続開始の原因となる事実
　申立人（債務者）株式会社ＭＴＧＯＸ（以下「申立人」という。）の概要及
び現在の資産・負債の状況は下記のとおりであるが，申立人は事業の継続に著
しい支障をきたすことなく弁済期にある債務を弁済することができず，債務超
過のおそれもあるため，破産原因が生じる恐れがある。なお，開始原因を生ず
るに至った事情は後述する。

第2　債務者の概要
　1　会社の概要
　（1）商号
　　　　「株式会社ＭＴＧＯＸ」である。

　（2）会社の目的
　　　　①　ＩＴ（情報技術）システムの構築及びコンサルティング
　　　　②　インターネットのウェブコンテンツの開発，製作及びコンサルティン
　　　　　グ
　　　　③　コンピューター及びサーバーの企画，開発，設計
　　　　④　インターネットサイトの運営及び管理
　　　　⑤　前各号に附帯する一切の事業

　（3）株式及び資本の額
　　　　発行する株式の総数　　　1万株
　　　　発行済株式総数　　　　　500株
　　　　資本の額　　　　　　　金500万円

　（4）設立年月日
　　　　平成23年8月9日

　（5）会社の株主

2

会社の株主は，下記の２名であり，申立人の代表者であるカルプレス・マルク・マリ・ロベート（以下「申立人代表者」という。）が発行済株式の１００％を保有する株式会社ＴＩＢＡＮＮＥ（以下「親会社」又は「ＴＩＢＡＮＮＥ」という。）が４４０株を有している（発行済み株式総数の８８％を保有）。

　　　　株式会社ＴＩＢＡＮＮＥ　　　４４０株（発行済株式の８８％）
　　　　Ｊｅｄ　ＭｃＣａｌｅｂ(個人)　６０株（発行済株式の１２％）

（６）会社の役員
　　代表取締役　カルプレス・マルク・マリ・ロベート
　　上記のとおり，申立人代表者は，親会社の代表取締役及び唯一の株主でもある。

（７）本店の所在地
　　東京都渋谷区渋谷二丁目１１番５号

２　申立人の事業内容
　　申立人の主たる事業は，仮想通貨であるビットコイン等の売買ができるオンライン交換取引所の運営である。

３　工場，営業所等の施設
　　会社の営業施設は，東京都渋谷区渋谷２丁目１１番５号（本店所在地）所在の本社事務所のみである。
　　同事務所は，親会社が賃借し，申立人は，ＴＩＢＡＮＮＥから賃借をしている。

４　従業員
　　申立人が直接雇用している従業員は存在せず，親会社と業務委託契約を締結し，親会社からサービスの提供を受けている。親会社の従業員（正社員，契約社員，アルバイト）は３２名である。

3

第3　申立人の資産と負債の状況
1　直近2期の貸借対照表
　　申立人の設立以降の貸借対照表は、提出した疎明資料のとおりであるが、その概要は以下の通りである。

（単位：千円）

| 貸借対照表 | H23.8.9～H24.3.31 | H24.4.1～H25.3.31 |
|---|---|---|
| 流動資産 | 95 | 3,838,803 |
| 資産合計 | 95 | 3,838,803 |
| 流動負債 | 21,232 | 3,831,393 |
| 負債合計 | 21,232 | 3,831,393 |
| 純資産合計 | ▲ 21,137 | 7,410 |
| 負債及び純資産合計 | 95 | 3,838,803 |

2　直近2期の損益計算書
　　申立人の設立以降の損益計算書は、提出した疎明資料のとおりであるが、その概要は以下の通りである。

（単位：千円）

| 損益計算書 | H23.8.9～H24.3.31 | H24.4.1～H25.3.31 |
|---|---|---|
| 売上高 | 0 | 135,072 |
| 売上総利益 | 0 | 131,085 |
| 営業利益（損失） | ▲ 26,138 | 21,205 |
| 経常利益金額 | 0 | 29,395 |
| 当期純利益（損失） | ▲ 26,137 | 28,548 |

3　資産の内容
　　申立人の資産の内容は，財産目録のとおりであり，主な資産の状況等は，以下のとおりである。
　（流動資産）
　（1）現金預金
　　申立人は，銀行及び支払サービス・プロバイダーに総額513,988,952円の現金・預金を有する。

　（2）ＢＴＣ勘定
　　申立人の取引所におけるビットコイン交換取引により取引所の利用者（以下「ユーザー」という。）がビットコインを売ることにより，申立人は，その約０．６％のビットコインを手数料として得る。このようにして手数料と

4

して得たビットコインを「ＢＴＣ勘定」としてこれを資産に計上している。
申立時において約９０１百万円。

（３）棚卸資産
　ＯＴＰカードが 18,627,790 円，Yubikey が 3,419,440 円，合計 22,047,230 円。

（４）前渡金
　コンピュータに興味がある人を対象とした E LOGIC というフランスで行われるイベントに年１回参加しており，その前払い費用 7,968,000 円。

（５）短期貸付金
　申立人が，申立人の関連会社に対して負担した費用，及びこれに対する貸付金。短期貸付金総額 801,249,564 円。

（６）他社預金
　申立人の銀行口座以外のところにあるユーザーからの預り金であり，他社預金総額 1,384,057,302 円。

（固定資産）
（７）工器具備品
　　申立人の備品等の固定資産は，パソコン，ハードウェア・サーバー等合計 107,510,694 円。

（８）開発費
　　開発費は，ソフトウェア開発費，ホーム・ページ開発費，モバイル電話開発費等が含まれる。合計 91,964,675 円

（９）敷金
　　賃貸スペースの敷金 540,000 円。

（１０）差入保険金
　　仮処分命令に基づく差押え
　　10,586,875 円

資産合計　　　　　　　　　　　　　　　　　　　　3,841,866,163 円

4　負債の内容
　　申立人の負債は以下のとおり。
（１）買掛金
　　　買掛金の金額については，一部含まれていないものがあるが，概ね
　　は判明しており，その総額は 19,033,902 円。

（２）ＢＴＣ仮受金　　　　　　　　　　　　　901,952,870 円
　　　同じ金額で，流動資産勘定がある。

（３）預り金　　　　　　　　　　　　　　　5,502,576,538 円
　　　ユーザーから預かっている現金（ユーザーの数は約１２万７０００
　　人）。

第４　申立人の財産に関してされている他の手続または処分
１　日本国内の訴訟手続
　　事件番号　東京地方裁判所平成２５年（ワ）第３３８７２号　預り金
　　　　　　　返還請求事件
　　事件概要　ユーザー（個人）から約１０００万円の預託金の返還請求
　　　　　　　を受けているものである。

２　アメリカ合衆国での民事訴訟
　　申立人は，デラウェア州法人よりライセンス契約の債務不履行に基づ
　　く７５００万米ドルの賠償請求を受け，他方で，同法人に対して申立人
　　が５００万米ドルの返還を請求する訴訟がアメリカ合衆国（以下「米国」
　　という。）のワシントン西部地区合衆国地方裁判所にて継続中である。

３　米国国土安全保障省による預金差押え
　　米国の国土安全保障省から，申立人の関連会社の預金約５００万米ドル
　　の差押えを受けている。かかる預金は，申立人自身ではなく，申立人の関
　　連会社名義の預金ではあるが，その原資は申立人がユーザー（殆ど米国内
　　のユーザー）から預託を受けた資金である。

第５　労働組合の有無
　　なし

第６　外国倒産処理手続きの有無

6

なし

第7 　会社の設立または目的である事業について官庁その他の機関の許可
なし

第8 　関係会社
　　　　申立人の関係会社は疎明資料のとおりであり，申立人の子会社が２社
　　　存するほか，申立人の親会社であるＴＩＢＡＮＮＥには申立人以外の子
　　　会社が多数存する。
　　　　かかる法人は主に２つに分類することができ，１つめは，金融取引に
　　　関する規制から日本国法人である申立人が金融機関口座を開設できない
　　　国において金融機関口座を確保するために（申立人のユーザーは世界各
　　　国に散らばっているため，ユーザーから預託を受けるために多くの金融
　　　機関に保有する必要がある），当該国法に基づく法人として設立したも
　　　のであり，２つめは，ビットコインのオンライン交換事業とは直接かか
　　　わらない事業を行い又は行うことを目的に設立されている法人である。

第9 　手続開始原因の存在
　１ 　申立てに至る経緯
　（１）申立人の設立について
　　　　　申立人の事業は，申立人の株主の１人であるＪｅｄ　ＭｃＣａｌｅｂが
　　　ビットコインとの名称の仮想通貨をオンライン上（インターネット上）で
　　　交換することができるソフトウェアを開発し，２０１０年（平成２２年）
　　　頃にオンライン交換所を開設したことに端を発しており，２０１１年（平
　　　成２３年）２月ごろ，ＴＩＢＡＮＮＥが，Ｊｅｄ　ＭｃＣａｌｅｂから，
　　　オンライン交換取引事業（オンライン交換所に係るシステムのみならず，
　　　顧客，保有するビッドコインを含む）を譲り受け，平成２３年８月９日，
　　　かかる事業の受け皿会社として申立人が設立された。
　　　　　かかる事業の譲渡の際に，ＴＩＢＡＮＮＥは，買収代金の一部を申立人
　　　の株式６０株で支払ったため，申立人の株主はＴＩＢＡＮＮＥ及びＪｅｄ
　　　ＭｃＣａｌｅｂとなっている。

　（２）申立人の事業拡大
　　　　　ＴＩＢＡＮＮＥが事業を承継した直後の２０１１年（平成２３年）６月，
　　　第三者からのハッキング攻撃を受け，ＴＩＢＡＮＮＥは，一時的にオンライ

7

ン交換機能を停止し，新たにソフトウェアを開発し，数週間後にオンライン交換を再開し，それ以降，急成長を遂げた。

申立人は，一時的に世界最大のビットコイン取引所へと成長した。

（３）申立人の事業に関するトラブル

　２０１３年（平成２５年）５月，米国の国土安全保障省（U.S. Department of Homeland Security）（以下「ＤＨＳ」という。）により，申立人の関連会社（Mutum Sigillum LLC）の米国における金融機関口座及び資金送金業者の口座への預金約５００万ドルが差し押さえられた。

　差押えの理由は，申立人が米国の資金移動業の資格を有していないというものであった。差し押さえを受けた金額の返還については，現在まで，半年以上交渉が継続しているが解決の目処は経っていない。

　また，申立人は，米国における業法上の問題を解決するため，米国で協力企業を探し，２０１２（平成２４年）年１１月にＣｏｉｎＬａｂ　Ｉｎｃ.とライセンス契約を締結した。このライセンス契約は，米国での事業をライセンシーたるＣｏｉｎＬａｂ　Ｉｎｃ.へ移転することを目的とするものであり，移行を円滑に行うことを主たる目的として定められた一定期間経過後に事業を移転することとされていたが，ＣｏｉｎＬａｂ　Ｉｎｃ.は申立人のサイトとの通信連絡テストを利用して，同期間中にユーザーから膨大な資金を自分の銀行口座に集める不当な行為を行った。かかる資金の一部は申立人に返還されたが約５００万米ドルはまだ申立人に返還されていない。申立人は，現在，米国の裁判所において，ＣｏｉｎＬａｂ　Ｉｎｃ.と訴訟中であり，返還を受ける目途は立っていない。

（４）申立の契機となったトラブル

　平成２６年２月初め頃，ビットコインの基礎ソフト（ビットコインの移転，認証，発掘等を管理するソフト）における「Transaction Malleability」と呼ばれるシステムのバグを悪用した不正アクセスにより，ビットコインの送金（ビットコインの引出）が正常に完了しない取引が増え，また，かかるバグを悪用した不正アクセスにより，ビットコインが不正に引き出されている可能性があることが判明した。申立人は，平成２６年２月１０日に，そのバグの影響をなくすべく，申立人のソフトのアップグレードを開発，テストするため，ビットコインの引出取引を停止した。なお，当該バグの存在そのものは２０１１年５月から既に認識されていたが，当該バグにより上記のような大量の正常に完了しない取引が発生されることは平成２６年１月末ごろま

ではなかったし，また，不正引き出しの危険性があることが認識されるように
なったのは平成２６年１月末頃からである。

その後，申立人の調査によって大量のビットコインがなくなっていたこと
が分かり，正確な状況はいまでも判明していないものの，平成２６年２月２
４日頃までに，ユーザーの取引履歴上のビットコイン保有高であるおよそ７
５万ビットコイン，及び，申立人自身の取引履歴上の保有ビットコインであ
る約１０万ビットコインのほぼ全てがなくなっていることが判明した。この
７５万ビットコインを現実の通貨で換算する場合，申立人が交換サービスを
停止した同月２５日の申立人の交換所における最終の交換レート（１ビット
コイン＝１万３４７２．７９円）での換算で約１１４億６千万円となる。申
立人は，なくなったビットコインは上記のバグが悪用により盗まれた可能性
が高いと考えており，現在,刑事告訴の検討，手続を専門家に依頼している。

また，同月２４日，ユーザーからの現実の預り金の総額と，かかる預り金
を管理している金融機関への預金残高の総額に多額の齟齬があり，預金残高
が大幅に不足していること（金額は調査中であり変動する可能性が高いが最
大約２８億円程度）が判明した。

申立人は上記問題の原因は現在調査中であるが，第三者によるハッキング
による被害を含めて，複数の原因があると見込まれるため，原因究明のため
には過去の膨大な取引を調査する必要がある。そのため，現時点では，問題
の原因はおろか，なくなったビットコインの総数や預り金残高に対して不足
している預金残高の額も確定できていない。

申立人は，上記のビットコインの消失及び預り金残高と預金残高の齟齬が
発覚したことから，平常の事業運営が困難であると判断し，同月２５日の昼
頃（日本時間）に申立人のサイトへのアクセスを全面的に停止した。

2  支払不能，債務超過

上記事情に鑑みると，申立人の財産状況は，資産総額約３８億円に対し，
申立人の流動負債が約６４億円となり，現時点で申立人が債務超過であるこ
とは明らかである。

また，上記のビットコインの消失や預金残高の不足が生じていることを
公にした場合には，現実の通貨の引き出しの停止やオンライン交換サービ
スの停止により既に不安が生じている申立人の信用が急激に悪化し，ユー
ザーからの現実の通貨やビットコインの引き出しが殺到し，申立てがその
全てを弁済することが不可能であることは明らかであり，申立人が事業に
著しい支障を来すことなく弁済期にある債務を弁済できないこともまた明
らかである。

9

第１０　再生計画案作成の方針についての申立人の意見

１　再建の方法

　　申立人の主たる収入源はオンライン交換所におけるビットコインの売買に
際して得られる手数料収入（売主及び買主がそれぞれ売買金額のおよそ 0.6%
を申立人に支払う）であるところ，申立人のオンライン交換所を利用するユー
ザーの中には，ビットコインを日常の資金決済方法として利用している者
や，現実通貨との交換レートがオンライン交換所毎に異なることに着目して
投機的な目的で交換取引を行う利用者も多数存することから，民事再生手続
の申立てにより，申立人に預託した通貨やビットコインの使用，交換又は換
金が不可能となったとしても，申立人のオンライン交換システムが再開され，
かつ，経営者の交代によって業務への信頼を回復することができれば，申立
人のオンライン交換所でビットコインの取引を再開し又は新たに開始する者
は多数存すると見込んでいる。

　　よって，オンライン交換システムを問題なく再度稼働させることができれば，
オンライン交換システムに資金を拠出する者を探すことは可能であるため，
かかる者にオンラインシステムを承継することで事業を再生し，且つ，承継の対
価として調達する資金によって再生債権に対する弁済原資を確保することが
申立人の再生の方針である。


２　今後の資金繰りの予定

　　手許資金は十分に存するため資金繰りは問題がない。


３　債権者，従業員及び主要取引先の協力の見込み

（１）債権者について

　　債権者については，預託している通貨やビットコインの引き出しが不可
能となったことに対しては相当の反発が予想される。

　　この点について，本件申立ての原因となったビットコインや預金の消失
に関して，徹底的な調査を行って損害の実態，原因を究明し，損害の回復
に向けた活動，捜査当局に対する被害申告及び捜査への協力を可能な限り
行う必要があるが，かかる調査，損害回復に向けた活動，捜査機関への申
告・協力等の活動を実施するとしても，事業の再開がほぼ不可能となる破
産手続よりも，事業の再開を前提とする民事再生手続の方が，債権者の理
解を得やすいことから，債権者の協力は見込めるものと思料している。

　　なお，一部報道によれば，菅義偉官房長官より，申立人については関係
省庁で情報収集していて実態を把握して必要があれば対応するとの発言

が記者会見でなされたと報じられているが，申立人としては，捜査機関は
もちろんのこと，また，国内・国外を問わず関係機関から実態調査等の要
請があれば，全面的に協力して早期の実態究明に努める所存である。

（２）従業員，主要な取引先について

　　親会社であるＴＩＢＡＮＮＥの協力は得られるため，従業員の協力につ
いての問題はない。また，申立人の取引先は，オンライン交換所を利用す
るユーザーが主であり，再生手続申立後に継続して協力を受けることに問
題はない。

疎明資料

| 甲１ | 定款 |
| 甲２ | 登記全部事項証明書 |
| 甲３ | 株主名簿 |
| 甲４、５ | 決算報告書及び勘定科目明細書 |
| 甲６ | 債権者一覧表（買掛金） |
|  | （会員債権者についてはメールアドレスしかわからない者多数 |
|  | あるため、精査の上で、追って提出する） |
| 甲７ | 財産目録 |
| 甲８ | 関係会社図 |

以上

[translation]

### Civil Rehabilitation Proceeding Commencement Application

February 28, 2014

To the person in charge of civil rehabilitation
Tokyo District Court 20th Civil Chamber

Applicant          MtGox Co., Ltd.
                   11-5, Shibuya 2-chome, Shibuya-ku, Tokyo 150-0002

                   Representative Director of the above Mark Marie Robert Karpeles

                   Counsel of the applicant
                         Attorney-at-law  Hideyuki Yamamoto
                         Attorney-at-law  Junko Suetomi
                         Baker & McKenzie (Gaikokuho Joint Enterprise)
                         Ark Hills Sengokuyama Mori Tower 28F
                         Roppongi 1-9-10, Minato-ku, Tokyo 106-0032
                         Tel: 03-6271-9900
                         Fax: 03-5549-7736

                   Counsel of the applicant
                         Attorney-at-law Akio Shinomiya
                         Attorney-at-law Kazumasa Kawai
                         Yodoyabashi & Yamagami LPC
                         Yusen Bldg 4F
                         Marunouchi 2-3-2, Chiyoda-ku, Tokyo 100-0005
                         Tel: 03-6267-1241
                         Fax: 03-6267-1210

Attachments

1.      Certificate of eligibility (same as exhibit 2 of prima facie evidence documents)
2.      Determination of Director
3.      Power of attorney

1

Purpose of the application

A decision of commencement of civil rehabilitation procedure against the applicant is hereby demanded.

Reasons for the application

Section 1.          Facts causing the the civil rehabilitation commencement

The outline as well as the current situation of the assets and liabilities of the applicant (the debtor) MtGox Co., Ltd. (the "applicant") are as follows. The applicant is not able to pay his debts when due without severe impediments to the continuation of the activity and since there is also a possibility of assets exceeding liabilities, there is a possibility of a cause for bankruptcy. Further, the circumstances leading to the causes for commencement are indicated below.

Section 2.          Outline of the debtor
      1.          Outline of the company
           (1)          Corporate name
                The name is: MtGox Co., Ltd.
           (2)          Business purpose of the company
                ①          Building and consulting with regard to IT systems
                ②          Development, production and consulting with regard to web content for the internet
                ③          Planning, development and design of computers and servers
                ④          Management and administration of internet sites
                ⑤          Anything incidental to each of the above.
           (3)          Shares and amount of capital
                Total number of shares that can be issued  10,000 shares
                Total number of shares issued          500 shares
                Amount of capital          JPY 5,000,000
           (4)          Date of establishment
                August 9, 2011
           (5)          Shareholders
                The following two parties. Further, the representative of the

2

applicant, Mark Marie Robert Karpeles (the "applicant representative") holds 100% of the issued shares of Tibanne Co., Ltd. (the "parent company" or "Tibanne") which owns 440 shares of the applicant (88% of the total number of issued shares).

Tibanne          440 shares (88% of the total)
Jed McCaleb (individual) 60 shares (12% of the total)

(6)    Directors
Representative Director Mark Marie Robert Karpeles
As indicated above, the applicant representative is also the representative director of the parent company as well as its only shareholder.

(7)    Address of the head office
11-5, Shibuya 2-chome, Shibuya-ku, Tokyo

2.    Business of the applicant
The main business of the applicant is the operation of an online exchange for the purchase and sale of virtual currencies such as bitcoins.

3.    Facilities at factories and other places of business
The only place of business of the company is at the address of its head office at 11-5, Shibuya 2-chome, Shibuya-ku, Tokyo.
This office is leased by the parent company and the applicant leases it from Tibanne.

4.    Employees
There are no employees directly employed by the applicant but a service agreement has been executed with the parent company and the applicant receives services from the parent company. The parent company has 32 employees (permanent employees, contract employees, arbeito).

Section 3.    Situation of the assets and liabilities of the applicant

3

1.    Balance sheet for the two most recent fiscal years

The balance sheets of the applicant since its establishment are as submitted in the prima facie evidence documentation. The outline is as follows:

| Balance sheet | August 9, 2011 - March 31, 2012 | April 1, 2012 - March 31, 2013 |
|---|---|---|
| Current assets | 95 | 3,838,803 |
| Total assets | 95 | 3,838,803 |
| Current liabilities | 21,232 | 3,831,393 |
| Total liabilities | 21,232 | 3,831,393 |
| Total net assets | (21,137) | 7,410 |
| Total liabilities and net assets | 95 | 3,838,803 |

2.    Profit and loss statement for the two most recent fiscal years

The profit and loss statement of te application since its establishment are as submitted in the prima facie evidence documentation. The outline is as follows:

| Profit and loss statement | August 9, 2011 - March 31, 2012 | April 1, 2012 - March 31, 2013 |
|---|---|---|
| Sales | 0 | 135,072 |
| Gross margin | 950 | 131,085 |
| Operating margin | (26,138) | 21,205 |
| Current margin | 0 | 29,395 |
| Current net income (loss) | (26,137) | 28,548 |

3.    Contents of the assets

The assets of the applicant are as shown in the list of assets. The situation, etc. of the main assets is as follows.

Current assets:

(1)    Cash deposits

The applicant holds a total of JPY 513,988,952 in banks and at payment service providers.

(2)    BTC account

The applicant earns a bitcoin fee of approximately 0.6% from users of the exchange of the applicant ("users") who sell bitcoins. This bitcoin fee is recorded as an assets in the

4

account "BTC account". Its value as of the time of the application is approximately JPY 901 millions.

(3) Inventory assets

This includes OTP cards (JPY 18,627,790), Yubikeys (JPY 3,419,440) for a total of JPY 22,047,230.

(4) Advance payments

Advance fees of JPY 7,968,000 paid to an annual event in France, E Logic, for computer fans.

(5) Short term loans

This includes expenses borne on behalf of related companies as well as related loans. The total amounts to JPY 801,249,564.

(6) Other companies cash

These are cash deposits located outside the bank accounts of the applicant. The total amounts to JPY 1,384,057,302.

Fixed assets:

(7) Fixtures and tools

These include computers, hardware and servers for a total of JPY 107,510,694.

(8) Development expenses

This include software development, web pages development, mobile phone developments. The total amounts to JPY 91,964,675.

(9) Deposits

The deposit for the leased space is JPY 540,000.

(10) Deposited insurance money

Seizures resulting from provisional dispositions. JPY 10,586,875

Total assets                                        JPY 3,841,866,163

4.    Contents of the liabilities

The liabilities of the applicant are as follows.

(1) Trade accounts payable

The total amount of trade accounts payable can mostly be

5

ascertained and, although it does not include everything, amounts to JPY 19,033,902.

(2)    BTC suspense receipts        JPY 901,952,870
This is the same amount as the one recorded in "BTC account" on the assets side.

(3)    Deposits        JPY 5,502,576,538
Cash deposited from users (there are approximately 127,000 users).

Section 4.    Other procedures or disposition related to the properties of the applicant

1.    Lawsuits in Japan
Case no. Tokyo District Court 2013 (*wa*) 33872 Claim for return of deposits
Case outline    This is a claim for return of a deposit of approximately JPY 10 million made by a user (individual)

2.    Civil proceedings in the USA
The applicant has received from a Delaware corporation a claim for payment of damages of USD 75 million for breach of a license contract. On the other hand, the applicant is claiming the return of USD 5 million from the same corporation. The lawsuit is proceeding in the United States District Court, Western District of Washington.

3.    Seizure of deposits from the Department of Homeland Security
The US Department of Homeland Security has seized USD 5 million from a related company of the applicant. The deposits are not those of the applicant but were held under the name of a related company but the source of these funds were deposits from users (mostly US users).

Section 5.    Existence of labor unions
None.

Section 6.    Existence of foreign bankruptcy proceedings
None.

6

Section 7.        Permits from administrative authorities or other agencies with regard to the establishment of the company or its business purpose
None.

Section 8.        Related companies
The related companies of the applicant are as shown in the prima facie evidence documentation. The applicant has two subsidiaries and the parent of the applicant, Tibanne has several subsidiaries other than the applicant.

Said corporations can be separated into two categories. The first one consists in corporations established in countries where the applicant which is a Japanese corporation cannot for financial regulations reasons open an account with financial instructions (since users exist all over the world, there is a need to have accounts in many financial institutions to receive deposits from users). The second category consists of corporation established for a business or with a business purpose unrelated to the operation of a bitcoin online exchange.

Section 9.        Existence of a cause for commencement of proceedings

1.        Account up to the application
    (1)        Establishment of the applicant
        Jed McCaleb, one of the shareholders of the applicant developed the software to exchange online the virtual currency known as bitcoin and the online exchange started operations in 2010. In February 2011, the online exchange (not only the system but also the customers and the bitcoins held) was transferred from Jed McCaleb to Tibanne and Tibanne established the applicant on August 9, 2011 as recipient for the business.

        When transferring the business, Tibanne delivered to Jed McCaleb 60 shares of the applicant as part of the price for the business which explains why Jed McCaleb is also a shareholder of the applicant.

7

(2)    Expansion of the business of the applicant

Immediately following the continuation of the business by Tibanne, in June 2011, the system was hacked and Tibanne had to stop the online exchange, develop new software and restart the online exchange after a few weeks. Following this, the business grew rapidly.

The applicant was at some time the largest bitcoin exchange in the world.

(3)    Troubles with the applicant business

In May 2013, the US Department of Homeland Security ("DHS") seized approximately USD 5 million in the US bank account and the account held at a money transmitting business provider of Mutum Sigillum LLC, a corporation related to the applicant.

The reasons for the seizure was the fact that the applicant did not have a money transmitter license in the US. With regard to the return of the funds seized, negotiations have been going on for more than 6 months but there is no solution in sight.

Further, in order to solve its regulatory problems, the applicant looked for a business partner and in November 2012 executed a license agreement with CoinLab Inc. The purpose of this agreement was to transfer to CoinLab Inc., as licensee, the US business and it stipulated a fixed transition period to ensure a smooth transfer. However, CoinLab Inc. used the test of the API with the site of the applicant during said period to unduly collect in its own account large amounts from users. CoinLab Inc. returned a part of these funds but has failed to return approximately USD 5 million. The applicant is in a lawsuit with CoinLab Inc in a US court and but there are no prospects yet for the return of these funds.

(4)    Troubles which lead to the application

At the start of February 2014, illegal access which abused a bug in the bitcoin base software (the software which manages the transfers, confirmation and mining, etc.) known as

8

"transaction malleability" resulted in an increase in unconfirmed transactions of bitcoins transfers (bitcoins withdrawals) and it was found that there was a possibility that the abuse of this bug may have resulted in illicit withdrawals of bitcoins. On February 10, 2014, the applicant stopped the withdrawal of bitcoins in order to eliminate the impact of this bug and develop and test an upgrade to the software of the applicant. The existence of this bug was known since May 2011 but it was not known until the end of January 2014 that it could lead to a large number of unconfirmed transactions and to a risk of illicit withdrawals.

Following this, the applicant's investigation revealed that a large number of bitcoins had disappeared and although the exact situation is still not known today, it was found that until February 24, 2014, almost all of 750,000 bitcoins held on the basis of users transactions records as well as of 100,000 bitcoins held on the basis of the applicant's own transaction records had disappeared. These 750,000 bitcoins expressed in currency would amount to approximately JPY 11.46 billion on the basis of the last exchange rate on the online exchange of the applicant on February 25 which is the date when the exchange service was stopped (1 bitcoin = 13472.79 yen). The applicant believes that there is a high probability that the bitcoins were stolen by the abuse of the above bug and is currently asking an expert to investigate criminal complaints as well as procedures.

Further, on February 24, it was found that there was a large discrepancy in the total of deposit balances at those financial institutions which managed said deposits compared to the total amount actually deposited by users and that there was a large shortfall of deposit balances (the amounts are still under investigation and will probably change but the amount should be a maximum of JPY 2.8 billion).

The reasons for these problems are under investigation. It is probable that there are several causes including damages from hacking by third parties but it is necessary to

9

investigate a huge number of past transactions in order to find these causes. As of this date, it is therefore not possible to confirm the total amount of bitcoins which disappeared and the shortfall of deposit balances compared to money deposited.

The applicant judged that continuing the business normally would be difficult taking into account the lost bitcoins and the discrepancy between deposit balances and the balance of funds deposited and stopped all access to the site of the applicant around noon (Japan time) on February 25.

2.    Insolvency, liabilities exceeding assets

From the circumstances described above, the total current liabilities of the applicant amount to JPY 6.4 billion compared to total assets of JPY 3.8 billion and the applicant is therefore in a situation of liabilities exceeding assets.

Further, making public the loss of bitcoins and the shortfall of funds deposited would abruptly worsen the credit of the applicant which is already affected by users' concerns about the stop of currency withdrawals and the stop of the online exchange service. A rush of withdrawals of bitcoins or currencies from users would clearly be impossible for the applicant to pay. It is therefore obvious that the applicant is not able to face the payment of its debts at the time they are due without this creating a significant problem to the business of the applicant.

Section 10.    Opinion of the applicant with regard to the policy of drafting a rehabilitation plan

1.    Method of rehabilitation

The main source of revenue of the application is the fees earned upon the purchase of sale and bitcoins on the online exchange (both purchaser and seller pay a fee of approximately 0.6% to the applicant). Users of the online exchange include many which use bitcoins as a method of daily settlement of funds and many which transact for the purpose of investment focusing on the different exchanges rates

available on each online exchange. On this basis, even if the currencies and bitcoins deposited cannot be used, exchanged or converted, the applicant believes that if the online exchange was restarted and if trust was restored in the business by a change in management, it is expected that many users would transact bitcoins again and new users would start transactions on the online exchange of the applicant.

Accordingly, if the online exchange system could be restarted without problems, since it is possible to search for persons willing to invest in the online exchange system, the business could be rehabilitated by having said person succeed the online exchange system and the funds obtained from said succession would secure the funds necessary to repay rehabilitation debts.

2.      Future financing plans

Since there is sufficient cash on hand, financing is not an issue.

3.      Prospects of cooperation from creditors, employees and important business partners

(1)      Creditors

The impossibility for creditors to withdraw bitcoins and currencies is likely to generate significant reaction.

Taking this into account, it is necessary to thoroughly investigate the disappearance of bitcoins and deposits which is the cause for this application, to evaluate damages, find causes, to actively repair damages, report damages to authorities and cooperate with their investigations. But even if these investigations, activities to repair damages, report and cooperation with authorities, etc. were implemented, the civil rehabilitation which assumes a rehabilitation of the activity should be easier for creditors to accept than a bankruptcy proceeding which would almost exclude any possibility of restart of the business. On this basis, the cooperation of creditors may be expected.

Further, according to some press reports, chief cabinet secretary Suga expressed in a press conference that the government would react as necessary after having collected

11

information through related government agencies and understood the situation. The applicant will do its best efforts to cooperate fully with authorities and with any agencies in or outside Japan investigating the situation and asking for the applicant's cooperation.

(2)    Employees, important business partners

Since the cooperation of the parent Tibanne can be obtained, the cooperation of the employees should not be a problem. Further, the main business partners of the applicant are the users of the online exchange, there should be no problems obtaining their continuing cooperation even after the application for civil rehabilitation.

Prima facie evidence documentation

1.    Articles of association

2.    Certificate of commercial registry

3.    Shareholders' registration

4. and 5.Financial statements and details of account headings

6.    List of creditors (trade accounts payable)

(since there are lots of member creditors for whom only an email address is known, this will be filed after further investigations)

7.    List of assets

8.    Chart showing related companies