# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GREGORY GREENE and JOSEPH LACK, individually and on behalf of all others similarly situated, | |
| *Plaintiffs*, | Case No. 1:14-cv-01437 |
| v. | Hon. Gary Feinerman |
| MTGOX INC., a Delaware corporation, MT. GOX KK, a Japanese corporation, TIBANNE KK, a Japanese corporation, MT. GOX NORTH AMERICA, INC., a New York corporation, MIZUHO BANK, LTD., a Japanese financial institution, MARK KARPELES, an individual, GONZAGUE GAY-BOUCHERY, an individual, JED MCCALEB, an individual, and JOHN DOE DEFENDANTS, | Magistrate Judge Susan Cox |
| *Defendants*. | |

## PLAINTIFFS' MOTION FOR PRELIMINARY SETTLEMENT APPROVAL

Jay Edelson
jedelson@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiffs Gregory Greene, Joseph Lack, and the Putative Class*

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................... 1

    A.   The Advent of Bitcoin......................................................................... 2

    B.   The Rise and Fall of Mt. Gox............................................................. 3

    C.   The Litigation History ........................................................................ 5

    D.   Settlement Discussions and Private Mediation .................................. 9

III.  TERMS OF THE SETTLEMENT.................................................................... 10

    A.   Presentment and Implementation of the Mt. Gox Reorganization Plan ................... 11

    B.   Complete Cooperation....................................................................... 12

    C.   Releases ............................................................................................ 12

    D.   Attorneys' Fees ................................................................................. 13

IV.  THE PROPOSED CLASS SHOULD BE CERTIFIED................................... 13

    A.   The Proposed Class is Sufficiently Numerous.................................. 14

    B.   The Claims of the Proposed Class Share Common Questions of Law and Fact. ..... 15

    C.   Plaintiffs' Claims are Typical of the Proposed Class Members' Claims.............. 16

    D.   Plaintiffs (and their Counsel) Will Adequately Represent the Class. ................ 17

    E.   The Proposed Class Satisfies Rule 23(b). ......................................... 18

        1.   Common Questions of Law and Fact Predominate. ................... 18

        2.   A Class Action is Superior to Other Available Methods of Adjudication.... 19

V.   PLAINTIFFS' COUNSEL SHOULD BE APPOINTED CLASS COUNSEL. .................. 20

VI.  THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL. .......... 22

A.    The Settlement Offer Balanced Against the Likelihood of Recovery Against Mt. Gox and the Settling Defendants Absent Settlement Weighs Strongly in Favor of Preliminary Settlement Approval. ...................................................................... 24

B.    The Complexity, Length, and Expense of Continued Litigation Against the Settling Defendants Favors Approval of the Settlement. .................................................. 27

C.    Competent Counsel Both in the United States and Abroad Support the Settlement. 28

D.    Plaintiffs Have Sufficient Information to Assess the Proposed Settlement. ............. 28

VII.  THE PROPOSED NOTICE PLAN SHOULD BE APPROVED. ...................................... 29

VIII. CONCLUSION ............................................................................................................... 31

# TABLE OF AUTHORITIES

## UNITED STATES SUPREME COURT CASES

*Wal-Mart Stores, Inc. v. Dukes,*
    131 S. Ct. 2541 (2011) ............................................15

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997) ............................................19

## UNITED STATES COURT OF APPEALS CASES

*Armstrong v. Board of Sch. Dirs. of City of Milwaukee,*
    616 F.2d 305 (7th Cir. 1980) ..................................23, 24

*De La Fuente v. Stokely-Van Camp, Inc.,*
    713 F.2d 225 (7th Cir. 1983) ..................................16

*Isby v. Bayh,*
    75 F.3d 1191 (7th Cir. 1996) ..................................23, 28

*Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co. of Chicago,*
    834 F.2d 677 (7th Cir. 1987) ..................................29

*Messner v. Northshore Univ. HealthSystem,*
    669 F.3d 802 (7th Cir. 2012) ..................................13, 19

*Rosario v. Livaditis,*
    963 F.2d 1013 (7th Cir. 1992) .................................15, 16

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.,*
    463 F.3d 646 (7th Cir. 2006) ..................................24

*Wigod v. Wells Fargo Bank, N.A.,*
    673 F.3d 547 (7th Cir. 2012) ..................................22

## UNITED STATES DISTRICT COURT CASES

*Boundas v. Abercrombie & Fitch Stores, Inc.,*
    280 F.R.D. 408 (N.D. Ill. 2012) ..............................14

*Buckley v. Engle,*
    No. 07CV254, 2010 WL 4064985 (D. Neb. Oct. 14, 2010) .........26

*Cicilline v. Jewel Food Stores, Inc.*,
    542 F. Supp. 2d 831 (N.D. Ill. 2008) ..............................................................19

*Harris v. comScore, Inc.*,
    292 F.R.D. 579 (N.D. Ill. 2013) ....................................................................21

*Heastie v. Cmty. Bank of Greater Peoria*,
    125 F.R.D. 669 (N.D. Ill. 1989) ....................................................................14

*Hinman v. M & M Rental Ctr., Inc.*,
    545 F. Supp. 2d 802 (N.D. Ill. 2008) ............................................................14

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
    MDL No. 2147, 270 F.R.D. 330 (N.D. Ill. 2010) ........................................23, 24, 28, 30

*In re Facebook Privacy Litig.*,
    No. 10-cv-02389 (N.D. Cal. Dec. 10, 2010) ..................................................21

*In re MtGox Co., Ltd.*,
    No. 14-31229-sgj-15 (Bankr. N.D. Tex.) ......................................................6, 9

*In re Netflix Privacy Litig.*,
    No 5:11-cv-00379 (N.D. Cal. Aug. 12, 2011) ................................................21

*In re Processed Egg Prods. Antitrust Litig.*,
    284 F.R.D. 278, 285 (E.D. Pa. 2012) ............................................................26

*Kessler v. Am. Resorts Int'l*,
    No. 05 C 5944, 2007 WL 4105204 (N.D. Ill. Nov. 14, 2007) ........................24

*Maxwell v. Arrow Fin. Servs., Inc.*,
    No. 03 C 1995, 2004 WL 719278 (N.D. Ill. Mar. 31, 2004) ..........................17

*Schmidt v. Smith & Wollensky, LLC*,
    268 F.R.D. 323 (N.D. Ill. 2010) ....................................................................14

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) ....................................24, 27, 28, 29, 31

*Streeter v. Sheriff of Cook Cnty.*,
    256 F.R.D. 609 (N.D. Ill. 2009) ....................................................................20

## STATUTES & FEDERAL RULES

28 U.S.C. § 1715....................................................................................................30

Fed. R. Civ. P. 23 ................................................................................................ *passim*


**OTHER AUTHORITIES**

Alba Conte & Herbert Newberg,
    4 Newberg on Class Actions §11.25 (4th ed. 2002) ........................................23

Announcement of Commencement of Bankruptcy Proceedings by Bankruptcy Trustee Nobuaki
    Kobayashi, *available at*
    https://www.mtgox.com/img/pdf/20140424_announce_qa_en.pdf (last accessed April
    28, 2014) ............................................................................................................9

*Joyce, et al. v. MtGox Inc.*,
    No. cv-14-500253-00CP (Can. Ont. Sup. Ct. J.) ...........................................7

Manual for Complex Litigation § 21.632 (4th ed. 2004) ...........................................23

U.S. Chamber Institute for Legal Reform,
    *The New Lawsuit Ecosystem: Trends, Targets and Players* (Oct. 2013), *available at*
    http://www.instituteforlegalreform.com/uploads/sites/1/The_New_Lawsuit_Ecosystem_
    pages_web.pdf .................................................................................................21

Rob Wile, *Bitcoin Enthusiast And Filmaker Has A Theory For Why Mt. Gox Failed*, Business
Insider (Apr. 25, 2014, 12:18 PM), http://www. Businessinsider.com/mtgox-could-have-been-a-
google-of-bitcoin-2014-4 .............................................................................................3

## I.    INTRODUCTION

When the Mt. Gox Bitcoin digital currency exchange unexpectedly closed its virtual

doors two months ago, exchange members were left unable to access a collective 850,000

bitcoins[1] worth more than $470 million. Shortly after that fateful day, the entity operating the

exchange, Mt. Gox KK, filed for bankruptcy protection in Japan and soon after that, the Japanese

bankruptcy court began liquidation proceedings. The likely—and unfortunate—result of all that

is exchange members would never again see their bitcoins or get their money back.

However, in what can only be described as an extraordinary turn of events, plaintiffs

Gregory Green and Joseph Lack, defendants Jed McCaleb and Gonzague Gay-Bouchery, various

international creditors, and a group of outside investors came together during a weeklong (at

times, day-and-night) mediation presided over by the Honorable Wayne R. Andersen (ret.) to

reach multiple class-wide settlements (one here and one in Canada) and a plan to reorganize the

Mt. Gox exchange as a going concern.  All told, the settlements and reorganization plan, if first

approved by this Court and then the Japanese bankruptcy court, have the potential of more than

fully compensating the class, as well as the other exchange members who don't fall within the

class, for their losses that resulted from the fall of Mt. Gox.

The settlements and reorganization plan include three key components: First, they call for

the immediate distribution to Mt. Gox exchange members of any bitcoins and much of the

currency still held by Mt. Gox (which includes at least 200,000 bitcoins worth approximately

$116 million).[2] Second, a new exchange will be created, in which old Mt. Gox exchange

---

[1]    For the sake of clarity, "Bitcoin" refers to the digital currency and "bitcoin" (with a lower case "b") refers to individual units of the currency.

[2]    To be clear, all exchange members will recover equally according to their *pro rata* share of the total amount of lost bitcoins and currency—no individual or group of exchange members is put ahead of any other under the settlement or the plan, nor are any creditors who may have claims prejudiced.

members will effectively receive a 16.5% interest—i.e., exchange members will receive 16.5%

of any future dividends paid, 16.5% of the proceeds of any sale of the reorganized exchange, and

16.5% of any common stock issued should the reorganized exchange make an initial public

offering. Third, defendants McCaleb and Gay-Bouchery (former principals at Mt. Gox with

unique insight into the exchange's collapse) have agreed to cooperate with Plaintiffs' continued

litigation against the non-settling defendants, and the reorganized exchange has agreed to

continue to investigate and pursue recovery of the still unaccounted-for bitcoins and currency

against other key players in the collapse for the benefit of exchange members.[3]

As explained more fully below, the proposed settlement (and reorganization plan) now

before the Court is a more than fair, reasonable and adequate result for the proposed settlement

class and is well within the range of possible approval. Given its substantive terms, the relief

provided to the class and exchange members globally, and the support of an international cast of

interested parties, the Court should not hesitate to grant preliminary—and ultimately, final—

approval to the deal.[4]

## II.    FACTUAL AND PROCEDURAL BACKGROUND[5]

### A.    The Advent of Bitcoin

Since its inception in late 2008, Bitcoin has quickly evolved from a proof of concept to

the foundation of a new digital marketplace. Like fiat currency[6], Bitcoin can be used to purchase

and sell goods and services through websites and merchants that accept them and is currently

---

[3]    The proposed settlement is contingent on the Japanese bankruptcy court's acceptance of the reorganization plan.

[4]    Approval of similar class settlements is being sought in Canada and other jurisdictions.

[5]    Except where otherwise noted, the procedural and factual background referenced here has been presented to the Court a number of times, most recently through Plaintiffs' Motion for Preliminary Injunction, supporting declaration, and the numerous exhibits attached thereto. (Dkts. 56, 57.)

[6]    Fiat currency refers to money issued by a government (i.e., U.S. Dollars).

used in transactions between millions of people and thousands of businesses around the world. Unlike fiat currency, however, bitcoins do not derive their value from government regulation. Instead, they are "mined" through complex computer algorithms and then bought and sold through private "exchanges." These exchanges accept credit card payments, wire transfers, or other forms of payment in fiat currency in exchange for bitcoins, and facilitate the trading of bitcoins between consumers around the globe. The price of bitcoins fluctuates on these exchanges just like any other currency market. Presently, with nearly 11 million bitcoins in circulation, the total worth of Bitcoin exceeds $1 billion.

### B.    The Rise and Fall of Mt. Gox

Until February of 2014, the Mt. Gox Bitcoin exchange ("Mt. Gox")—with CEO Mark Karpeles at the helm—was one of the largest Bitcoin exchanges in the world, at one time handling over 80% of all Bitcoin trade worldwide. Mt. Gox was also one of the world's largest "digital wallets," holding hundreds of millions of dollars' worth of its members' bitcoins and fiat currency.[7]

Founded in 2010 by settling defendant Jed McCaleb, Mt. Gox was sold to Mark Karpeles in 2011, leaving McCaleb with a 12% stake in the exchange. Mt. Gox quickly emerged as a dominant force in the Bitcoin industry. By April of 2013, Mt. Gox was facilitating transfers of about $20 million in Bitcoin per day—and profiting from a .6% commission charged on each transaction. By December of 2013, Mt. Gox had a customer base of one million members. Mt. Gox was valued by some to be worth $1 billion.[8]

---

[7]    A "digital wallet" or "bitcoin wallet" is a file that contains cryptographic identifiers that enable the transfer of bitcoins, or that allow a Bitcoin holder to prove ownership of bitcoins. Through the use of digital wallets, users are able to deposit and store their bitcoins in accounts held on Bitcoin exchanges.

[8]    *See* Rob Wile, *Bitcoin Enthusiast And Filmaker Has A Theory For Why Mt. Gox Failed*, Business Insider (Apr. 25, 2014, 12:18 PM), http://www.Businessinsider.com/mtgox-could-have-been-a-google-of-bitcoin-2014-4.

In late 2013 to early 2014, however, problems began to surface at Mt. Gox. Members reported long processing delays of weeks, and even months, for simple withdrawal requests. In February 2014, the exchange announced that it had discovered a "bug" in its system and that some bitcoins were missing as a result. The technical issues persisted, and on February 7, 2014, Mt. Gox temporarily paused all withdrawal requests on the exchange, assuring its members that the withdrawals in the system would be "reinitiated once the issue [was] resolved." Three days later, Mt. Gox reported "unusual activity" with respect to its Bitcoin wallets, and stated that it was investigating a technical issue called "transaction malleability," which appeared to involve third-party manipulation of Bitcoin transactions.[9] Despite these issues, Mt. Gox continued to accept member deposits into the exchange—reassuring members that measures were being taken to resolve withdrawal issues and improve transaction speeds.

On February 24, 2014, consumers navigating to the Mt. Gox website found that the exchange—along with its customers' bitcoins and fiat currency—had vanished. Mt. Gox suspended trading on the exchange entirely, and its website "went dark"—returning nothing but a blank page. The next day, a message on the Mt. Gox website notified exchange members that a "decision was taken to close all transactions for the time being."

Four days after Mt. Gox's unexpected collapse, Mt. Gox KK filed for bankruptcy in Japan, stirring rumors and speculation in the Bitcoin community about the fate of the exchange and the money that was lost with it. Mt. Gox would later reveal that it had lost a total of 850,000 bitcoins—worth upwards of $470 million and representing 7% of the total number of bitcoins in circulation worldwide. Shortly thereafter, and, as explained below, apparently in response to

---

[9]     As Mt. Gox would later claim in its bankruptcy filings, these technical issues had afflicted the Mt. Gox exchange for years.

Plaintiffs' efforts (which this Court referred to as a "sting"), Mt. Gox reported that it had "found" 200,000 lost bitcoins (worth approximately $116 million) in an old Bitcoin wallet.

### C.    The Litigation History

Three days after the sudden closure of Mt. Gox, Gregory Greene filed this putative class action against Mark Karpeles, Mt. Gox KK, MtGox Inc., and Tibanne KK. (Dkt. 1.) He subsequently amended his complaint, naming Mizuho Bank, Ltd. ("Mizuho"), Jed McCaleb, Mt. Gox NA, Gonzague Gay-Bouchery, and John Does as additional defendants (collectively, and together with the original defendants, "Defendants"). (Dkt. 36) (the "Complaint".) The Complaint also added Joseph Lack as a plaintiff. (*Id*.)

In the Complaint, Mr. Greene and Mr. Lack (collectively, "Plaintiffs"), alleged that Defendants failed to safeguard and segregate Mt. Gox exchange members' bitcoins and fiat currency as promised in Mt. Gox's Terms of Use (dkt. 37 ¶¶ 113–127, 192–196), and failed to implement industry-standard protocols to detect and prevent the improper access and misuse of exchange members' bitcoins and fiat currency held by Mt. Gox. (*Id*. ¶¶ 106–112.) Plaintiffs further alleged that Defendants (1) continued to accept and deposit wire transfers into Mt. Gox until the exchange shut down, despite their knowledge that exchange members' funds were lost or misappropriated; (2) acted in concert to misappropriate the bitcoins and fiat currency of exchange members; and (3) misrepresented to exchange members that they could securely trade and withdraw their property from Mt. Gox, up until the day it closed. (*Id*. ¶¶ 75–105, 181–191, 197-203.) The Complaint stated causes of action for, among other things, fraud, negligence, breach of fiduciary duty, breach of contract, unjust enrichment, trespass to chattels, conversion, civil conspiracy, and RICO violations. (Dkt. 37.) The Complaint also sought a permanent

injunction, an accounting, and a constructive trust over exchange members' property. (*Id.* ¶¶ 140–155, 168–180.)[10]

The day after the original complaint had been filed, Mt. Gox KK sought bankruptcy protection in Japan and filed a Civil Rehabilitation Proceeding Commencement Application in the Tokyo District Court. Seeking recognition of the Japanese proceedings in the United States, Mt. Gox KK filed an "emergency" Chapter 15 Petition in the Bankruptcy Court for the Northern District of Texas on March 9, 2014, seeking—and obtaining— a provisional stay of all litigation against it. *See In re MtGox Co., Ltd.*, No. 14-31229-sgj15 (Dkt. 13) (Bankr. N.D. Tex.). The Texas bankruptcy court, however, refused to grant provisional relief to the other—non-debtor— Defendants. The next day in Japan, Mr. Karpeles sought (and received) appointment as the Foreign Representative of the debtor Mt. Gox KK.

On March 4, 2014, Plaintiffs[11] filed a Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction, seeking, among other things, a freeze of Defendants' U.S. assets and expedited discovery. (Dkt. 8.) Mt. Gox's response to the sought TRO was swift:  just three days after Plaintiffs' filing (i.e., on March 7th), the Mt. Gox Defendants suddenly "found" approximately 200,000 bitcoins in a so-called "older format wallet," which represented over 20% of the 850,000 bitcoins the exchange held at the time of its collapse.[12] On March 11, 2014, this Court held a hearing on Plaintiffs' motion for a TRO, during which it accepted the Texas bankruptcy court's provisional stay with respect to Mt. Gox KK only, entered a TRO freezing

---

[10]    For a complete statement of Plaintiffs' causes of action in this matter, *see* Dkt. 37 ¶¶ 75–213.

[11]    Though Mr. Lack had not yet been added as a plaintiff at that time, for convenience, this brief will use the plural even when discussing the period when Mr. Greene was the only plaintiff.

[12]    While this finding was reported to the Tokyo District Court a few days later on March 10th (i.e., the day before the TRO hearing before this Court), it would not be mentioned to either the larger public or any United States court until *after* Plaintiffs made clear their intention to definitively trace the movement of certain bitcoins by individuals suspected to be working for or in concert with the Defendants.

the U.S. assets of all non-debtor Defendants and allowed expedited discovery with respect to

those assets. (Dkt. 33.)

In accordance with the TRO, Plaintiffs' counsel propounded written discovery—

including interrogatories, requests for production, and requests for admission—on all Defendants

(except for Mt. Gox KK, pursuant to the provisional stay) seeking information about their U.S.

assets. Plaintiffs' counsel also served several third parties with subpoenas, including, among

others, different manufacturers and distributors of Bitcoin mining equipment and Bitcoin

"mining pools." Though MtGox Inc., Mark Karpeles, and Tibanne KK had yet to appear before

this Court and failed to respond to Plaintiffs' discovery requests, Plaintiffs' counsel uncovered

through third-party subpoenas and private investigators meaningful information about

Defendants' assets, their global operations, and the loss of Mt. Gox exchange members'

property. Plaintiffs' counsel also retained an expert to investigate and analyze the technical

issues (i.e., "transaction malleability") that—according to public statements issued by Mt. Gox—

had led to the catastrophic loss of bitcoins and fiat currency held by Mt. Gox.

Around this time, a similar class action was filed in the Superior Court of Ontario against

MtGox Inc., Mt. Gox KK, Tibanne KK, Mt. Gox North America ("Mt. Gox NA"), Mizuho,

Mark Karpeles, and Jed McCaleb (the "Canadian Action"). Like the instant action, the Canadian

Action arose from Mt. Gox's loss of consumer bitcoins and fiat currency, and alleges, among

other things, negligence, breach of contract, breach of trust and fiduciary duty, fraudulent

misrepresentation, and conversion. *See Joyce, et al. v. MtGox Inc.*, No. cv-14-500253-00CP

(Can. Ont. Sup. Ct. J.).

On March 20, 2014, the Court held a status hearing, during which Plaintiffs' counsel

updated the Court as to service, discovery, and Plaintiffs' ongoing investigation. At that same

hearing, Plaintiffs also asked the Court for partial relief from the TRO so that the movement of

certain bitcoins could be traced—i.e., bitcoins believed to be controlled by the Defendants and

moved in violation of the TRO. In response—this time just hours following the status hearing

where Plaintiffs requested leave to "trace" these bitcoins—Mt. Gox publicly announced the

existence of the 200,000 bitcoins it previously found on March 7th through its website,

www.mtgox.com.

On April 2, 2014, Plaintiffs filed a motion to "extend" the TRO by effectively converting

it into a preliminary injunction (dkt. 49), which this Court granted. Attorneys from the law firm

of Novack & Macey filed appearances on behalf of Mr. Karpeles and Tibanne KK and attended

the hearing on the motion to extend TRO, indicating their intent to contest jurisdiction and

sufficiency of service.[13]

On April 8, 2014, Plaintiffs filed a Motion for Preliminary Injunction, seeking, among

other things, a continued freeze of Defendants' U.S. assets for the duration of this litigation and

an extension of the expedited discovery schedule. (Dkt. 56.) The motion likewise set forth the

detailed factual findings of Plaintiffs' discovery efforts, argued the likelihood of prevailing on

each of their claims, and sought to preserve the *status quo ante* to ensure that Plaintiffs and the

putative class could ultimately recover should they prevail in the litigation. On April 14, 2014,

settling defendants Jed McCaleb and Gonzague Gay-Bouchery appeared in this matter through

their respective counsel, though counsel for Mr. Gay-Bouchery indicated his intent to contest this

---

[13]     Since the initial filing of Plaintiff Greene's complaint, Plaintiffs hav made reasonable attempts to
serve the Complaint and summons on Karpeles and Tibanne through the Hague Convention and by
international mail and e-mail, and have completed service of the Complaint and summons via process
server on Mt. Gox's U.S. subsidiaries (one of which was authorized to accept service on behalf of Mr.
Karpeles). After Tibanne and Karpeles appeared through counsel, however, Plaintiffs filed a Motion to
Approve Service by Alternative Means, seeking to serve the Complaint and summons through
Defendants' attorneys at Novack & Macey. (Dkt. 54.)

Court's jurisdiction and, potentially, Plaintiffs' Motion for Alternative Service.

Meanwhile, in the Texas bankruptcy court, Plaintiffs moved to compel the deposition of Mr. Karpeles in his capacity as the Foreign Representative of Mt. Gox KK. *See In re MtGox Co., Ltd.*, No. 14-31229-sgj-15 (Dkt. 39) (Bankr. N.D. Tex.). On April 4, 2014, the Bankruptcy Court granted Plaintiffs' motion and ordered that Mr. Karpeles appear for a deposition in Texas. *In re Mt. Gox Co., Ltd.*, No. 14-31229-sgj-15 (Dkt. 72) (Bankr. N.D. Tex.). The day before Mr. Karpeles's deposition was scheduled to take place, however, the Tokyo District Court dismissed Mt. Gox KK's bid for Civil Rehabilitation and transferred control of Mt. Gox KK to a court-appointed Provisional Administrator, Nobuaki Kobayashi. Mr. Karpeles was likewise removed as Mt. Gox KK's foreign representative in the Chapter 15 proceedings. The Tokyo District Court then entered an order for provisional administration, with commencement of bankruptcy proceedings expected to follow. Shortly thereafter, on April 24, 2014, the Tokyo District Court ordered the commencement of bankruptcy proceedings and confirmed the appointment of Mr. Nobuaki Kobayashi as bankruptcy trustee.[14] The court likewise issued a "Cautions" statement to Mt. Gox detailing its obligation to cooperate in the bankruptcy proceedings and with the bankruptcy trustee, and prohibiting the concealment or destruction of any debtor assets.[15]

### D.    Settlement Discussions and Private Mediation

In March 2014, Plaintiffs' counsel began discussions about a potential resolution of this case with counsel for Jed McCaleb. (*See* Edelson Decl. ¶ 13.) Plaintiffs' counsel also began settlement negotiations with other Defendants. (*Id.*) These discussions, along with discussions

---

[14]    *See* Declaration of Jay Edelson ("Edelson Decl."), a copy of which is attached hereto as Exhibit 1, ¶ 5; *see also* Announcement of Commencement of Bankruptcy Proceedings by Bankruptcy trustee Nobuaki Kobayashi, available online at https://www.mtgox.com/img/pdf/20140424_announce_qa_en.pdf (last accessed April 28, 2014).

[15]    *See* Edelson Decl. ¶ 6.

with an outside group of potential investors, Sunlot Holdings Limited ("Sunlot"), culminated in a mediation that spanned the week of April 21. (*Id.* ¶¶ 14–15.)[16]

The mediation—facilitated and presided over by Judge Andersen—involved Mr. McCaleb and Mr. Gay-Bouchery (collectively, the "Settling Defendants"), Sunlot, a putative class of Canadian consumer creditors, and other interested creditors of Mt. Gox KK internationally. *(Id.* ¶ 15.) Over the course of the mediation, the parties coalesced around a negotiated purchase agreement, where Plaintiffs, on behalf of a class of U.S. Mt. Gox exchange members, would support Sunlot's acquisition of Mt. Gox in exchange for a set of terms benefitting and protecting the class. (*Id.* ¶ 16.) Numerous drafts of proposed terms were exchanged and evaluated and—through the mediation process and negotiations with numerous interested international creditors and stakeholders—the parties were able to reach both the terms of a settlement, and the material terms of Sunlot's acquisition of Mt. Gox that would make settlement possible. (*Id.* ¶ 17.) Assuming the enumerated contingencies of the settlement are met, it provides the proposed class here with the greatest opportunity to realize a full recovery of their losses (or more), and Plaintiffs respectfully request that this Court preliminary approve it.[17]

## III.   TERMS OF THE SETTLEMENT

A copy of the settlement agreement (the "Settlement Agreement" or "Agreement") is attached hereto as Exhibit 2. The key terms of the Agreement are briefly set forth below:

---

[16]     Sunlot is composed of a consortium of investors including Brock Pierce (Crypto Currency Partners), William Quigley (Clearstone Venture Partners), and Matthew Roszak (SilkRoad Equity) who collectively manage over one billion dollars of invested capital and have access to significant cash and credit facilities through public and private investment vehicles.

[17]     An identical settlement agreement is being entered into on behalf of a class of Canadian Mt. Gox exchange members. (Edelson Decl. ¶ 18.)

### A.    Presentment and Implementation of the Mt. Gox Reorganization Plan

Under the Agreement, the Settling Defendants agree to present, support, get approval of, and implement a plan to reorganize the Mt. Gox exchange (the "Mt. Gox Reorganization Plan" or "Plan") to the Japanese Bankruptcy Court. (Agreement ¶ 2.1.)[18] Pursuant to the Plan, PricewaterhouseCoopers (or an equivalent alternative auditor) will perform an accounting of the Mt. Gox exchange and determine the amount of bitcoins and fiat currency held by each Mt. Gox exchange member at the time it ceased operations. (Plan at 1.) With the exception of a $10 million fiat currency holdback to fund administration and further recovery efforts, all bitcoins and fiat currency currently held by Mt. Gox—including the 200,000 recently discovered bitcoins—will be automatically returned *pro rata* to affected Mt. Gox exchange members' wallets (the "Initial Distribution"). (Plan at 1-3.)

In addition, under the Mt. Gox Reorganization Plan, Sunlot will acquire Mt. Gox and establish a new Bitcoin exchange ("New Gox"). (Plan at 1-2.) Affected Mt. Gox exchange members will be treated, collectively, as if they hold a 16.5% stake in New Gox. Thus, affected Mt. Gox exchange members will be entitled to 16.5% of any dividends paid by Sunlot/New Gox to its stockholders, as well as to 16.5% of the net proceeds received by Sunlot/New Gox shareholders in the event of any subsequent sale of New Gox, all to be paid to individual affected Mt. Gox exchange members *pro rata*. (Plan at 2.) Further, in the event New Gox conducts an initial public offering of common stock, affected Mt. Gox exchange members are entitled to 16.5% of such stock, their *pro rata* share of which each individual affected exchange member can elect to receive either as stock or the equivalent cash value. (Plan at 2.)

---

[18]    A copy of the Mt. Gox Reorganization Plan is attached to the Settlement Agreement as Exhibit A. In the event the Japanese Bankruptcy Court refuses to approve in any material respect the Mt. Gox Reorganization Plan, Plaintiffs have the right to terminate the Settlement Agreement. (Agreement ¶ 6.1.)

Finally, under both the Mt. Gox Reorganization Plan and the Settlement Agreement,
Sunlot agrees to use commercially reasonable best efforts to investigate and prosecute civil
actions against any person or entity determined to be in any way involved in the loss or theft of
Mt. Gox bitcoins and fiat currency, and to return *pro rata* to the affected Mt. Gox exchange
members any bitcoins or fiat currency recovered through such investigation and prosecution.
(Plan at 3; Agreement ¶¶ 2.2(a), (b).)[19]

Neither the Agreement nor the Plan have any limitation on the amount of bitcoins and/or
fiat currency that an affected Mt. Gox exchange member may ultimately recover (*i.e.*, an affected
Mt. Gox exchange member's recoupment from the Initial Distribution, payments related to their
*pro rata* share of the 16.5% interest in New Gox, and recovery from any subsequent prosecutions
by Sunlot are not capped by the amount of the member's initial loss). Further, the Plan states that
Mt. Gox exchange members will not receive any preferential treatment over any other putative
creditors. (Plan at 1.)

## B.      Complete Cooperation

Both Sunlot and the Settling Defendants agree to provide Plaintiffs and their counsel all
reasonably necessary information in their possession or control related to this litigation and
Plaintiffs' claims against the non-settling Defendants. (Agreement ¶ 2.2.)

## C.      Releases

In exchange for the relief described above, Settling Defendants, Sunlot, and certain Mt.
Gox entities will receive a full release of all claims relating to the collapse of the Mt. Gox
exchange. (Agreement ¶¶ 1.28-1.30, 3.)

---

[19]      As an incentive and compensation for investigating and pursuing such claims, Sunlot may retain
10% of any assets recovered. (Plan at 3.)

D.      **Attorneys' Fees**

The parties agree that proposed class counsel shall be entitled to a fee award in an amount

to be determined by this Court upon petition, which will request that any such award be paid out

of the proceeds going to the class at the same time and in the same manner as the relief afforded

to the class under the Agreement and the Mt. Gox Reorganization Plan. (Agreement ¶ 8.1.)

**IV.     THE PROPOSED CLASS SHOULD BE CERTIFIED.**

Plaintiffs respectfully request that the following class be certified: Persons in the United

States and its territories who had bitcoins or Fiat Currency stored with the Mt. Gox Exchange on

February 24, 2014.[20] (Agreement ¶ 1.35.)

To be certified, a proposed class must satisfy the requirements of Federal Rule of Civil

Procedure 23(a), as well as one of the three alternatives in Rule 23(b). *Messner v. Northshore*

*Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Rule 23(a) requires that (1) the proposed

class is so numerous that joinder of all individual class members is impracticable (numerosity),

(2) that there are questions of law or fact common to the proposed class (commonality), (3) that

the claims of the plaintiff are typical of those of the class (typicality), and (4) that plaintiff will

adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition, where, as here

certification is sought under Rule 23(b)(3), the proponent of the class must show that (1) the

common questions of law or fact predominate over questions affecting only individual class

members (predominance), and (2) that a class action is superior to other available methods of

resolving the controversy (superiority). Fed. R. Civ. P. 23(b)(3); *Messner*, 669 F.3d at 811. As

---

[20]      Excluded from the class are (1) MTGOX, Inc., Mt. Gox KK, Tibanne KK, Mt. Gox North
America, Inc., Mizuho Bank, Ltd., Mark Karpeles, and any entity in which they or their parents have a
controlling interest and their current and former employees, officers, and directors, (2) the Judge or
Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family,
(3) Persons who execute and file a timely request for exclusion, (4) all persons who have previously had
claims similar to those alleged herein finally adjudicated or who have released their claims, and (5) the
Settling Defendants.

more fully discussed below, the proposed class satisfies all of these requirements, and should therefore be certified.

### A.    The Proposed Class is Sufficiently Numerous.

The first requirement of Rule 23(a)—numerosity—is satisfied where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although there is no "magic number at which joinder is impracticable," a class of at least 40 members is generally sufficient, *Schmidt v. Smith & Wollensky, LLC*, 268 F.R.D. 323, 326 (N.D. Ill. 2010), and classes numbering in the thousands "clearly" satisfy the numerosity requirement, *Heastie v. Cmty. Bank of Greater Peoria*, 125 F.R.D. 669, 674 (N.D. Ill. 1989).

Here, although Mt. Gox at times had one million members, only approximately 138,000 Mt. Gox account holders had wallets holding bitcoins or fiat currency at the time of closure, and approximately 45,000 of those account holders comprise the proposed class. (Edelson Decl. ¶ 7.) Plaintiffs need not allege the exact number or identity of the class members, and this Court may make common sense assumptions in determining numerosity. *Hinman v. M & M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 805-06 (N.D. Ill. 2008). Further, while courts have read a "definiteness" requirement into the Rule 23(a) prerequisites for class certification, a class is sufficiently definite if its members can be determined by reference to objective criteria. *Id. See also Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 417 (N.D. Ill. 2012). The objective criterion to determine class membership here is whether an individual or entity had bitcoins or fiat currency held by Mt. Gox on February 24, 2014, and a list of such individuals and entities is to be sought from Mt. Gox pursuant to the Mt. Gox Reorganization Plan. *See id.* (holding that where class members could be identified with reference to lists generated by defendant or third parties, the class was sufficiently definite).

Consequently, because the proposed class consists of roughly 45,000 members who can be determined by objective criteria (and ultimately identified by Mt. Gox), the numerosity requirement of Rule 23(a)(1) is satisfied.

**B.      The Claims of the Proposed Class Share Common Questions of Law and Fact.**

The second requirement of Rule 23(a)—commonality—is satisfied where "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requires a common contention that is of such a nature that it is capable of class-wide resolution, meaning that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)," *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992), and commonality exists where a plaintiff can show that class members have all "suffered the same injury," *Wal-Mart*, 131 S. Ct. at 2551.

Here, each proposed class member's claims against the Settling Defendants share a common nucleus of operative fact, and each class member suffered the same injury. Specifically, each member of the proposed class had their Mt. Gox account frozen in February—preventing them from withdrawing any bitcoins or fiat currency—shortly before Mt. Gox's website "went dark" and Mt. Gox filed for bankruptcy. Plaintiffs' Complaint alleges that Mt. Gox—including the Settling Defendants—misrepresented their ability to adequately safeguard its customers' bitcoins and fiat currency, failed to do so, and fraudulently concealed the large-scale loss and/or theft of bitcoins. These allegations raise questions of law and fact common to all members of the proposed class, including, among others, (1) whether Mt. Gox engaged in the alleged conduct; (2) whether the Settling Defendants participated in the alleged conduct, and, if so what their role

15

in the alleged conduct was; (3) whether the alleged conduct was fraudulent; (4) whether the

alleged conduct was negligent; (5) whether the alleged conduct breached any express or implied

contracts with, or fiduciary duties owed to, Mt. Gox exchange members, and, if so whether the

Settling Defendants are bound by such agreements or duties; and (6) whether Mt. Gox principals

(including the Settling Defendants) may retain monies paid to or deposited into accounts with

Mt. Gox.

These questions are common to every member of the proposed class, and determining the

answer to each would resolve—in one stroke—an issue that is central to the validity of every

proposed class member's claims, and determining liability for the identical injury suffered by

every member of the proposed class. Consequently, the commonality requirement of Rule

23(a)(2) is satisfied. *See Rosario*, 963 F.2d at 1018 (finding commonality satisfied where

question at the "heart of [the] case" was whether defendants operated cosmetology schools

pursuant to an ongoing scheme to defraud and deceive prospective students).

### C.    Plaintiffs' Claims are Typical of the Proposed Class Members' Claims.

The third Rule 23(a) requirement—typicality—is satisfied where "the claims … of the

representative parties are typical of the claims … of the class." Fed. R. Civ. P. 23(a)(3). This

factor directs courts to focus on whether Plaintiffs' claims "have the same essential

characteristics as the claims of the class at large." *De La Fuente v. Stokely-Van Camp, Inc.*, 713

F.2d 225, 232 (7th Cir. 1983). A plaintiff's claim is typical "if it arises from the same event or

practice or course of conduct that gives rise to the claims of other class members and his or her

claims are based on the same legal theory." *Id*. That is precisely the situation here.

Plaintiffs, along with every other member of the proposed class, were allegedly subjected

to the same common course of conduct by Defendants, including the Settling Defendants.

Settling Defendants, among others, allegedly failed to secure every proposed class member's

bitcoins and fiat currency—including Plaintiffs'—and allegedly misrepresented the security and

accessibility of the Mt. Gox exchange to every proposed class member—including Plaintiffs.

The kind of harm arising out of this alleged conduct was identical with respect to every member

of the proposed class, including Plaintiffs, and thus, their claims all share "the same essential

characteristics." Consequently, Rule 23(a)(3)'s typicality requirement is satisfied here.

### D.    Plaintiffs (and their Counsel) Will Adequately Represent the Class.

The final Rule 23(a) requirement—adequacy—requires that Plaintiffs "will fairly and

adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement mandates

that both Plaintiffs' and their counsel "be able to zealously represent and advocate on behalf of

the class as a whole." *Maxwell v. Arrow Fin. Servs., Inc.*, No. 03 C 1995, 2004 WL 719278, *5

(N.D. Ill. Mar. 31, 2004). This means that Plaintiffs must have no antagonistic or conflicting

claims with other class members and must have a sufficient interest in the outcome of the case to

ensure vigorous advocacy. *Id*. With respect to Plaintiffs' counsel, it means that they must be

experienced and qualified and generally be able to conduct the litigation. *Id.* Here, Plaintiffs and

their counsel easily satisfy these requirements.

Neither Plaintiff has any conflicting claims with other members of the proposed class,

and each has a sufficient stake in the outcome to ensure vigorous advocacy. Shortly before Mt.

Gox shut down, Mr. Lack had transferred $40,000 to Mt. Gox to be deposited into his account,

and at the time Mt. Gox shut down, Mr. Greene's account contained approximately $25,000 in

bitcoins. Plaintiffs Lack and Greene have exactly the same interests as other members of the

proposed class in recovering their bitcoins and/or fiat currency and have sufficient amounts at

stake to ensure vigorous advocacy. Plaintiffs' dogged pursuit of their claims across the globe thus far demonstrates as much.

Likewise, Plaintiffs' counsel are well-qualified and experienced members of the plaintiffs' bar who have extensive experience in class actions of similar size, scope, and complexity to the instant action. (Edelson Decl. ¶ 27.) As explained more fully below, *see infra* Part V, Plaintiffs' counsel have regularly engaged in major complex litigation involving both consumer technology and banking issues, have the resources necessary to conduct litigation of this nature, and have frequently been appointed class counsel by courts throughout the country. (Edelson Decl. ¶¶ 29-33.) Further, Plaintiffs' counsel have already diligently investigated and dedicated substantial resources to the claims in this action, and will continue to do so throughout its pendency. (*Id.* ¶ 34.)

Because both Plaintiffs and their counsel have and will continue to zealously represent and advocate on behalf of the proposed class, Rule 23(a)(4)'s adequacy requirement is satisfied here.

### E.    The Proposed Class Satisfies Rule 23(b).

As noted above, in addition to meeting all four of Rule 23(a)'s prerequisites for certification, a proposed class must also fall within one of the subsections of Rule 23(b). Here, the proposed class falls within Rule 23(b)(3) because the common questions predominate over any individual questions, and a class action is superior to alternative methods of resolving this dispute.

### 1.    *Common Questions of Law and Fact Predominate.*

Under the first prong of Rule 23(b)(3)—predominance—this Court must find "that the questions of law or fact common to class members predominate over any questions affecting

only individual members." Fed. R. Civ. P. 23(b)(3). The purpose of the predominance

requirement is "to determine whether a proposed class is 'sufficiently cohesive to warrant

adjudication by representation.'" *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814

(7th Cir. 2012) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). This

requirement is satisfied when "common questions represent a significant aspect of a case and can

be resolved for all members of a class in a single adjudication." *Id*. (internal quotations omitted).

As the Seventh Circuit has explained:

> If, to make a prima facie showing on a given question, the members of a proposed
> class will need to present evidence that varies from member to member, then it is
> an individual question. If the same evidence will suffice for each member to make
> a prima facie showing, then it becomes a common question.

*Id*.

Here, virtually every question in the case is common to all members of the proposed

class. The complaint states numerous causes of action against Defendants for fraud, negligence,

breaches of contract and fiduciary duty, conversion, and civil conspiracy, among others. Each of

these claims arises out of the same alleged conduct of Defendants—including the Settling

Defendants—in operating and making representations about the Mt. Gox exchange, and the

evidence needed to establish these claims will be the same for every proposed class member.

Consequently, the common questions of law and fact predominate over any individual issues

here, and the first prong of Rule 23(b)(3) is thus satisfied.

### 2. A Class Action is Superior to Other Available Methods of Adjudication.

Under the second prong of Rule 23(b)(3)—superiority—this Court must find that "a class

action is superior to other available methods for fairly and efficiently adjudicating the

controversy." Fed. R. Civ. P. 23(b)(3). A class action is usually considered a superior method of

adjudicating claims that, like here, involve standardized conduct, even if there are individual

issues that exist among class members such as damages. *Cicilline v. Jewel Food Stores, Inc.*, 542
F. Supp. 2d 831, 838 (N.D. Ill. 2008). In addition, "[t]he class action device is also superior to
other methods of adjudication when the judicial economy from consolidation of separate claims
outweighs any concern with possible inaccuracies from their being lumped together in a single
proceeding for decision by a single judge or jury." *Streeter v. Sheriff of Cook County*, 256 F.R.D.
609, 614 (N.D. Ill. 2009) (internal quotations omitted).

Here, a class action is superior to other available methods of adjudication for precisely
these reasons. Because Defendants acted exactly the same with respect to every member of the
proposed class, their claims can be fairly and efficiently adjudicated in one action. Absent class
treatment, each proposed class member would be required to present the same legal and factual
arguments in separate and duplicative proceedings, creating a multiplicity of unnecessary actions
at great expense to both the litigants and the judicial system. Further, certifying a class will allow
class members to speak with a unified voice in attempting to influence the outcome of events—
such as the Japanese bankruptcy proceedings or private negotiations over the fate of the Mt. Gox
exchange—that will affect their interests at stake here, rather than forcing them to speak
individually, or, more likely, to not be heard at all.

In short, because the proposed class here satisfies each of Rule 23(a)'s prerequisites for
class certification, as well as Rule 23(b)(3)'s predominance and superiority requirements, this
Court should certify the proposed class.

## V.    PLAINTIFFS' COUNSEL SHOULD BE APPOINTED CLASS COUNSEL.

When certifying a class, a court must also appoint class counsel who will fairly and
adequately represent the interests of the class. Fed. R. Civ. P. 23(g)(1), (2), (4). In appointing
class counsel, the court must consider (1) the work counsel has done in identifying or

investigating potential claims, (2) counsel's experience in handling class actions, other complex

litigation, and the types of claims asserted in the case, (3) counsel's knowledge of the applicable

law, and (4) the resources class counsel has committed to representing the class. Fed. R. Civ. P.

23(g)(1)(A)(i)-(iv).

Here, as noted above, proposed class counsel has extensive experience prosecuting

similar class actions and other complex litigation. Edelson PC has been recognized as a pioneer

in both large digital privacy cases involving complicated technological issues as well as large-

scale complex banking litigation. For example, in appointing Edelson PC as interim co-lead

counsel in a privacy class action against Facebook, the United States District Court for the

Northern District of California described the firm as "pioneers in the electronic privacy class

action field, having litigated some of the largest consumer class actions in the country on this

issue." *In re Facebook Privacy Litig.*, No. 10-cv-02389 (N.D. Cal. Dec. 10, 2010)*; see also In re

Netflix Privacy Litig.*, No 5:11-cv-00379 (N.D. Cal. Aug. 12, 2011) (appointing Edelson PC

interim lead counsel, noting that while two other firms had impressive resumes and litigation

experience, Edelson PC's "significant and particularly specialized expertise in electronic privacy

litigation and class action renders them superior to represent the putative class."); *Harris v.

comScore, Inc.*, 292 F.R.D. 579 (N.D. Ill. 2013) (adversarially certifying what is believed to be

the largest digital privacy consumer class action and appointing Edelson PC as class counsel).

Edelson PC has also been named a "top national plaintiff's class action firm" in the areas of

"technology, privacy, and telecommunications" by the U.S. Chamber Institute for Legal Reform.

U.S. Chamber Institute for Legal Reform, *The New Lawsuit Ecosystem: Trends, Targets and

Players* at 16 (October 2013) (available at http://www.instituteforlegalreform.com/uploads/sites/

1/The_New_Lawsuit_Ecosystem_pages_web.pdf).

With respect to banking litigation, Edelson PC has been at the forefront of class action litigation arising in the aftermath of the federal bailouts of too-big-to-fail banks following the 2008 financial crisis, being named as lead counsel in nationwide class actions involving illegal suspensions of home equity lines of credit and the rights of individuals to sue to enforce portions of the federal Home Affordable Modification Program ("HAMP"). (Edelson Decl. ¶ 33.) These actions have led to the restoration of billions of dollars of credit to homeowners (*id.*) and, in the case of the HAMP litigation, caused one Seventh Circuit judge to remark that "[p]rompt resolution of this matter is necessary not only for the good of the litigants but for the good of the Country." *Wigod v. Wells Fargo Bank*, N.A. 673 F.3d 547, 586 (7th Cir. 2012) (Ripple, J. concurring).

In addition, Edelson PC has dedicated significant resources to representing the proposed class, diligently investigating and pursuing the claims here against the Settling Defendants and others. (Edelson Decl. ¶ 34.) Proposed class counsel further spearheaded the settlement efforts here and successfully negotiated a settlement that, as explained below, is a remarkable result for the class.

For all these reasons, this Court should appoint Jay Edelson of Edelson PC as class counsel.[21]

## VI.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL.

A class action may be settled only with this Court's approval. Fed. R. Civ. P. 23(e). District Court review of a proposed class action settlement is a well-established two-step process.

---

[21]    Appointment of Jay Edelson as class counsel is supported by four committees of attorneys working on behalf of affected Mt. Gox exchange members: (1) U.S. Committee led by Robert Clifford of The Clifford Law Offices and Brett Luskin of Law Office of Bret Lusskin, Esq.; (2) the Bankruptcy Committee led by Scott Kitei of Honigman Miller Schwartz and Cohn LLP; (3) the Canadian Committee led by Theodore P. Charney of Charney Lawyers; and (4) the International Committee led by Scott A. Kamber of KamberLaw, LLC. (Edelson Decl. ¶ 35.)

*Armstrong v. Board of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980),

*overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). First, courts

conduct a pre-notification hearing to determine whether the proposed settlement is "within the

range of possible approval." Conte & Newberg, 4 Newberg on Class Actions, §11.25, at 38 – 39

(4th ed. 2002); *Armstrong*, 616 F.2d at 314. The purpose of this preliminary approval hearing is

not to conduct a "fairness hearing," but rather "to ascertain whether there is any reason to notify

the class members of the proposed settlement and to proceed with a fairness hearing."

*Armstrong*, 616 F.2d at 314; Newberg, §11.25, at 38–39. This stage serves as an "initial

evaluation" of the proposed settlement, taking into consideration the written submissions as well

as the informal presentations provided by the settling parties. Manual for Complex Litigation,

§ 21.632 (4th ed. 2004). Upon determining that the settlement proposal is "within the range of

possible approval," the court then proceeds to the second step, a final approval hearing.

Newberg, §11.25, at 38 – 39; *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, MDL No.

2147, 270 F.R.D. 330, 346 (N.D. Ill. 2010). Here, the proposed settlement is well within the

range of possible approval, and this Court should therefore preliminarily approve the settlement,

order the parties to provide notice of the proposed settlement to the class, and set a date for a

final approval hearing.

     "Federal courts naturally favor the settlement of class action litigation." *In re AT&T,* 270

F.R.D. at 345 (quoting *Isby v. Bayh,* 75 F.3d 1191, 1196 (7th Cir. 1996)). Upon a finding that a

proposed settlement is "fair, reasonable, and adequate," strong judicial and public policy favors

the approval of such a settlement. *Isby*, 75 F.3d at 1198. In determining whether the proposed

settlement is fair, reasonable and adequate, courts look to the following factors: (1) the strength

of the plaintiff's case compared to the amount of the settlement offer; (2) an assessment of the

likely complexity of a trial; (3) the length and expense of the litigation; (4) the amount of

opposition to settlement among affected parties; (5) the opinion of competent counsel; and (6)

the stage of the proceedings and amount of discovery completed at the time of settlement.

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 578 (N.D. Ill. 2011) (citing *Synfuel Techs., Inc.

v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir.2006)). Though these factors are

ultimately assessed at the fairness hearing that follows preliminary approval of the proposed

settlement, a summary version of the same inquiry also takes place at this phase of the approval

process. *Kessler v. Am. Resorts Int'l,* 05 C 5944, 2007 WL 4105204, at *5 (N.D. Ill. Nov. 14,

2007) (citing *Armstrong*, 616 F.2d at 314)).

Applying a summary version of the six-factor test here demonstrates that the proposed

settlement is "fair, reasonable and adequate" and thus well within the range of approval.

### A.    The Settlement Offer Balanced Against the Likelihood of Recovery Against Mt. Gox and the Settling Defendants Absent Settlement Weighs Strongly in Favor of Preliminary Settlement Approval.

The first factor—the strength of Plaintiffs' case compared to the settlement offer—is the

most heavily weighted and strongly favors approval here. *See Schulte*, 805 F. Supp. 2d at 578.

Courts should be mindful not to reject a settlement solely because it does not provide a complete

victory, given that parties to a settlement "benefit by immediately resolving the litigation and

receiving some measure of vindication for [their] position[s] while foregoing the opportunity to

achieve an unmitigated victory." *In re AT&T*, 270 F.R.D. at 347.

Here, the proposed settlement provides significant relief to class members, especially in

light of their chances of ultimate recovery against Mt. Gox and the Settling Defendants absent

settlement. Under the proposed settlement, the parties agree to present the Mt. Gox

Reorganization Plan to the Japanese bankruptcy court. If the Plan is adopted by that court—and

the proposed settlement is only valid if it is—then class members will receive an immediate

distribution of bitcoins and, potentially, fiat currency. As noted above, Mt. Gox holds at least

200,000 bitcoins it recently "found," worth approximately $116 million. Further, class members

will receive an interest in the New Gox exchange, entitling them to 16.5% of any dividends,

proceeds of sale, and common stock issued in an initial public offering. Finally, Sunlot has

agreed to continue to pursue recovery of bitcoins and fiat currency against other responsible

parties (distributing 90% of any recovered assets to exchange members), and the Settling

Defendants have agreed to cooperate in Plaintiffs' continued litigation against the non-settling

Defendants. Receiving an immediate distribution of money, a substantial interest in the new

exchange—with no cap on income from such interest, and which thus has the potential to make

them more than whole—and an agreement from Sunlot to pursue recovery against other actors

and from both Sunlot and settling Defendants to cooperate in Plaintiffs' own continued efforts,

provides significant benefits for class members and is an exceedingly good result.

This is especially true given the obstacles that class members would face to ultimate

recovery from Mt. Gox and the Settling Defendants in the absence of the proposed settlement.

With respect to Mt. Gox, the alternative to the proposed settlement and reorganization is

liquidation, which would likely result in recovery for class members and other exchange

members—if any—of pennies on the dollar. Thus, it almost goes without saying that the

potential to be made more than whole through the proposed settlement via the immediate

distribution of bitcoins and currency, continued recovery efforts, and a substantial interest in the

New Gox Bitcoin exchange is a far superior result for the class.

With respect to McCaleb and Gay-Bouchery, the alternative to this settlement is lengthy

and expensive litigation against two individuals who have insufficient assets to offer meaningful

recovery to the class.[22] Again, as with Mt. Gox, the settlement offers a much better result for the

class. In addition to throwing their support behind the Mt. Gox Reorganization Plan, McCaleb

and Gay-Bouchery have agreed to cooperate with Plaintiffs as they pursue their claims against

the non-settling Defendants. This cooperation alone is beneficial to the class because unlike

McCaleb and Gay-Bouchery, the non-settling defendants have significant assets against which

the class could potentially recover. Federal courts nationwide have recognized the value of

similar agreements to cooperate in approving class action settlements. *See, e.g., In re Processed

Egg Prods. Antitrust Litig.*, 284 F.R.D. 278, 285 (E.D. Pa. 2012) (approving a settlement in

which the only benefit to the class was defendant's agreement "to cooperate with the [p]laintiffs'

preparation for and prosecution of their class action" against remaining defendants by providing

relevant documents and witnesses); *Buckley v. Engle*, No. 07CV254, 2010 WL 4064985, at *2

(D. Neb. Oct. 14, 2010) (approving a "proposed settlement [that] provides the important benefit

of [defendant]'s cooperation in pursuing recovery from the nonsettling parties" by "providing

testimony, documents and information regarding the plaintiffs' claims," given the "prospect that

[defendant]'s financial condition would make any judgment against him difficult to collect").

In short, the proposed settlement here—providing immediate partial recovery to the class,

agreements to continue recovery efforts and cooperate with Plaintiffs' own recovery efforts

against non-settling Defendants, and an ongoing stake in the reorganized Bitcoin exchange,

which itself offers the opportunity for more-than-full recovery—is a resounding victory

compared to the alternative to settlement, the liquidation of Mt. Gox and continued litigation

---

[22]     In addition, while Plaintiffs believe they have a strong case against Gay-Bouchery, the case against McCaleb may be somewhat weaker, as it appears that he received minimal financial benefit, if any, from the collapse of the Mt. Gox exchange, and was not actively involved in the activities of the company during the relevant time.

against two individual defendants lacking significant resources.[23] Consequently, because the proposed settlement offers class members substantial benefits, especially when considered against the alternative, this factor weighs in favor of preliminary approval.

**B.      The Complexity, Length, and Expense of Continued Litigation Against the Settling Defendants Favors Approval of the Settlement.**

The second and third factors—the likely complexity of trial and the length and expense of the litigation—also weigh in favor of approving the proposed settlement here. The proposed settlement "allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation" against the Settling Defendants. *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011). Here, settlement is especially favorable due to the complex facts and novel legal issues involved. Plaintiffs' claims will require highly complex investigation and fact-finding to determine what actually took place (i.e., what actually led to and caused the loss of bitcoins and fiat currency and resulted in Mt. Gox's insolvency), and will then require the resolution of novel and complex legal issues involving rights, duties, and best practices as applied to the relatively recent phenomenon of digital currency. (Edelson Decl. ¶ 25.) Additionally, the underlying facts are the subject of litigation in the United States and Canada, bankruptcy proceedings in Japan and related bankruptcy proceedings in the United States. (*Id.* ¶ 26.) Continued litigation against the Settling Defendants would create unnecessary delay and expense in attempting to obtain ultimate recovery for the class from those Defendants, which thus weighs strongly in favor of preliminary settlement approval here.

---

[23]      In addition, as Bitcoin holders, class members have an additional interest in avoiding the liquidiation of the largest Bitcoin exchange because it would undermine public confidence in Bitcoin generally.

### C.    Competent Counsel Both in the United States and Abroad Support the Settlement.

The fifth[24] factor to consider—the opinion of competent counsel—also supports the proposed settlement. When evaluating a proposed settlement, it is appropriate for courts to "give consideration to the opinion of competent counsel that the settlement was fair, reasonable and adequate." *Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996). When weighing class counsel's opinion, the Court may consider affidavits, as well as general observations made by class counsel. *Id.*

Here, as noted above, *supra* Part V, Plaintiffs' counsel is recognized as leaders in prosecuting both digital consumer protection litigation and large-scale complex banking litigation. Based on their substantial experience, Plaintiffs' counsel was fully competent to weigh the risks and rewards of further litigation as compared to agreeing to the proposed settlement. As a result, proposed class counsel believes that the proposed settlement is likely the only avenue for substantial class member recovery. (Edelson Decl. ¶¶ 20, 23.)

Consequently, the opinion of counsel factor strongly favors preliminary approval.

### D.    Plaintiffs Have Sufficient Information to Assess the Proposed Settlement.

Finally, the sixth settlement approval factor—the stage of proceedings and amount of discovery completed—also weighs in favor of approval here. This factor is relevant because it determines "how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Schulte*, 805 F. Supp. 2d at 587 (internal quotations omitted). The pertinent inquiry is "what facts and information plaintiffs have been provided", and seeks to avoid collusion among the parties, or other failures of class counsel "to get the best agreement possible for their class."

---

[24]    The fourth settlement approval factor—amount of opposition among affected parties—is not typically assessed at the preliminary approval stage, before notice of the settlement has been disseminated. *See In re AT&T*, 270 F.R.D. at 349.

*Id.* at 587-88 (internal quotations omitted). Here, Plaintiffs had sufficient information to evaluate the settlement, did not collude with the Settling Defendants, and ultimately were able to get what can realistically be viewed as the best agreement possible for the class.

Plaintiffs conducted substantial factual investigation (including through the retention of private investigators), and obtained information through investigations performed by the media and members of the Bitcoin community. (Edelson Decl. ¶ 12.) These various fact-finding methods have resulted in the receipt of information from Defendants, declarations from putative class members, the Expert Report of Cornell Professor Emin Gün Sirer, and more. (*Id.* ¶ 12.) Using this information, Plaintiffs were able to spearhead an effort to avoid the liquidation of Mt. Gox and negotiate an extremely valuable settlement for the class. The fact that the result is so beneficial to class members alone suggests that Plaintiffs had sufficient information to fully evaluate the settlement. *Schulte*, 805 F.3d at 588 ("[A]s the Seventh Circuit has suggested, the fact that Class Counsel negotiated a fair settlement is evidence that he had enough information to effectively represent the class.") (citing *Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co. of Chicago*, 834 F.2d 677, 684 (7th Cir. 1987)).

Consequently, the final factor weighs in favor of approval. And thus, as all factors suggest that the proposed settlement is fair, adequate, and reasonable and thus within the range of approval, this Court should grant preliminary approval to the proposed settlement.

## VII.    THE PROPOSED NOTICE PLAN SHOULD BE APPROVED.

When a class is certified under Rule 23(b)(3), the court must direct to class members "the best notice that is practicable under the circumstances" informing them of the nature of the class action and their right to opt-out of the class. Fed. R. Civ. P. 23(c)(2)(B). The best notice practicable includes "individual notice to all members who can be identified through reasonable

effort." *Id*. In addition, where the parties seek to settle a class action, the court must direct notice

"in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ.

P. 23(e)(1). The notice of class certification and the notice of settlement may be combined in a

single notice directed to class members. *See In re AT&T Mobility Wireless Data Servs. Sales

Litig.*, 270 F.R.D. 330, 350-51 (N.D. Ill. 2010). Here, the parties have agreed on a notice plan

(the "Notice Plan") that satisfies the requirements of Rule 23. The Notice Plan, fully set forth in

the Settlement Agreement, is summarized below.

Plaintiffs and the Settling Defendants have agreed to request, within five days, that the

Japanese Bankruptcy Court release a list of all names, U.S. mailing addresses, and email

addresses associated with each class member registered with the Mt. Gox exchange. (Agreement

¶ 4.2(a).) Using that list, Epiq Systems, Inc. (the "Settlement Administrator") will send a notice

directly to each class member by both first class U.S. mail and email. (Agreement ¶¶ 1.33,

4.2(c).) The notice will describe the nature of the action, the claims, and the settlement; provide

the class definition; and explain class members' rights to exclude themselves from, comment

upon, and/or object to the settlement, and how to exercise those rights. (Agreement ¶ 4.3, Ex. A.)

The notice will also provide contact information for class counsel and the Settlement

Administrator, as well as the address for a settlement website, which will contain further

information about the settlement. (Agreement ¶ 4.2(e), Ex. B.)

The direct notice sent by mail and email to each class member will be supplemented

through a press release to local, national, and syndicated news organizations discussing the terms

of the Settlement Agreement, as well as advertisement in *Investors Business Daily*. (Agreement

¶¶ 4.2(e), (f).) Finally, pursuant to 28 U.S.C. § 1715, notice of the settlement will be sent within

ten days to the U.S. Attorney General and the attorneys general of each state. (Agreement ¶ 4.2(g).)

Because the Notice Plan calls for individual direct notice to all class members, as well as publication notice generally, it is reasonable and the best notice practicable, and thus satisfies Rule 23's notice requirements. *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 595-96 (N.D. Ill. 2011) (finding Rule 23 notice requirements satisfied where professional class action notification company provided direct notice to virtually all class members; notice was additionally disseminated via the internet, advertisements, and press releases; and settlement administrator established toll-free telephone number to answer questions). Consequently, this Court should approve the proposed Notice Plan.

## VIII.   CONCLUSION

For the reasons discussed above, Plaintiffs respectfully request that this Court enter an order (1) certifying the proposed class, (2) naming Plaintiffs as class representatives, (3) appointing Jay Edelson of Edelson PC as class counsel, (4) granting preliminary approval to the Settlement Agreement, (5) approving the proposed Notice Plan, (6) scheduling a final fairness hearing, and (7) providing such further relief as this Court deems just and proper.[26]

//

//

---

[26]    A proposed preliminary approval order will be submitted with this motion.

Respectfully submitted,

**GREGORY GREENE and JOSEPH LACK**,
individually, and on behalf of a class of similarly
situated individuals,

Dated: April 28, 2014

By:   /s/ Jay Edelson
         One of Plaintiffs' Attorneys

Steven L. Woodrow
swoodrow@edelson.com
Megan Lindsey
mlindsey@edelson.com
EDELSON PC
999 West 18th Street, Suite 3000
Denver, Colorado 80202
Tel: 303.357.4878
Fax: 303.446.9111

Jay Edelson
jedelson@edelson.com
Christopher L. Dore
cdore@edelson.com
David I. Mindell
dmindell@edelson.com
Alicia Hwang
ahwang@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiffs and the Putative Class*

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GREGORY GREENE and JOSEPH LACK, individually and on behalf of all others similarly situated, | |
| *Plaintiffs*, | Case No. 1:14-cv-01437 |
| v. | Hon. Gary Feinerman |
| MTGOX INC., a Delaware corporation, MT. GOX KK, a Japanese corporation, TIBANNE KK, a Japanese corporation, MT. GOX NORTH AMERICA, INC., a New York corporation, MIZUHO BANK, LTD., a Japanese financial institution, MARK KARPELES, an individual, GONZAGUE GAY-BOUCHERY, an individual, JED MCCALEB, an individual, and JOHN DOE DEFENDANTS, | Magistrate Judge Susan Cox **DECLARATION OF JAY EDELSON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL** |
| *Defendants*. | |

I, Jay Edelson, pursuant to 28 U.S.C. § 1746, hereby declare on oath as follows:

1.  I am over the age of eighteen and am fully competent to make this declaration. I make this declaration based upon person knowledge unless otherwise indicated.

2.  I am an attorney admitted to practice in the State of Illinois and in the United States District Court for the Northern District of Illinois. I am entering this declaration in support of Plaintiffs' Motion and Memorandum in Support of Preliminary Approval of Class Action Settlement.

3.  I am the managing Partner at the law firm of Edelson PC, which has been retained to represent Plaintiffs Gregory Greene and Joseph Lack (collectively, "Plaintiffs") in this matter. I am an adult over the age of 18 and am fully competent to make this Declaration. If called upon

to testify as to the matters stated herein, I could and would competently do so.

4.      Attached hereto as Exhibit A is a true and accurate copy of the firm resume of Edelson PC.

5.      Attached hereto as Exhibit B is a true and accurate copy of the Decision and Judgment from the Tokyo District Court ordering that "[a] bankruptcy procedure shall commence with regard to debtor MtGox Co., Ltd. [a/k/a Mt. Gox KK]" and appointing Attorney-at-law Nobuaki Kobayashi as Bankruptcy Trustee over Mt. Gox KK and the Mt. Gox Exchange.

6.      Attached hereto as Exhibit C is a true and accurate copy of the "CAUTIONS TO THE BANKRUPT" issued by the Tokyo District Court 20th Civil Camber Consensus to MtGox Co., Ltd. and Representative Director Mark Marie Robert Karpeles.

7.      The proposed settlement class consists of approximately 45,000 of Mt. Gox account holders that had Mt. Gox "wallets" holding bitcoins or fiat currency at the time that the Mt. Gox Exchange "went dark" and closed (i.e., out of approximately 138,000 individual account holders from around the world).

8.      Because each settlement class member was required to provide certain information before creating an account with the Mt. Gox Exchange, Mt. Gox KK (which is now under the management of Mr. Kobayashi, the Exchange's Bankruptcy Trustee) has a complete list of contact information for the settlement class, including at least both names and email addresses. Indeed, as of this filing, Mt. Gox Exchange account holders (including settlement class members) can still use their Mt. Gox usernames and passwords to log into the Exchange (at www.mtgox.com) and check their wallet balances—i.e., at least as last recorded by the Exchange without the benefit of any confirmatory audit.

***Discovery and Related Efforts To-Date***

9.      All discovery efforts to-date have been effected through the Temporary

Restraining Order and Interim Preliminary Injunction entered in this case.

10.     Consistent with those Orders and as detailed in their other filings, Plaintiffs have

propounded extensive discovery requests on each of the Defendants and have issued many third

party subpoenas, requesting both documents and sworn testimony.

11.     To date, Plaintiffs have not received any discovery-related communications

(much less formal responses) from Mark Karpeles, Tibanne KK, Mt. Gox Inc., or Mt. Gox North

America, Inc. Plaintiffs have, however, received information from other Defendants, along with

information stemming from the issued third party subpoenas, including meaningful information

about Defendants' assets, their global operations, and the loss of Mt. Gox exchange members'

property.

12.     Likewise, my firm has conducted substantial factual investigations outside of the

formal discovery channels.  We are, for example, in constant contact with around 300 putative

class members who have been asked to be kept apprised of case developments—many of which

have provided us with valuable information about the Mt. Gox Exchange and the moments

leading up to its collapse, and many of whom have provided declarations in this matter. We have

engaged Emin Gün Sirer—an expert in distributed systems and virtual currencies, and professor

at Cornell University with substantial experience in crypto-currencies, including Bitcoin—to

help understand the circumstances of the Exchange's collapse and the legitimacy of those

excuses publicly offered to explain its downfall. Further, we have utilized both private

investigators and information obtained by the media and members of the Bitcoin community to

obtain additional information about the Mt. Gox Exchange and its collapse.

*Negotiations Leading to Proposed Class Settlement*

13.     Beginning in March 2014, I, along with attorneys my firm, began discussing the

possible resolution of this matter with counsel for Jed McCaleb. Shortly thereafter, we began

settlement discussions with certain other Defendants and explored different potential settlement

structures.

14.     Over the course of these negotiations, we entered into concurrent discussions with

a group of investors external to the litigation—Sunlot Holdings Limited ("Sunlot")—regarding a

possible plan for purchasing the assets and business of Mt. Gox in the course of the ongoing

Japanese bankruptcy proceedings.

15.     These ongoing discussions culminated in a mediation that spanned the week of

April 21, 2014, which was facilitated and provided over by Judge Andersen (Ret.) and involved

(i) Plaintiffs and attorneys at my firm, (ii) Mr. McCaleb and Mr. Gay-Bouchery (collectively, the

"Settling Defendants"), (iii) Sunlot, (iv) attorneys representing the putative Canadian Class in

*Joyce et al. v. MtGox, Inc. et al.*, CV-14-500253-00CP (Ontario Sup. Ct. J.), and (v) other

interested creditors of Mt. Gox KK internationally.

16.     Over the course of the week, the mediating parties coalesced around a negotiated

purchase agreement, where Plaintiffs, on behalf of a class of U.S. Mt. Gox exchange members,

would support Sunlot's acquisition of Mt. Gox in exchange for a set of terms benefitting and

protecting the class.

17.     Throughout this time, the mediating parties exchanged and evaluated several

drafts of proposed terms and—through the mediation process and negotiations with numerous

interested international creditors and stakeholders—were able to reach both the terms of a

settlement, and the material terms of Sunlot's acquisition of Mt. Gox that would make settlement

possible.

18.     An agreement materially identical to the Settlement Agreement reached here is

being entered into on behalf of the class of Canadian Mt. Gox exchange members in the matter

of *Joyce et al. v. MtGox, Inc. et al.*, CV-14-500253-00CP (Ontario Sup. Ct. J.).

19.     Assuming the enumerated contingencies of the settlement are met, I believe that

the settlement provides the proposed settlement class with the greatest opportunity to realize a

maximized recovery of their losses, and that it warrants approval by the Court.

***The Proposed Settlement Is In the Settlement Class's Best Interests***

20.      In my view, the proposed settlement provides significant relief to settlement class

members, especially in light of their chances of recovering—even with a verdict in their favor—

against Mt. Gox KK (which is in bankruptcy proceedings and against whom this litigation is

currently stayed), Jed McCaleb (who was a part-owner of the Mt. Gox Exchange before its

movement into bankruptcy and liquidation), and Gonzague Gay-Bouchery (Mt. Gox's Chief

Marketing Officer and Manager of Business Development).

21.     Prior to and throughout the duration of this matter, my firm has diligently

investigated and prosecuted this case, dedicating substantial resources to the investigation of the

claims at issue in the action and has successfully negotiated the settlement of this matter to the

benefit of the proposed Class. We are confident in the strength of Plaintiffs' claims and believe

they would ultimately prevail at trial—indeed, we have been shown nothing to suggest

otherwise, and are aware of no facts that would hurt Plaintiffs' chances of prevailing under any

of their causes of action. Regardless, Plaintiffs also recognize that litigation is inherently risky.

22.     Here, such risks include that—in the absence of the proposed settlement—Mt.

Gox and the Settling Defendants would certainly oppose class certification and vigorously

contest the merits of Plaintiffs' claims. Further, even if Plaintiffs ultimately succeeded on a class

basis at trial against the Settling Defendants, lengthy appeals would likely follow, as would

potential difficulties in collecting any award.

23.     More importantly, and even apart from the risks inherent to this and any other

litigation, this matter carries significant obstacles relating to the settlement class's ability to be

made whole, specifically because of several known and rapidly developing external factors that

would, in all likelihood, make recovery difficult—if not impossible—as against the Settling

Defendants. Namely, the Defendant against whom class members have the strongest claims—

and who holds the most assets potentially available to remedy class members—Mt. Gox KK, is

under bankruptcy protection. If the proposed settlement is not approved, and the Mt. Gox

Reorganization Plan not adopted, the Japanese bankruptcy court will likely extinguish class

members' claims against Mt. Gox KK, and force class members to participate in a lengthy and

complex international claims process that could take years to resolve and would likely result in

their obtaining only pennies on the dollar, if that. As such, and with respect to Mt. Gox, the

alternative to settlement is not even continued litigation culminating in a trial (at which

Plaintiffs' are confident they could prevail), but liquidation.

24.     Consequently, I believe that the proposed settlement presents a real—and the

best—opportunity for members of the settlement class to recover all their losses caused by the

Mt. Gox Exchange's collapse, if not more.  That is, under the proposed settlement (assuming the

Mt. Gox Reorganization Plan is approved), all consumer creditors of the Mt. Gox Exchange (i.e.,

not just settlement class members, as the Settlement Agreement does not seek to prioritize U.S.

consumer creditors over others) will receive (i) an immediate and definite pro rata recovery from

certain bitcoins and fiat currency currently held by the Mt. Gox Exchange, (ii) ongoing

recoveries via distributions taken from the dividends and net proceeds enjoyed by the rehabilitated Mt. Gox Exchange (i.e., through the treatment of settlement class members as effective 16.5% stakeholders in the Exchange), and, (iii) upon any future sale of the Exchange and at the election of each class member, a 16.5% *pro rata* interest in the new Exchange's equity security or the equivalent value. The latter two modes of relief should be particularly valuable to settlement class members, as they have an interest both in maintaining public confidence in Bitcoin generally as well as in continued viability its largest exchange. The Plan will allow settlement class members to further those interests.

25.     Even aside from the above-discussed external factors that make recovery difficult in this case, the relief obtained on behalf of the settlement class is particularly favorable in light of the complex facts and novel legal issues involved. The claims asserted in the First Amended Complaint will require highly complex investigation and fact-finding to determine what actually took place (i.e., what actually led to and caused the loss of bitcoins and fiat currency and resulted in Mt. Gox's insolvency), and will then require the resolution of novel and complex legal issues involving rights, duties, and best practices as applied to the relatively recent phenomenon of digital currency.

26.     Adding an additional layer of complication is that all of these facts—i.e., as they directly relate to the Mt. Gox Exchange—are the subject of litigation in the United States and Canada, bankruptcy proceedings in Japan, and related bankruptcy proceedings in the United States.

27.     Even given all the above, it should be noted that if the proposed settlement is approved, the litigation will continue forward against Mark Karpeles, Tibanne KK, and Mizuho Bank, Ltd. Likewise, the Settlement Agreement is structured around key contingencies—such

that if the Tokyo District Court or appointed Administrator of the Mt. Gox Exchange fails to move forward with material aspects the proposed structured purchase, then the Settlement Agreement will unwind and the litigation will continue forward against all Defendants from where it left off. As such, the settlement class is insulated against any prejudicial harm that could conceivably result from the Settlement Agreement.

28.     All told, and based on my experience and knowledge of this case, the immediate and substantial relief provided by the Settlement here weighs strongly in favor of approval, and avoids the inherent and various external risks associated with this complex and novel litigation.

***Experience of Edelson PC***

29.     The attorneys of Edelson PC are well-qualified and experienced members of the plaintiffs' bar who have extensive experience in class actions of similar size, scope, and complexity to the instant action.

30.     The attorneys at my firm have regularly engaged in major complex litigation involving consumer technology issues, have the resources necessary to conduct litigation of this nature, and have frequently been appointed class counsel by courts throughout the country.

31.     Consistent with this experience, Edelson PC has been recognized as a pioneer in both large digital privacy cases involving complicated technological issues as well as large-scale complex banking litigation.

32.     For example, Edelson PC was appointed as interim co-lead counsel in a privacy class action against Facebook, where the United States District Court for the Northern District of California described the firm as "pioneers in the electronic privacy class action field, having litigated some of the largest consumer class actions in the country on this issue." *In re Facebook Privacy Litig.*, No. 10-cv-02389 (N.D. Cal. Dec. 10, 2010). *See also In re Netflix Privacy Litig.*,

No 5:11-cv-00379 (N.D. Cal. Aug. 12, 2011) (appointing Edelson PC interim lead counsel,

noting that while two other firms had impressive resumes and litigation experience, Edelson

PC's "significant and particularly specialized expertise in electronic privacy litigation and class

action renders them superior to represent the putative class."). Edelson PC has also been named a

"top national plaintiff's class action firm" in the areas of "technology, privacy, and

telecommunications" by the U.S. Chamber Institute for Legal Reform. U.S. Chamber Institute

for Legal Reform, The New Lawsuit Ecosystem: Trends, Targets and Players at 16 (October

2013) (available at http://www.instituteforlegalreform.com/uploads/sites/1/The_New_Lawsuit_

Ecosystem_pages_web.pdf).

33. With respect to banking litigation, my firm has been at the forefront of class

action litigation arising in the aftermath of the federal bailouts of too-big-to-fail banks following

the 2008 financial crisis, being named as lead counsel in nationwide class actions involving

illegal suspensions of home equity lines of credit and the rights of individuals to sue to enforce

portions of the federal Home Affordable Modification Program ("HAMP"). These actions have

led to the restoration of billions of dollars of credit to homeowners, and, in the case of the HAMP

litigation, caused one Seventh Circuit judge to remark that "[p]rompt resolution of this matter is

necessary not only for the good of the litigants but for the good of the Country." *Wigod v. Wells*

*Fargo Bank, N.A.*, 673 F.3d 547, 586 (7th Cir. 2012) (Ripple, J. concurring).

34. For this case, my firm has already diligently investigated and dedicated

substantial resources to the claims in this action and will continue to do so throughout its

pendency. Examples, among others, include Edelson PC's (i) substantial efforts and expenses

towards third party discovery pursuant to the Temporary Restraining Order and Interim

Preliminary Injunction entered by this Court; (ii) early engagement of expert witnesses,

including Cornell Professor Emin Gün Sirer; and (iii) retention of Japanese counsel to keep

apprised of the Tokyo District Court bankruptcy proceedings and, importantly, evaluate the

proposed purchase plan underlying this settlement.

35.     Further, in this matter, my appointment as class counsel in this matter is supported

by four committees of attorneys working on behalf of affected Mt. Gox exchange members: (1)

U.S. Committee led by Robert Clifford of The Clifford Law Offices and Bret Lusskin of Law

Office of Bret Lusskin, Esq.; (2) the Bankruptcy Committee led by Scott Kitei of Honigman

Miller Schwartz and Cohn LLP; (3) the Canadian Committee led by Theodore P. Charney of

Charney Lawyers; and (4) the International Committee led by Scott A. Kamber of KamberLaw,

LLC.


I declare under penalty of perjury that the foregoing is true and correct. Executed April

28, 2014 in Chicago, Illinois.


                                        /s/ Jay Edelson
                                          Jay Edelson

# Exhibit A

## Edelson PC Firm Resume

EDELSON PC is a plaintiff's class action and commercial litigation firm with attorneys in Illinois, Colorado and California.

Our attorneys have been recognized as leaders in these fields by state and federal legislatures, national and international media groups, the courts, and our peers.  Our reputation for leadership in class action litigation has led state and federal courts to appoint us lead counsel in many high-profile class action suits, including privacy class actions involving comScore, Netflix, Time, Microsoft, and Facebook, numerous Telephone Consumer Protection Act ("TCPA") against companies such as Google, Twentieth Century Fox, and Simon & Schuester, class actions against Citibank, Wells Fargo, and JP Morgan Chase related to reductions in home equity lines of credit, fraudulent marketing cases against software companies such as Symantec, mobile content class actions against all major cellular telephone carriers, the Thomas the Tank Engine lead paint class actions, and the tainted pet food litigation. We have testified before the United States Senate on class action issues and have repeatedly been asked to work on federal and state legislation involving cellular telephony, privacy and other issues. Our attorneys have appeared on dozens of national and international television and radio programs to discuss our cases and class action and consumer protection issues more generally.  Our attorneys speak regularly at seminars on consumer protection and class action issues, lecture on class actions at law schools and are asked to serve as testifying experts in cases involving class action and consumer issues.

### PLAINTIFFS' CLASS AND MASS ACTION PRACTICE GROUP

EDELSON PC is a leader in plaintiffs' class and mass action litigation, with a particular emphasis on consumer technology class actions, and has been called a "class action 'super firm'".  (Decalogue Society of Lawyers, Spring 2010.)  As recognized by federal courts nationwide, our firm has an "extensive histor[y] of experience in complex class action litigation, and [is a] well-respected law firm[] in the plaintiffs' class action bar."  *In re Pet Food Prod. Liab. Litig.*, MDL Dkt. No. 1850, No. 07-2867 (NLH) (D.N.J. Nov. 18, 2008). A leading arbitrator concurred:   "The proof of [the firm's] experience, reputation, and abilities is extraordinary. . . .  Each [of their cases] elaborates on the experience and unique success [they] have had in achieving leading roles in the area of 'technology consumer protection class actions.'"  (Arbitration award in mobile content class action settlement, August 6, 2009)

In appointing our firm interim co-lead in one of the most high profile cases in the country, a federal court pointed to our ability to be "vigorous advocates, constructive problem-solvers, and civil with their adversaries."  - *In Re JPMorgan Chase Home Equity Line of Credit Litig.*, No. 10 C 3647 (N.D. Ill, July 16, 2010).   After hard fought litigation, that case settled, resulting in the reinstatement of between $3.2 billion and $4.7 billion in home credit lines.

We have been specifically recognized as "pioneers in the electronic privacy class action field, having litigated some of the largest consumer class actions in the country on this issue."  *In re Facebook Privacy Litig.*, No. C 10-02389 (N.D. Cal) (order appointing the firm interim co-lead of privacy class action); see also In re Netflix Privacy Litigation, 5:11-cv-00379 (N.D. Cal. Aug. 12, 2011) (appointing the sole lead counsel due, in part, to its  "significant and particularly

specialized expertise in electronic privacy litigation and class actions[.]")

Similarly, as recognized by a recent federal court, our firm has "pioneered the application of the TCPA to text-messaging technology, litigating some of the largest consumer class actions in the country on this issue." *Ellison v Steve Madden, Ltd.,* cv 11-5935 PSG (C.D. Cal. May 7, 2013).

We have several sub-specialties within our plaintiffs' class action practice:

***Privacy/Data Loss***

### Data Loss/Unauthorized Disclosure of Data

We have litigated numerous class actions involving issues of first impression against Facebook, Apple, Netflix, Sony, Red Box, Pandora, Sears, Storm 8, Google, T-Mobile, Microsoft and others involving the failure to protect customers' private information, security breaches, and unauthorized sharing of personal information with third parties. Representative settlements and ongoing cases include:

- *Dunstan v. comScore, Inc.*, No. 11-cv-5807 (N.D. Ill.):  Lead counsel in certified class action accusing internet analytics company of improper data collection practices.

- *Resnick v. Avmed*, No. 10-cv-24513 (S.D. Fla.):  Lead counsel in data breach case filed against health insurance company.  Obtained landmark appellate decision endorsing common law unjust enrichment theory, irrespective of whether identity theft occurred.

- *In re Netflix Privacy Litigation*, No. 5:11-cv-00379 (N.D. Cal.):  Sole lead counsel in suit alleging that defendant violated the Video Privacy Protection Act by illegally retaining customer viewing information.  Case resulted in a $9 million dollar cy pres settlement that has been finally approved (pending appeal).

- *Halaburda v. Bauer Publishing Co.* 12-CV-12831 (E.D. Mich.), *Grenke v. Hearst Communications, Inc.,* 12-CV-14221 (E.D. Mich.), *Fox v. Time, Inc.,* 12-CV-14390 (E.D. Mich.) Consolidated actions brought under Michigan's Video Rental Privacy Act, alleging unlawful disclosure of subscribers' personal information. In a ground-breaking decision, the court denied three motions to dismiss finding that the magazine publishers were covered by the act and that the illegal sale of personal information triggers an automatic $5,000 award to each aggrieved consumer.

- *Standiford v. Palm*, No. 5:09-cv-05719-LHK (N.D. Cal.):  Sole lead counsel in data loss class action, resulting in $640,000 settlement.

- *In re Zynga Privacy Litigation,* 10-cv-04680 (N.D. Cal.):  Appointed co-lead counsel in suit against gaming application designer for the alleged

unlawful disclosure of its users' personally identifiable information to advertisers and other third parties.

- *In re Facebook Privacy Litigation,* 10-cv-02389 (N.D. Cal.): Appointed co-lead counsel in suit alleging that Facebook unlawfully shared its users' sensitive personally identifiable information with Facebook's advertising partners.

- *In re Sidekick Litig.,* No. C 09-04854-JW (N.D. Cal.): Co-lead counsel in cloud computing data loss case against T-Mobile and Microsoft. Settlement provided the class with potential settlement benefits valued at over $12 million.

- *Desantis v. Sears*, 08 CH 00448 (Cook County, IL): Lead counsel in injunctive settlement alleging national retailer allowed purchase information to be publicly available through the internet.

### Telephone Consumer Protection Act

Edelson has been at the forefront to TCPA litigation for over six years, having secured the groundbreaking *Satterfield* ruling in the Ninth Circuit applying the TCPA to text messages. In addition to numerous settlements totaling over $100 million in relief to consumers, we have over two dozen putative TCPA class actions pending against companies including Santander Consumer USA, Inc., Walgreen Co., Path, Inc., Nuance Communications, Inc., Stonebridge Life Insurance, Inc., UnitedHealth Group, Inc., GEICO, DirectBuy, Inc., and RCI, Inc. Representative settlements and ongoing cases include:

- *Rojas v CEC*, No. 1:10-cv-05260 (N.D. Ill): Lead counsel in text spam class action that settled for $19,999,400.

- *In re Jiffy Lube Int'l Text Spam Litig*, No. 11-md-2261, 2012 WL 762888 (S.D. Cal. March 9, 2012): Co-lead counsel in $35 million text spam settlement.

- *Ellison v Steve Madden, Ltd.,* cv 11-5935 PSG (C.D.Cal.): Lead counsel in $10 million text spam settlement.

- *Kramer v. B2Mobile, et al,* No. 0-cv-02722-CW (N.D. Cal.): Lead counsel in $12.2 million text spam settlement.

- *Pimental v. Google, Inc*., No. 11-cv-02585 (N.D.Cal.): Lead counsel in class action alleging that defendant co-opted group text messaging lists to send unsolicited text messages. $6 million settlement provides class members with an unprecedented $500 recovery.

- *Robles v. Lucky Brand Dungarees, Inc.*, No. 10-cv-04846 (N.D.Cal.).

Lead counsel in $10 million text spam settlement.

- *Miller v. Red Bull*, No. 12-CV-04961 (N.D. Ill.) Lead counsel in preliminary approved $6 million settlement.

- *Woodman et al v. ADP Dealer Services, et al.,* 2013 CH 10169 (Cook County, IL) Lead counsel in $7.5 million text spam settlement.

- *Lozano v. 20th Century Fox,* No. 09-cv-05344 (N.D. Ill): Lead counsel in class action alleging that defendants violated federal law by sending unsolicited text messages to cellular telephones of consumers.  Case settled for $16 million.

- *Satterfield v. Simon & Schuster*, No. C 06 2893 CW (N.D. Cal.).  Co-lead counsel in in $10 million text spam settlement.

- *Weinstein, et al. v. Airit2me, Inc*., Case No. 06 C 0484 (N.D. Ill):  Co-lead counsel in $7 million text spam settlement.

### *Consumer Technology*

### **Fraudulent Software**

In addition to the settlements listed below, Edelson PC has consumer fraud cases pending in courts nationwide against companies such as McAfee, Inc., Avanquest North America Inc., PC Cleaner, AVG, iolo Technologies, LLC, among others.  Representative settlements include:

- *Drymon v. Cyberdefender*, No. 11 CH 16779 (Cook County, IL):  Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software.  Case settled for $9.75 million.

- *Gross v. Symantec Corp., et al.*, No. 3:12-cv-00154-CRB (N.D. Cal.) Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software.  Case settled for $11 million.

- *LaGarde, et al. v. Support.com, Inc., et al.* (N.D. Cal.) Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software.  Case settled for $8.59 million.

- *Ledet v. Ascentive LLC* (E.D. Pa.) Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software.  Case settled for $9.6 million.

- *Webb, et al. v. Cleverbridge, Inc.,* et al. (N.D. Ill.) Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software.  Case settled for $5.5 million.

## Video Games

Edelson PC has litigated cases video game related cases against Activision Blizzard Inc., Electronic Arts, Inc., Google, and Zenimax Media, Inc., and has active litigation pending, including:

- *Locke v. Sega of America*, 13-cv-01962-MEJ (N.D. Cal.)   Pending putative class action alleging that Sega of America and Gearbox Software released video game trailer that falsely represented the actual content of the game.

### *Mortgage & Banking*

EDELSON PC has been at the forefront of class action litigation arising in the aftermath of the federal bailouts of the banks.   Our suits include claims that the certain banks unlawfully suspended home credit lines based on pre-textual reasons, and that certain banks have failed to honor loan modification programs.  We achieved the first federal appellate decision in the country recognizing the right of borrowers to enforce HAMP trial plans under state law.  The court noted that "Prompt resolution of this matter is necessary not only for the good of the litigants but for the good of the Country." *Wigod v. Wells Fargo Bank,* N.A., 673 F.3d 547, 586 (7th Cir. 2012) (Ripple, J., concurring).  Our settlements have restored billions of dollars in home credit lines to people throughout the country. Representative cases and settlements include:

- *In re JP Morgan Chase Bank Home Equity Line of Credit Litig.*, 10-cv-3647 (N.D. Ill.):  Court appointed interim co-lead counsel in nationwide putative class action alleging illegal suspensions of home credit lines. Settlement restored between $3.2 billion and $4.7 billion in credit to the class.

- *Hamilton v. Wells Fargo Bank, N.A.*, 4:09-cv-04152-CW (N.D. Cal.). Lead counsel in class actions challenging Wells Fargo's suspensions of home equity lines of credit. Nationwide settlement restores access to over $1 billion in credit and provides industry leading service enhancements and injunctive relief.

- *In re Citibank HELOC Reduction Litigation*, 09-CV-0350-MMC. Lead counsel in class actions challenging Citibanks's suspensions of home equity lines of credit. The settlement restored up to $653,920,000 worth of credit to affected borrowers.

- *Wigod v. Wells Fargo*, No. 10-cv-2348 (N.D. Ill.):  In ongoing putative class action, obtained first appellate decision in the country recognizing the right of private litigants to sue to enforce HAMP trial plans.

*General Consumer Protection Class Actions*

We have successfully prosecuted countless class action suits against computer software companies, technology companies, health clubs, dating agencies, phone companies, debt collectors, and other businesses on behalf of consumers. In addition to the settlements listed below, Edelson PC has consumer fraud cases pending in courts nationwide against companies such as Motorola Mobility, Stonebridge Benefit Services, J.C. Penney, Sempris LLC, and Plimus, LLC. Representative settlements include:

<u>Mobile Content</u>

We have prosecuted over 100 cases involving mobile content, settling numerous nationwide class actions, including against industry leader AT&T Mobility, collectively worth over a hundred million dollars.

- *McFerren v. AT&T Mobility, LLC*, No. 08-CV-151322 (Fulton County Sup. Ct., GA):  Lead counsel class action settlement involving 16 related cases against largest wireless service provider in the nation.  "No cap" settlement provided virtually full refunds to a nationwide class of consumers who alleged that unauthorized charges for mobile content were placed on their cell phone bills.

- *Paluzzi v. Cellco Partnership*, No. 07 CH 37213 (Cook County, Illinois): Lead counsel in class action settlement involving 27 related cases alleging unauthorized mobile content charges.  Case settled for $36 million.

- *Gray v. Mobile Messenger Americas, Inc.*, No. 08-CV-61089 (S.D. Fla.): Lead counsel in case alleging unauthorized charges were placed on cell phone bills.  Case settled for $12 million.

- *Parone v. m-Qube, Inc.* No. 08  CH 15834 (Cook County, Illinois): Lead counsel in class action settlement involving over 2 dozen cases alleging the imposition of unauthorized mobile content charges.  Case settled for $12.254 million.

- *Williams, et al. v. Motricity*, *Inc. et al.*, Case No. 09 CH 19089 (Cook County, Illinois):  Lead counsel in class action settlement involving 24 cases alleging the imposition of unauthorized mobile content charges. Case settled for $9 million.

- *VanDyke v. Media Breakaway, LLC*, No. 08 CV 22131 (S.D. Fla.):  Lead counsel in class action settlement alleging unauthorized mobile content charges.  Case settled for $7.6 million.

- *Gresham v. Cellco Partnership*, No. BC 387729 (Los Angeles Sup. Ct.): Lead counsel in case alleging unauthorized charges were placed on cell phone bills.  Settlement provided class members with full refunds.

- *Abrams v. Facebook, Inc.,* No. 07-05378 (N.D. Cal.):  Lead counsel in injunctive settlement concerning the transmission of allegedly unauthorized mobile content.

### Deceptive Marketing

- *Van Tassell v. UMG*, No. 1:10-cv-2675 (N.D. Ill):  Lead counsel in negative option marketing class action.  Case settled for $2.85 million.

- *McK Sales Inc. v. Discover Bank*, No. 1:10-cv-02964 (N.D. Ill):  Lead counsel in class action alleging deceptive marketing aimed at small businesses.  Case settled for $6 million.

- *Farrell v. OpenTable*, No 3:11-cv-01785-si (N.D. Cal.):  Lead counsel in gift certificate expiration case.  Settlement netted class over $3 million in benefits.

- *Ducharme v. Lexington Law*, No. 10-cv-2763-crb (N.D. Cal):  Lead counsel in CROA class action.  Settlement resulted in over $6 million of benefits to the class.

- *Pulcini v. Bally Total Fitness Corp.*, No. 05 CH 10649 (Cook County, IL):  Co-lead counsel in four class action lawsuits brought against two health clubs and three debt collection companies.  A global settlement provided the class with over $40 million in benefits, including cash payments, debt relief, and free health club services.

- *Kozubik v. Capital Fitness, Inc.*, 04 CH 627 (Cook County, IL):  Co-lead counsel in state-wide suit against a leading health club chain, which settled in 2004, providing the over 150,000 class members with between $11 million and $14 million in benefits, consisting of cash refunds, full debt relief, and months of free health club membership.

- *Kim v. Riscuity*, No. 06 C 01585 (N.D. Ill):  Co-lead counsel in suit against a debt collection company accused of attempting to collect on illegal contracts.  The case settled in 2007, providing the class with full debt relief and return of all money collected.

- *Jones v. TrueLogic Financial Corp.*, No. 05 C 5937 (N.D. Ill):  Co-lead counsel in suit against two debt collectors accused of attempting to collect on illegal contracts.  The case settled in 2007, providing the class with approximately $2 million in debt relief.

- *Fertelmeyster v. Match.com*, No. 02 CH 11534 (Cook County, IL):  Co-lead counsel in a state-wide class action suit brought under Illinois consumer protection statutes.  The settlement provided the class with a collective award with a face value in excess of $3 million.

- *Cioe v. Yahoo!, Inc.*, No. 02 CH 21458 (Cook County, IL): Co-lead counsel in a state-wide class action suit brought under state consumer protection statutes. The settlement provided the class with a collective award with a face value between $1.6 million and $4.8 million.

- *Zurakov v. Register.com,* No. 01-600703 (New York County, NY): Co-lead counsel in a class action brought on behalf of an international class of over one million members against Register.com for its allegedly deceptive practices in advertising on "coming soon" pages of newly registered Internet domain names. Settlement required Register.com to fully disclose its practices and provided the class with relief valued in excess of $17 million.

### Products Liability Class Actions

We have been appointed lead counsel in state and federal products liability class settlements, including a $30, million settlement resolving the "Thomas the Tank Engine" lead paint recall cases and a $32 million settlement involving the largest pet food recall in the history of the United States and Canada. Representative settlements include:

- *Barrett v. RC2 Corp.*, No. 07 CH 20924 (Cook County, IL): Co-lead counsel in lead paint recall case involving Thomas the Tank toy trains. Settlement is valued at over $30 million and provided class with full cash refunds and reimbursement of certain costs related to blood testing.

- *In re Pet Food Products Liability Litig.*, No. 07-2867 (D. N.J.): Part of mediation team in class action involving largest pet food recall in United States history. Settlement provided $24 million common fund and $8 million in charge backs.

### Insurance Class Actions

We have prosecuted and settled multi-million dollar suits against J.C. Penney Life Insurance for allegedly illegally denying life insurance benefits under an unenforceable policy exclusion and against a Wisconsin insurance company for terminating the health insurance policies of groups of self-insureds. Representative settlements include:

- *Holloway v. J.C. Penney*, No. 97 C 4555, (N.D. Ill.): One of the primary attorneys in a multi-state class action suit alleging that the defendant illegally denied life insurance benefits to the class. The case settled in or around December of 2000, resulting in a multi-million dollar cash award to the class.

- *Ramlow v. Family Health Plan* (Wisc. Cir. Ct., WI): Co-lead counsel in a class action suit challenging defendant's termination of health insurance to groups of self-insureds. The plaintiff won a temporary injunction, which was sustained on appeal, prohibiting such termination and eventually

settled the case ensuring that each class member would remain insured.

### Mass/Class Tort Cases

Our attorneys were part of a team of lawyers representing a group of public housing residents in a suit based upon contamination related injuries, a group of employees exposed to second hand smoke on a riverboat casino, and a class of individuals suing a hospital and national association of blood banks for failure to warn of risks related to blood transfusions. Representative settlements include:

- *Aaron v. Chicago Housing Authority,* 99 L 11738, (Cook County, IL): Part of team representing a group of public housing residents bringing suit over contamination-related injuries. Case settled on a mass basis for over $10 million.

- *Januszewski v. Horseshoe Hammond*, No. 2:00CV352JM (N.D. Ind.): Part of team of attorneys in mass suit alleging that defendant riverboat casino caused injuries to its employees arising from exposure to second-hand smoke.

The firm's cases regularly receive attention from local, national, and international media. Our cases and attorneys have been reported in the Chicago Tribune, USA Today, the Wall Street Journal, the New York Times, the LA Times, by the Reuters and UPI news services, and BBC International. Our attorneys have appeared on numerous national television and radio programs, including ABC World News, CNN, Fox News, NPR, and CBS Radio, as well as television and radio programs outside of the United States. We have also been called upon to give congressional testimony and other assistance in hearings involving our cases.

## GENERAL COMMERCIAL LITIGATION

Our attorneys have handled a wide range of general commercial litigation matters, from partnership and business-to-business disputes, to litigation involving corporate takeovers. We have handled cases involving tens of thousands of dollars to "bet the company" cases involving up to hundreds of millions of dollars. Our attorneys have collectively tried hundreds of cases, as well as scores of arbitrations and mediations.

## OUR ATTORNEYS

**JAY EDELSON** is the founder and Managing Partner of EDELSON PC. He has been recognized as a leader in class actions, technology law, corporate compliance issues and consumer advocacy by his peers, the media, state and federal legislators, academia and courts throughout the country.

Jay has been appointed lead counsel in numerous state, federal, and international class actions, resulting in hundreds of millions of dollars for his clients. He is regularly asked to weigh in on federal and state legislation involving his cases. He testified to the U.S. Senate about the largest pet food recall in the country's history and is advising state and federal politicians on consumer issues relating to the recent federal bailouts, as well as technology issues, such as those involving mobile marketing. Jay also counsels companies on legal compliance and legislative issues in

addition to handling all types of complex commercial litigation.

Jay has litigated class actions that have established precedent concerning the ownership rights of domain name registrants, the applicability of consumer protection statutes to Internet businesses, and the interpretation of numerous other state and federal statutes including the Telephone Consumer Protection Act and the Video Privacy Protection Act. As lead counsel, he has also secured settlement in cases of first impression involving Facebook, Microsoft, AT&T and countless others, collectively worth hundreds of millions of dollars.

In addition to technology based litigation, Jay has been involved in a number of high-profile "mass tort" class actions and product recall cases, including cases against Menu Foods for selling contaminated pet food, a $30 million class action settlement involving the Thomas the Tank toy train recall, and suits involving damages arising from second-hand smoke.

In 2009, Jay was named one of the top 40 Illinois attorneys under 40 by the Chicago Daily Law Bulletin. In giving Jay that award, he was heralded for his history of bringing and winning landmark cases and for his "reputation for integrity" in the "rough and tumble class action arena." In the same award, he was called "one of the best in the country" when it "comes to legal strategy and execution." Also in 2009, Jay was included in the American Bar Association's "24 hours of Legal Rebels" program, where he was dubbed one of "the most creative minds in the legal profession" for his views of associate training and firm management.  In 2010, he was presented with the Annual Humanitarian Award in recognition of his "personal integrity, professional achievements, and charitable contributions" by the Hope Presbyterian Church. Starting in 2011, he has been selected as an Illinois Super Lawyer and, separately, as a top Illinois class action lawyer by Benchmark Plaintiff.

Jay is frequently asked to participate in legal seminars and discussions regarding the cases he is prosecuting, including serving as panelist on national symposium on tort reform and, separately, serving as a panelist on litigating high-profile cases. He has also appeared on dozens of television and radio programs to discuss his cases. He has taught classes on class action law at Northwestern Law School and The John Marshall Law School, and has co-chaired a 2-day national symposium on class action issues.  He has been an adjunct professor, teaching a seminar on class action litigation at Chicago-Kent College of Law since 2010.

Jay is a graduate of Brandeis University and the University of Michigan Law School.

**RYAN D. ANDREWS** is a Partner at EDELSON PC, and the Chair of the Telecommunications Practice Group. Mr. Andrews has been appointed class counsel in numerous state and federal class actions nationwide that have resulted in nearly $100 million dollars in refunds to consumers, including *Satterfield v. Simon & Schuster, Inc.*, No. C 06 2893 CW (N.D. Cal.), *Gray v. Mobile Messenger Americas, Inc.*, No. 08-CV-61089 (S.D. Fla.), *Lofton v. Bank of America Corp.*, No. 07-5892 (N.D. Cal.), *Paluzzi v. Cellco Partnership*, No. 07 CH 37213 (Cook County, Ill.), *Parone v. m-Qube, Inc.* No. 08 CH 15834 (Cook County, Ill.), and *Kramer v. Autobytel*, Inc., No. 10-cv-2722 (N.D. Cal. 2010).

In addition, Mr. Andrews has achieved groundbreaking court decisions protecting consumers through the application of the Telephone Consumer Protection Act to emerging text-messaging

technology. Representative reported decisions include: Lozano v. Twentieth Century Fox, 702 F. Supp. 2d 999 (N.D. Ill. 2010), *Satterfield v. Simon & Schuster, Inc.* 569 F.3d 946 (9th Cir. 2009), and *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010), *In re Jiffy Lube Int'l Text Spam Litig*, --- F. Supp. 2d ---, No. 11-md-2261, 2012 WL 762888 (S.D. Cal. March 9, 2012).

Mr. Andrews received his J.D. with High Honors from the Chicago-Kent College of Law and was named Order of the Coif. Recently, Mr. Andrews has returned to Chicago-Kent as an Adjunct Professor of Law, teaching a third-year seminar on Class Actions.  While in law school, Mr. Andrews was a Notes & Comments Editor for The Chicago-Kent Law Review, as well as a teaching assistant for both Property Law and Legal Writing courses. Mr. Andrews externed for the Honorable Joan B. Gottschall in the United State District Court for the Northern District of Illinois.

A native of the Detroit area, Mr. Andrews graduated from the University of Michigan, earning his B.A., with distinction, in Political Science and Communications.

Mr. Andrews is licensed to practice in Illinois state courts, the United States District Court for the Northern District of Illinois, the U.S. Court of Appeals for the Seventh Circuit, and the U.S. Court of Appeals for the Ninth Circuit.

**RAFEY S. BALABANIAN** is a Partner and the Chair of the Corporate Governance and Business Litigation Practice Group. Rafey's practice focuses upon a wide range of complex consumer class action litigation, as well as general business litigation.

On the plaintiff's side, Rafey has been appointed lead counsel in numerous class actions, including landmark settlements involving the telecom industry worth hundreds of millions of dollars. Rafey has been appointed Class Counsel in nationwide class action settlements against the major wireless carriers, aggregators, and providers of "mobile content," including *Van Dyke v. Media Breakaway, LLC*, No. 08-cv-22131 (S.D. Fla.); *Parone v. m-Qube, Inc.*, 08 CH 15834 (Cir. Ct. Cook County, Ill.); *Williams v. Motricity, Inc.*, et al., No. 09 CH 19089 (Cir. Ct. Cook County, Ill.); and *Walker v. OpenMarket, Inc., et al.*, No. 08 CH 40592 (Cir. Ct. Cook County, Ill.).

On the business side, Rafey has counseled clients ranging from "emerging technology" companies, real estate developers, hotels, insurance companies, lenders, shareholders and attorneys. He has successful litigated numerous multi-million dollar cases, including several "bet the company" cases.

Rafey has first chaired jury and bench trials, mediations, and national and international arbitrations.

Rafey received his J.D. from the DePaul University College of Law in 2005. While in law school, he received a certificate in international and comparative law. Rafey received his B.A. in History, with distinction, from the University of Colorado – Boulder in 2002.

**CHRISTOPHER L. DORE** is a Partner at Edelson and a member of the Technology and Fraudulent Marketing Group. Chris focuses his practice on emerging consumer technology issues, with his cases relating to online fraud, deceptive marketing, consumer privacy, negative option membership enrollment, and unsolicited text messaging. Chris is also a member of the firm's Incubation and Startup Development Group wherein he consults with emergent businesses.

Chris has been appointed class counsel in multiple class actions, including one of the largest text-spam settlements under the Telephone Consumer Protection Act, ground breaking issues in the mobile phone industry and fraudulent marketing, as well as consumer privacy. (*Pimental v. Google, Inc.*, No. 11-cv-02585 (N.D.Cal.); *Kramer v. Autobytel, Inc.* (10-cv-02722-CW); *Turner v. Storm8, LLC*, (09-cv-05234) (N.D. Cal.); Standiford v Palm, Inc. (09-cv-05719-LHK) (N.D. Cal.); and *Espinal v Burger King Corporation*, (09-20982) (S.D. Fla.)). In addition, Chris has achieved groundbreaking court decisions protecting consumer rights. Representative reported decisions include: *Claridge v. RockYou, Inc.* 785 F.Supp.2d 855 (N.D. Cal.), *Kramer v. Autobytel, Inc.*, 759 F.Supp.2d 1165 (N.D. Cal.), and *Van Tassell v. United Marketing Group, LLC*, 795 F.Supp.2d 770 (N.D.Ill.). In total, his suits have resulted in hundreds of millions of dollars to consumers.

Prior to joining Edelson, Chris worked for two large defense firms in the areas of employment and products liability. Chris graduated magna cum laude from The John Marshall Law School, where he served as the Executive Lead Articles for the Law Review, as well as a team member for the D.M. Harish International Moot Court Competition in Mumbai, India. Chris has since returned to his alma mater to lecture on current issues in class action litigation and negations.

Before entering law school, Chris received his Masters degree in Legal Sociology, graduating magna cum laude from the International Institute for the Sociology of Law, located in Onati, Spain. Chris received his B.A. in Legal Sociology from the University of California, Santa Barbara.

**BENJAMIN H. RICHMAN** is a Partner at EDELSON PC and is a member of the firm's Corporate Governance and Business Litigation Practice Group. He handles plaintiff's-side consumer class actions, focusing mainly on technology-related cases, represents corporate defendants in class actions, and handles general commercial litigation matters.

On the plaintiff's side, Ben has brought industry-changing lawsuits involving the marketing practices of the mobile industry, print and online direct advertisers, and Internet companies. He has successfully prosecuted cases involving privacy claims and the negligent storage of consumer data. His suits have also uncovered complex fraudulent methodologies of Web 2.0 companies, including the use of automated bots to distort the value of consumer goods and services. In total, his suits have resulted in hundreds of millions of dollars to consumers.

On the defense side, Ben has represented large institutional lenders in the defense of employment class actions. He also routinely represents technology companies in a wide variety of both class action defense and general commercial litigation matters.

Ben received his J.D. from The John Marshall Law School, where he was an Executive Editor of the Law Review and earned a Certificate in Trial Advocacy. While in law school, Ben served as a judicial extern to the Honorable John W. Darrah of the United States District Court for the Northern District of Illinois, in addition to acting as a teaching assistant for Prof. Rogelio Lasso in several torts courses. Ben has since returned to the classroom as a guest-lecturer on issues related to class actions, complex litigation and negotiation. He also lectures incoming law students on the core first year curriculums. Before entering law school, Ben graduated from Colorado State University with a B.S. in Psychology.

Ben is the director of EDELSON PC's Summer Associate Program.

**ARI J. SCHARG** is a Partner at EDELSON PC. He handles technology-related class actions, focusing mainly on cases involving the unlawful geo-locational tracking of consumers through their mobile devices, the illegal collection, storage, and disclosure of personal information, fraudulent software products, data breaches, and text message spam. His settlements have resulted in tens of millions of dollars to consumers, as well as industry-changing injunctive relief. Ari has been appointed class counsel by state and federal courts in several nationwide class action settlements, including Webb v. Cleverbridge, et al., 11-cv-4141 (N.D. Ill.), Missaghi v. Blockbuster, 11-cv-2559 (D. Minn.), Ledet v. Ascentive, 11-cv-294 (E.D. Penn.), and Drymon v. CyberDefender, 11 CH 16779 (Cook Cnty, Illinois), and was appointed sole-lead class counsel in Loewy v. Live Nation, 11-cv-4872 (N.D. Ill.), where the court praised his work as "impressive" and noted that he "understand[s] what it means to be on a team that's working toward justice." Ari was selected as an Illinois Rising Star (2013) by Super Lawyers.

Prior to joining the firm, Ari worked as a litigation associate at a large Chicago firm, where he represented a wide range of clients including Fortune 500 companies and local municipalities. His work included representing the Cook County Sheriff's Office in several civil rights cases and he was part of the litigation team that forced Craigslist to remove its "Adult Services" section from its website.

Ari is very active in community groups and legal industry associations. He is a member of the Board of Directors of the Chicago Legal Clinic, an organization that provides legal services to low-income families in the Chicago area. Ari acts as Outreach Chair of the Young Adult Division of American Committee for the Shaare Zedek Medical Center in Jerusalem, and is actively involved with the Anti-Defamation League. He is also a member of the Standard Club Associates Committee.

Ari received his B.A. in Sociology from the University of Michigan – Ann Arbor and graduated magna cum laude from The John Marshall Law School where he served as a Staff Editor for The John Marshall Law Review and competed nationally in trial competitions. During law school, he also served as a judicial extern to The Honorable Judge Bruce W. Black of the U.S. Bankruptcy Court for the Northern District of Illinois.

**STEVEN LEZELL WOODROW** is a Partner and Chair of the firm's Banking and Financial Services Practice Group. Mr. Woodrow focuses his practice on complex national class actions against some of the Country's largest financial institutions. Representative matters include cases against national banks and mortgage servicers for improper loan modification practices, unlawful

home equity line of credit ("HELOC") account suspensions and reductions, and claims regarding the misapplication of payments.

Mr. Woodrow delivered the winning oral argument in *Wigod v. Wells Fargo Bank, N.A.* (7th Cir. 2012), the first federal appellate court decision to allow borrowers to challenge bank failures to follow the federal Home Affordable Modification Program ("HAMP") under state law.

Courts have also appointed Mr. Woodrow as class counsel in nationwide class action settlements against cellphone companies, aggregators, and mobile content providers related to unauthorized charges for ringtones and other mobile content, including *Paluzzi v. Cellco Partnership*, *Williams et. al. v. Motricity, Inc.*, and *Walker et. al. v. OpenMarket Inc.*

Mr. Woodrow has also served as an Adjunct Professor of Law at Chicago-Kent College of Law where he co-taught a seminar on class actions. Prior to joining the firm, he worked as a litigator at a Chicago boutique where he tried and arbitrated a range of consumer protection and real estate matters.

Mr. Woodrow received his J.D. High Honors, Order of the Coif, from Chicago-Kent College of Law in 2005. During law school, Mr. Woodrow served as a Notes and Comments Editor for The Chicago-Kent Law Review, competed on Moot Court, and served as President of the Student Bar Association. He additionally spent a semester as a judicial extern for the Honorable Ann C. Williams on the United States Court of Appeals for the Seventh Circuit. Steven received the ALI-ABA Scholarship and Leadership Award for best representing the combination of leadership and scholarship in his graduating class as well as the Lowell H. Jacobson Memorial Scholarship, which is awarded competitively each year to a student from one of the law schools in the Seventh Circuit to recognize personal commitment and achievement.

Mr. Woodrow is admitted to practice in Colorado (2011) and Illinois (2005).

Mr. Woodrow received his B.A. in Political Science with Distinction from the University of Michigan—Ann Arbor in 2002.

**COURTNEY BOOTH** is an Associate at Edelson PC. Courtney focuses her practice on consumer class actions.

Courtney received her J.D., magna cum laude, from The John Marshall Law School. While in law school, she was a staff editor of The John Marshall Law Review, a teaching assistant for Legal Writing and Civil Procedure, and a member of the Moot Court Honor Society. Courtney represented John Marshall at the Mercer Legal Ethics and Professionalism Competition where she was a semi-finalist and won Best Respondent's Brief and at the Cardozo/BMI Entertainment and Communications Law Competition where she placed in the top three oralists. Courtney was recently nominated as a 2013 Member of the National Order of Scribes.

Prior to law school, Courtney attended Saint Louis University where she earned a B.A. in Communication. While there, she was a community relations intern for the St. Louis Blues.

**MARK EISEN** is an Associate at Edelson PC, where he focuses on consumer class actions. Prior to joining the firm, Mark clerked for the Honorable Gary Allen Feess, United States District Court for the Central District of California.

Mark received his J.D., magna cum laude, from the Boston University School of Law. While in law school, he won the Homer Albers Prize Moot Court Competition, represented BU on the National Moot Court team, and was a note development editor on the BU International Law Journal. Mark's academic note, Who's Running This Place? A Comparative Look at the Political Appointment System in the United States and Britain, and What the United States Can Learn, was published in the International Law Journal in the spring of 2012. Most importantly, Mark was active with the Boston University School of Law Softball Team.

Prior to law school, Mark attended the University of Southern California where he earned a B.A., magna cum laude, in Political Science and Economics. While there, Mark was a teaching assistant to Professor Dan Schnur. Mark also traveled the country as part of the advance team for John McCain's 2008 presidential campaign.

**CHANDLER GIVENS** is an Associate at EDELSON PC, where his practice focuses on technology and privacy class actions. His lawsuits have centered on fraudulent software development, unlawful tracking of consumers through mobile devices and computers, illegal data retention, and data breach litigation.

Chandler leads a group of researchers in investigating complex technological fraud and privacy related violations. His team's research has lead to cases that have helped cause significant reforms to the utility software industry and resulted in tens of millions of dollars to U.S. consumers. On the privacy litigation front, Chandler plays an instrumental role in applying new technologies to federal and state statutes. His briefing of these issues has helped produce seminal rulings under statutes like the Stored Communications Act and establish data breach jurisprudence favorable to consumers.

A frequent speaker on emerging law and technology issues, Chandler has presented to legal panels and state bar associations on topics ranging from data privacy and security to complex litigation and social media. He has been featured on syndicated radio, quoted in major publications such as Reuters and PCWorld, and been an invited Cyberlaw guest lecturer at his alma mater.

Chandler graduated from the University of Pittsburgh School of Law where he was a research assistant for Cyberlaw Professor Dr. Kevin Ashley, and a judicial extern for the Honorable David S. Cercone of the United States District Court for the Western District of Pennsylvania. He graduated cum laude from Virginia Tech, with a B.S. in business information technology, with a focus on computer-based decision support systems. Chandler sits on the ABA committees for Information Security and e-Discovery.

Before joining the legal profession, Chandler worked as a systems analyst. He has also interned at the Virginia Attorney General's Office as well as the U.S. Department of Justice in Washington D.C.

**ALICIA HWANG** is an Associate at EDELSON PC. Alicia practices in the area of consumer class action and general litigation.

Alicia received her J.D. from the Northwestern University School of Law in May 2012, where she was an articles editor for the Journal of Law and Social Policy. During law school, Alicia was a legal intern for the Chinese American Service League, served as president of the Asian Pacific American Law Student Association and the Student Animal Legal Defense Fund, and was Chair of the Student Services Committee. She also worked as a student in the Northwestern Entrepreneurship Law Clinic and Complex Civil Litigation and Investor Protection Clinic.

Prior to joining EDELSON PC, Alicia worked as an Executive Team Leader for the Target Corporation, as well as a public relations intern for a tourism-marketing agency in London.

Alicia graduated magna cum laude from the University of Southern California, earning her B.A. in Communication in 2007. She is a member of the Phi Beta Kappa honor society.

**NICK LARRY** is an Associate at EDELSON PC. Nick practices in the area of consumer class action and general litigation.

Nick received his J.D., cum laude, from Northwestern University School of Law, where he was a senior editor of the Northwestern University Journal of International Law and Business.

Nick attended Michigan State University, where he graduated with a B.A. in General Business Administration/Pre-law in 2008 and played on the school's rugby team.

**MEGAN LINDSEY** is an Associate at EDELSON PC. Megan practices in the area of consumer class action, focusing on complex class actions in the banking industry.

Prior to joining EDELSON PC, Megan worked for several years as a commercial loan underwriter and portfolio officer at Merrill Lynch, Pierce, Fenner & Smith. Megan also worked as an analyst in the troubled asset group at Bank of America, helping to monitor and restructure high-risk loans.

Megan received her J.D. from Chicago-Kent College of Law in May 2011. During law school Megan externed for the Honorable Judge Bauer in the Seventh Circuit Court of Appeals and served as Vice President-Evening Division of the Student Bar Association and Vice President of the Moot Court Honor Society. Megan also represented Chicago-Kent at the National First Amendment Moot Court Competition in Nashville, Tennessee and the National Cultural Heritage Law Moot Court Competition in Chicago, Illinois.

Megan graduated with High Honors from DePaul University in July 2005, earning her B.S. in Finance.

**DAVID I. MINDELL** is an Associate at EDELSON PC. David practices in the area of technology and privacy class actions.

David has worked on cases involving fraudulent software products, unlawful collection and retention of consumer data, and mobile-device privacy violations. David also serves as a

business consultant to private companies at all stages of development, from start-up to exit.

Prior to joining EDELSON PC, David co-founded several technology companies that reached multi-million dollar valuations within 12 months of launch. David has advised or created strategic development and exit plans for a variety of other technology companies.

While in law school, David was a research assistant for University of Chicago Law School Kauffman and Bigelow Fellow, Matthew Tokson, and for the preeminent cyber-security professor, Hank Perritt at the Chicago-Kent College of Law. David's research included cyberattack and denial of service vulnerabilities of the Internet, intellectual property rights, and privacy issues.

David has given speeches related to his research to a wide-range of audiences.

**AMIR MISSAGHI** is an Associate at Edelson, where he focuses on technology and privacy class actions.

Amir received his J.D. from the Chicago-Kent College of Law, where he was a member of the Moot Court Honor Society and a teaching assistant in Property. Before law school, he attended the University of Minnesota, where he received his B.S. and M.S. in Applied Economics. He then began working at a Fortune 50 company as a programmer and data analyst. During that time Amir started working on his graduate studies in Applied Economics where he focused on analyzing consumer choice in healthcare markets.

**JOHN OCHOA** is an associate at Edelson PC, focusing his practice on protecting consumers with a special emphasis on plaintiffs' privacy class action litigation, including cases brought under the Telephone Consumer Protection Act. John prosecutes cases in both state and federal courts at the trial and appellate levels.

John has secured important court decisions protecting the rights of consumers, including Elder v. Pacific Bell Telephone Co., et al., 205 Cal. App. 4th 841 (2012), where the California Court of Appeals held that consumers may pursue claims against telecommunications companies for placing unauthorized charges on consumers' telephone bills, a practice known as "cramming." John was also appointed class counsel in *Lee v. Stonebridge Life Ins. Co., et al*., --- F.R.D. ---, 2013 WL 542854 (N.D. Cal. Feb. 12, 2013), a case where the Defendants are alleged to have caused the transmission of unauthorized text messages to the cellular telephones of thousands of consumers.

He graduated magna cum laude from the John Marshall Law School in May, 2010 and served as Managing Editor for the John Marshall Law Review. His student Comment, which examines bicycling and government tort immunity in Illinois, appears in Vol. 43, No. 1 of the John Marshall Law Review. While in law school, John externed with Judge Thomas Hoffman at the Illinois Court of Appeals, and competed in the ABA National Appellate Advocacy Competition.

John is active in the Illinois legal community, and serves as Co-Chair of the Membership Committee on the Young Professionals Board of Illinois Legal Aid Online (ILAO). ILAO is a non-profit organization committed to using technology to increase access to free and pro bono legal services for underserved communities throughout Illinois.

He received his B.A. with Honors in Political Science from the University of Iowa in 2004.

**ROGER PERLSTADT** is an Associate at EDELSON PC, where he concentrates on appellate and complex litigation advocacy.  Roger graduated from the University of Chicago Law School, where he was a member of the University of Chicago Law Review.  After law school, he served as a clerk to the Honorable Elaine E. Bucklo of the United States District Court for the Northern District of Illinois.

Prior to joining the firm, Roger spent several years at a litigation boutique in Chicago where his practice included employment and housing discrimination claims, constitutional litigation, and general commercial matters.  In 2011, he was named a Rising Star by Illinois Super Lawyers Magazine.

Roger also spent time as a Visiting Assistant Professor at the University of Florida Law School where he taught Arbitration, Conflict of Laws, and Employment Discrimination, and has published articles on the Federal Arbitration Act in various law reviews.

**EVE-LYNN RAPP** is an Associate at EDELSON PC. Eve-Lynn focuses her practice in the areas of consumer and technology class action litigation.

Prior to joining EDELSON PC, Eve-Lynn was involved in numerous class action cases in the areas of consumer and securities fraud, debt collection abuses and public interest litigation.  Eve-Lynn has substantial experience in both state and federal courts, including successfully briefing issues in both the United States and Illinois Supreme Courts.

Eve-Lynn received her J.D. from Loyola University of Chicago-School of Law, graduating cum laude, with a Certificate in Trial Advocacy. During law school, Eve-Lynn was an Associate Editor of Loyola's International Law Review and externed as a "711" at both the Cook County State's Attorney's Office and for Cook County Commissioner Larry Suffredin. Eve-Lynn also clerked for both civil and criminal judges (The Honorable Judge Yvonne Lewis and Plummer Lott) in the Supreme Court of New York.

Eve-Lynn graduated from the University of Colorado, Boulder, with distinction and Phi Beta Kappa honors, receiving a B.A. in Political Science.

**BEN THOMASSEN** is an Associate at EDELSON PC. At the firm, Ben's practice centers on the prosecution of class actions cases that address federally protected privacy rights and issues of consumer fraud—several of which have established industry-changing precedent. Among other high profile cases, Ben recently played key roles in delivering the winning oral argument before the United States Court of Appeals for the Eleventh Circuit in *Curry v. AvMed*, 693 F.3d 1317 (11th Cir. 2012) (a data breach case that has, following the Eleventh Circuit's decision, garnered national attention both within and without the legal profession) and securing certification of a massive consumer class in *Dunstan v. comScore*, No. 11 C 5807, 2013 WL 1339262 (N.D. Ill. Apr. 2, 2013) (estimated by several sources as the largest privacy case ever certified on an adversarial basis).

Ben received his J.D., magna cum laude, from Chicago-Kent College of Law, where he also earned his certificate in Litigation and Alternative Dispute Resolution and was named Order of

the Coif. At Chicago-Kent, Ben was Vice President of the Moot Court Honor Society and earned (a currently unbroken firm record of) seven CALI awards for receiving the highest grade in Appellate Advocacy, Business Organizations, Conflict of Laws, Family Law, Personal Income Tax, Property, and Torts.

Before settling into his legal career, Ben worked in and around the Chicago and Washington, D.C. areas in a number of capacities, including stints as a website designer/developer, a regular contributor to a monthly Capitol Hill newspaper, and a film projectionist and media technician (with many years experience) for commercial theatres, museums, and educational institutions. Ben received his Bachelor of Arts, summa cum laude, from St. Mary's College of Maryland and his Master of Arts from the University of Chicago.

**JACK YAMIN** is an Associate at EDELSON PC, where he focuses on privacy and consumer class actions.

Jack graduated cum laude from Northwestern University's Accelerated (2-year) JD Program. While in law school, Jack was a member of the Center for Wrongful Convictions, where he worked on post-conviction cases in Illinois appellate courts. Jack also served as a judicial extern to the Honorable Marvin Aspen, a senior judge of the United States District Court for the Northern District of Illinois. Throughout law school, Jack was a member of the Center for Conflict Resolution, where he mediated cases in Illinois courts throughout Chicago.

Prior to joining the firm, Jack worked as a tax consultant for business owners throughout the country, representing clients before the Internal Revenue Service, negotiating installment agreements, and handling tax audits. Jack also spent some time working at a literary agency, helping writers publish novels and marketing their work. Jack graduated summa cum laude from Binghamton University, earning his B.A. in philosophy and English literature. He is a member of the Phi Beta Kappa honor society.

# Exhibit B

平成２６年（フ）第３８３０号

決　　　　　定

東京都渋谷区渋谷二丁目１１番５号
債務者（破産者）　　株式会社ＭＴＧＯＸ
代表者代表取締役　カルプレス・マルク・マリ・ロベート

主　　　文

債務者株式会社ＭＴＧＯＸについて破産手続を開始する。

理　　　由

一件記録によれば，債務者が支払不能の状態にあることが認められる。
よって，主文のとおり決定する。
なお，この決定に併せて，下記のとおり定める。

記

１　破産管財人　　　東京都渋谷区渋谷二丁目１１番５号
　　　　　　　　　　株式会社ＭＴＧＯＸ　破産管財人室
　　　　　　　　　　弁護士　小林　信明
２　債権届出期間　　平成２６年１１月２８日まで
３　財産状況報告集会の期日
　　　　　　　　　　平成２６年７月２３日午後１時３０分
４　債権調査期日　　平成２７年２月２５日午前１０時

平成２６年４月２４日午後５時

東京地方裁判所民事第２０部

　　　　　　　　　裁判長裁判官　　鹿　子　木　　　　康

　　　　　　　　　　　裁判官　　金　澤　秀　樹

　　　　　　　　　　　裁判官　　樋　口　正　樹

これは正本である。
平成２６年４月２４日
　　　　東京地方裁判所民事第２０部
　　　　　　裁判所書記官　櫻　庭　一　威



[translation]

2014 (*fu*) no. 3830

## DECISION

Shibuya 2-11-5, Shibuya-ku, Tokyo

Debtor (bankrupt) MtGox Co., Ltd.

Representative Director Robert Marie Mark Karpeles

## JUDGMENT

A bankruptcy procedure shall commence with regard to debtor MtGox Co., Ltd.

## REASONS

From the records of a case, it is recognized that the debtor is in a situation of insolvency. Accordingly, this judgment is decided.

Further, together with this decision, it is also hereby decided as follows.

1.      Bankruptcy trustee          Attorney-at-law Nobuaki Kobayashi

Bankruptcy Trustee Room

MtGox Co., Ltd.

Shibuya 2-11-5, Shibuya-ku, Tokyo

2.      Period for notification of claims      until November 28, 2014

3.      General meeting to report the situation of properties

July 23, 2014 1:30pm

4.      Period for investigation of claims   until February 25, 2015 10am

April 24, 2014 5pm

Tokyo District Court 20th Civil Chamber

Head Judge      Yasushi Kanokogi

Judge          Hideki Kanazawa

Judge          Masaki Higuchi

This is an authentic copy.

April 24, 2014

Tokyo District Court 20th Civil Chamber

Court clerk      Kazui Sakuraba [seal]

# Exhibit C

平成２６年（フ）第３８３０号

破産者　株式会社ＭＴＧＯＸ

　　　　代表者代表取締役　　カルプレス・マルク・マリ・ロベート

# 破 産 者 に 対 す る 注 意 事 項

1　破産者（本人及び破産会社代表者のほか，破産者の法定代理人，法人である破産者
　　の理事，取締役等も含む。以下同様）は，破産管財人等の請求により破産に関し必要
　　な説明をしなければなりません（破産法４０条）。

　　　説明を拒んだり，偽りの説明をしたときには，刑事上の処罰を受けたり（破産法２
　　６８条），免責が許可されなかったりします（破産法２５２条１項１１号）。

2　破産者が，破産手続中，住所を変更したり，居住地を離れたりする場合は，その旨
　　を書面で破産管財人に申請し，破産管財人の同意を得てください。その中で住所の変
　　更を伴う場合には，変更後の住所及び破産管財人の同意を得た旨を記載した上申書を，
　　破産者側から裁判所に提出してください。

　　　破産管財人の同意を得ないで転居等をした場合は，免責が許可されないことがあり
　　ます（破産法２５２条１項１１号，３７条１項）。

3　破産者にあてた郵便物については，破産手続開始決定の日と同日に，破産管財人に
　　配達することを嘱託する旨の決定がされました。管財人に配達された郵便物は，破産
　　管財人が破産財団に関するものかどうか内容を調査します（破産法８１条，８２条）。

4　破産財団に属する財産を隠したり，壊したり，仮装譲渡したり，債権者の不利益に
　　処分すると，詐欺破産罪で処罰されたり（破産法２６５条），免責が許可されなくな
　　ったりします（破産法２５２条１項１号）。破産者の業務や財産の状況に関する帳簿
　　や書類などを隠したり，偽造したり，変造した場合も同様です（破産法２７０条，２
　　５２条１項６号）。

　　　　　　　　　　　　　　　平成２６年４月２４日

　　　　　　　　　　　　　　　東京地方裁判所民事第２０部　合議Ｆ係

[translation]

2014 (*fu*) no. 3830

Bankrupt        MtGox Co., Ltd.

                Representative Director Mark Marie Robert Karpeles

CAUTIONS TO THE BANKRUPT

1.    The bankrupt (in addition to the bankrupt itself and the representatives of the
      bankrupt company, including the legal representatives, the administration officers
      and the directors, etc. of the bankrupt; the same shall apply thereafter) has an
      obligation to give the necessary explanations with regard to the bankruptcy at the
      request of the bankruptcy trustee (Bankruptcy Law Article 40).
      Criminal sanctions (Bankruptcy Law Article 268) may apply and discharge may be
      refused (Bankruptcy Law Article 252.1.11) if explanations are refused or wrong
      explanations are given.

2.    If during the bankruptcy procedure, the bankrupt shall change its address or get
      away from its place of residence, please make a request in writing to the bankruptcy
      trustee and obtain the bankruptcy trustee's approval. In the case of a change of
      address, the bankrupt shall submit to the court an affidavit indicating the new
      address and the fact that the change has been approved by the bankruptcy trustee.
      Discharge may be refused (Bankruptcy Law Articles 252.1.11 and 37.1) in the case of
      a change of residence made without the approval of the bankruptcy trustee.

3.    A decision was made on the same day that the day of decision of commencement of
      the bankruptcy procedure that postal articles addressed to the bankrupt shall be
      delivered to the bankruptcy trustee. The bankruptcy trustee shall examine the
      contents of the postal articles delivered to the bankruptcy trustee to determine if
      they are part or not of the bankruptcy estate (Bankruptcy Law Articles 81, 82).

4.    Hiding, destroying or making disguised transfers properties which belong to the
      bankruptcy estate, or disposing of the same to the detriment of the creditors may be
      punished as fraudulent bankruptcy (Bankruptcy Law Article 265) or the discharge
      may be refused (Bankruptcy Law Article 252.1.1). Hiding, falsifying or modifying the
      books and documents which relate to the situation of the properties of the bankrupt
      may be treated similarly (Bankruptcy Law Articles 270 and 252.1.6).

                April 24, 2014

                Tokyo District Court 20th Civil Chamber Consensus F

# Exhibit 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| GREGORY GREENE and JOSEPH LACK, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> MTGOX INC., a Delaware corporation, MT. GOX KK, a Japanese corporation, TIBANNE KK, a Japanese corporation, MT. GOX NORTH AMERICA, INC., a New York corporation, MIZUHO BANK, LTD., a Japanese financial institution, MARK KARPELES, an individual, GONZAGUE GAY-BOUCHERY, an individual, JED MCCALEB, an individual, and JOHN DOE DEFENDANTS, <br><br> *Defendants*. | Case No. 1:14-cv-01437 <br><br> Hon. Gary Feinerman <br><br> Magistrate Judge Susan Cox |

## PARTIAL CLASS ACTION SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement" or "Settlement Agreement") is entered into by and among (i) Gregory Greene ("Greene"); (ii) Joseph Lack ("Lack"); (iii) the Settlement Class (as defined herein and together with Green and Lack the "Plaintiffs"); (iv) Defendant Jed McCaleb; (v) Defendant Gonzague Gay-Bouchery (McCaleb and Gay-Bouchery are collectively referred to herein as "Settling Defendants" unless otherwise stated)l and (vi) Sunlot Holdings Limited ("Sunlot"). The Plaintiffs, Sunlot, and the Settling Defendants are collectively referred to herein as the "Parties." This Settlement Agreement is intended by the Parties to fully, finally and forever resolve, discharge and settle the Released Claims (as the term is defined below), in

exchange for and subject to the terms and conditions of this Settlement Agreement, and the final approval of the Court.

## RECITALS

A.      WHEREAS, on February 27, 2014, Plaintiff Gregory Greene filed this putative class action in the United States District Court for the Northern District of Illinois ("the Court") against Mt. Gox KK, MtGox Inc., Tibanne KK, and Mark Karpeles, alleging, *inter alia*, consumer and common law fraud, negligence, breach of fiduciary duty, breach of contract, unjust enrichment, trespass to chattels, and conversion. (Dkt. 1.) Through his Complaint, Plaintiff Greene also sought a temporary restraining order ("TRO"), a preliminary injunction, a permanent injunction, an accounting, and a constructive trust over Class members' property. (Dkt. 1 ¶¶ 107–124, 139–154.)

B.      WHEREAS, on February 28, 2014, Mt. Gox KK sought bankruptcy protection in Japan, and filed a Civil Rehabilitation Proceeding Commencement Application in the Tokyo District Court.

C.      WHEREAS, on March 4, 2014, Plaintiff Greene filed a Motion for Temporary Restraining Order and Preliminary Injunction, seeking, *inter alia*, a freeze of Mt.Gox Inc., Mt. Gox KK, Tibanne KK, and Mark Karpeles'' assets in the United States, and expedited discovery with respect to those assets. (Dkt. 8.)

D.      WHEREAS Mt. Gox KK filed an "emergency" Chapter 15 Petition in the Bankruptcy Court for the Northern District of Texas on March 9, 2014, and obtained a provisional stay of litigation against it. *In re MtGox Co., Ltd.*, No. 14-31229-sgj15 (Dkt. 13) (Bankr. N.D. Tex.).

E.      WHEREAS, on March 11, 2014, the Court held a hearing on Plaintiff Greene's

motion for a TRO. At the hearing (i) the Court accepted the Northern District of Texas's

provisional stay with respect to Mt. Gox KK and stayed all proceedings against it, (ii) refused to

stay the case as against the remaining, non-debtor defendants, and (iii) granted in part Plaintiff

Greene's motion, entering a TRO freezing the U.S. assets of Mt. Gox Inc., Tibanne KK, and

Mark Karpeles, and permitting expedited discovery into those assets. (Dkt. 33.)

F.      WHEREAS, following the issuance of the TRO, Plaintiffs' counsel propounded

discovery—including interrogatories, requests for production, requests for admission, and

notices of depositions—on all defendants (except for Mt. Gox KK, pursuant to the provisional

stay), seeking information about their U.S. assets. Plaintiffs' counsel also served several third

parties with subpoenas, including different manufacturers/distributors of Bitcoin mining

equipment, Bitcoin "mining pools," among other individuals and entities.

G.      WHEREAS, through the third-party subpoenas, Plaintiffs' counsel uncovered

substantive information related to defendants' assets, operations, and the collapse of the Mt. Gox

exchange. Likewise, Plaintiffs' counsel additionally hired and utilized private asset investigators

to track the defendants' U.S. assets, and additionally retained an expert in distributed systems

and virtual currencies to investigate and analyze the technical issues that purportedly caused the

loss of bitcoins and fiat currency at Mt. Gox.

H.      WHEREAS, on March 14, 2014, Plaintiff Greene filed his First Amended

Complaint, adding Mizuho Bank Ltd. ("Mizuho"), Jed McCaleb, Mt. Gox North America, Inc.

("Mt. Gox NA"), Gonzague Gay-Bouchery, and John Does as defendants, and adding Joseph

Lack as a named Plaintiff. (Dkt. 36.) The First Amended Complaint added causes of action for

civil conspiracy, breach of express trust, tortious interference with contract, and violations of the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. (Dkt. 36 ¶ 186–213.)

I.    WHEREAS, on March 14, 2014, a putative class action was filed in the Superior Court of Ontario against MtGox Inc., Mt. Gox KK, Tibanne KK, Mt. Gox NA, Mizuho, Mark Karpeles, and Jed McCaleb (the "Canadian Action") regarding the same subject matter as this litigation and alleging, *inter alia*, causes of action for negligence, breach of contract, breach of trust, breach of fiduciary duty, fraudulent misrepresentation, conversion, and unjust enrichment. *Joyce v. MtGox Inc.* No. 1cv-14-500253-00CP (Can. Ont. Sup. Ct. J.).

J.    WHEREAS, on March 17, 2014, Plaintiffs filed their Corrected First Amended Class Action Complaint, which made explicit that the case remained stay as to Mt. Gox KK and added additional factual support for Plaintiffs' claims. (Dkt. 37.)

K.    WHEREAS, at a status hearing on March 20, 2014, and on Plaintiffs' request, the Court extended the TRO until April 8, 2014 and granted partial relief from the TRO to allow Plaintiffs' investigators to trace the movement of the assets of MtGox, Inc., Tibanee KK, and Mark Karpeles, through the redistribution of certain bitcoins that had been "found" by the MtGox, Inc. or Mt. Gox KK. (Dkt. 38.)

L.    WHEREAS, on April 2, 2014, Plaintiffs filed a motion to "extend" the TRO—by effectively converting it into a preliminary injunction—pursuant to *H-D Michigan, LLC v. Hellenic Duty Free Shops, S.A.*, 694 F.3d 827 (7th Cir. 2012). (Dkt. 49.)

M.    WHEREAS, on April 4, 2014, attorneys filed appearances on behalf of defendants Mark Karpeles and Tibanne KK.

N.    WHEREAS, on April 7, 2014, the Court held a hearing on and ultimately granted Plaintiffs' motion to "extend" the TRO and, as such, converted the TRO into an interim

preliminary injunction. At that same hearing, counsel for Mr. Karpeles and Tibanne KK

indicated their intent to contest jurisdiction and sufficiency of service.

O.    WHEREAS, after attempting service of the Complaint and Summons on Mr.

Karpeles and Tibanne KK through the Hague Convention, by process server on Mt. Gox KK's

U.S. subsidiaries (one of which was authorized to accept service on behalf of Mr. Karpeles), and

by international mail and email, Plaintiffs filed their Motion to Approve Service by Alternative

Means on April 7, 2014, seeking authorization to serve the operative Complaint and summons on

Mr. Karpeles' and Tibanne KK's attorneys. (Dkt. 54.)

P.    WHEREAS, Plaintiffs filed their Motion for Preliminary Injunction on April 8,

2014, seeking, *inter alia*, a continued freeze (i.e., for the duration of this litigation) of

defendants' assets located in the United States and continued expedited discovery into

defendants' assets. (Dkt. 56.) That motion—34-pages in length—set forth the detailed factual

findings of Plaintiffs' discovery efforts and their argument as to their likelihood of prevailing on

each of their claims, and sought to preserve the status quo ante to ensure that Plaintiffs and the

Class could ultimately recover should they prevail in the litigation.

Q.    WHEREAS, on April 14, 2014, attorneys filed appearances on behalf of

defendants Jed McCaleb and Gonzague Gay-Bouchery. (Dkts. 62, 64.) Counsel for Mr. Gay-

Bouchery also indicated his intent to contest the Court's jurisdiction and, potentially, Plaintiffs'

Motion for Alternative Service.

R.    WHEREAS, on April 16, 2014, the Tokyo District Court dismissed Mt. Gox

KK's petition for Civil Rehabilitation. Finding that "the drafting of a rehabilitation plan and its

adoption or approval appear difficult," the Tokyo District court placed Mt. Gox KK into

provisional administration proceedings and appointed Nobuaki Kobayashi as Provisional
Administrator.

S.      WHEREAS without further intervention by its creditors and/or stakeholders, the
Japanese proceedings are likely to lead to the liquidation of the Mt. Gox Exchange, whereby
individual class members will have no other option than to file individual claims in the Tokyo
District Court and will stand to recover only insignificant, non-material percentages of their
investments of bitcoins and Fiat Currency that were lost once the Mt. Gox Exchange "went dark"
on February 24, 2014.

T.      WHEREAS, on April 22, 2014, the certain Parties, in consultation with Sunlot, an
investment group represented by Cooley LLC, attempted to resolve this matter through an arm's-
length mediation presided over by Hon. Wayne R. Andersen (Ret.) of JAMS. Through those
discussions and as described herein, the Parties discussed whether a sale—rather than
liquidation—of the Mt. Gox exchange might maximize Class members' ability to recover a
significant portion of their investments (i.e., rather than seeking a percentage share as individual
creditors of Mt. Gox's overall assets through a liquidation, as determined by the Japanese courts
and appointed Administrator) and gain an equity share in a "new" Mt. Gox.

U.      WHEREAS the plaintiffs in the Canadian Action have reached a class action
settlement upon substantially identical terms as the instant Settlement with the Settling
Defendants, which will be presented to the Superior Court of Ontario for approval in parallel
with this Action.

V.      WHEREAS the Settling Defendants have denied and continue to deny any
wrongdoing whatsoever and have denied and continue to deny that they have committed, or
threatened or attempted to commit, any wrongful act or violation of law or duty alleged in this

Action. Nonetheless, taking into account the uncertainty and risks inherent in any litigation, and considering the mutual benefits of the settlement structure discussed by certain of the Parties with Judge Andersen, the Settling Defendants have concluded that it is desirable and beneficial that the Action be fully and finally settled and terminated in the manner and upon the terms and conditions set forth in this Agreement. This Agreement is a compromise, and the Agreement, any related documents, and any negotiations resulting from it shall not be construed as or deemed to be evidence of an admission or concession of liability or wrongdoing on the part of the Settling Defendants with respect to any claim of any fault, liability, wrongdoing, or damage whatsoever.

W.    WHEREAS, Plaintiffs Gregory Greene and Joseph Lack believe that the claims asserted in the Action against the Settling Defendants have merit and that they would have ultimately been successful in certifying the proposed Classes under Rule 23 and in prevailing on the merits at summary judgment or trial. Nonetheless, Plaintiffs and Class Counsel have performed considerable investigation and analysis since filing the Action, including obtaining information from counsel for the Settling Defendants about the Settling Defendants' involvement (or non-involvement) in the underlying facts, their potential liability and related issues, and recognize and acknowledge that Settling Defendants may raise factual and legal defenses in the Action that present a risk that Plaintiffs may not prevail. Plaintiffs and Class Counsel also recognize the expense and delay associated with continued prosecution of the Action against the Settling Defendants through class certification, trial, and any subsequent appeals. Plaintiffs and Class Counsel have also taken into account the uncertain outcome and risks of any litigation, especially in complex actions, as well as the difficulties inherent in such litigation. Therefore, Plaintiffs believe that it is desirable that the Released Claims be fully and finally compromised, settled, and resolved with prejudice, and barred pursuant to the terms set forth herein.

X.       WHEREAS, based on their evaluation, proposed Class Counsel have concluded

that the terms and conditions of this Agreement are fair, reasonable, and adequate to the

proposed Settlement Class, and that it is in the best interests of the Settlement Class to settle the

claims raised in the Action pursuant to the terms and provisions of this Agreement.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and among

Greene, Lack, the Settlement Class, and each of them, and Settling Defendants and Sunlot, by

and through their respective undersigned counsel that, subject to final approval of the Court after

a hearing or hearings as provided for in this Settlement Agreement, in consideration of the

benefits flowing to the Parties from the Settlement Agreement set forth herein, that the Action

and the Released Claims shall be finally and fully compromised, settled and released, and the

Action shall be dismissed with prejudice, upon and subject to the terms and conditions of this

Agreement.

## AGREEMENT

1.    **DEFINITIONS**.

As used in this Settlement Agreement, the following terms have the meanings specified

below:

1.1       **"Action"** means *Greene et al v. MTGOX, Inc. et al*, 14-cv-01437, pending in the

United States District Court for the Northern District of Illinois.

1.2      **"Bitcoin"** means the digital currency and/or commodity mined from the "Bitcoin

Network" and posted on the public ledger known as the "Block Chain." An individual unit of

this currency and/or commodity shall be referred to herein as bitcoin (with a lowercase "b").

1.3      **"Class Counsel"** means lead class counsel Jay Edelson of Edelson PC.

1.4     **"Class Representatives"** means the named Plaintiffs in this Action, Gregory

Greene and Joseph Lack.

1.5     **"Court"** means the United States District Court for the Northern District of

Illinois, Judge Gary Feinerman or any judge who shall succeed him as the Judge in this Action,

presiding.

1.6      **"Effective Date"** means the date ten (10) days after which all of the events and

conditions specified in Paragraph 9.1 have been met and have occurred.

1.7     **"Fee Award"** means the amount of attorneys' fees and reimbursement of

expenses awarded by the Court to Class Counsel.

1.8     **"Fiat Currency"** means money or official currency issued by the government of

any country and deposited with or held by Mt. Gox.

1.9     **"Final"** means one (1) business day following the latest of the following events:

(i) the date upon which the time expires for filing or noticing any appeal of the Court's Final

Judgment approving the Settlement Agreement; (ii) if there is an appeal or appeals, other than an

appeal or appeals solely with respect to the Fee Award, the date of completion, in a manner that

finally affirms and leaves in place the Final Judgment without any material modification, of all

proceedings arising out of the appeal or appeals (including, but not limited to, the expiration of

all deadlines for motions for reconsideration or petitions for review and/or certiorari, all

proceedings ordered on remand, and all proceedings arising out of any subsequent appeal or

appeals following decisions on remand); or (iii) the date of final dismissal of any appeal or the

final dismissal of any proceeding on certiorari.

1.10   **"Final Approval Hearing"** means the hearing before the Court where the Parties

will request the Final Judgment to be entered by the Court approving the Settlement Agreement,

approving the Fee Award, and the incentive awards to the Class Representatives.

1.11   **"Final Judgment"** means the Final Judgment and Order to be entered by the

Court approving the Settlement after the Final Approval Hearing.

1.12   **"Gay-Bouchery's Counsel"** means Daniel J. Fumagalli and Michael A. Eurich of

Chuhak & Tecson, P.C.

1.13   **"Gonzague Gay-Bouchery"** means Defendant Gonzague Gay-Bouchery, an

individual.

1.14   **"Japanese Bankruptcy Court"** means the Tokyo District Court, Twentieth Civil

Division, Mr. Nobuaki Kobayashi as Trustee, or any person to be appointed trustee in his stead.

1.15   **"Jed McCaleb"** means Defendant Jed McCaleb, an individual and owner of

twelve percent of Mt. Gox KK.

1.16   **"Mediator"** means Honorable Wayne R. Andersen (ret.).

1.17   **"McCaleb's Counsel"** means Stan Roman and Ethan Jacobs of Keller, Sloan,

Roman & Holland LLP and David J. Bradford and Paul B. Rietema of Jenner & Block LLP.

1.18   **"Mt. Gox Exchange"** means the online Bitcoin marketplace located at

www.mtgox.com where bitcoins can be bought, sold, or traded.

1.19   **"Mt. Gox Rehabilitation Plan"** means the plan for the purchase and

rehabilitation of the entities controlling the Mt. Gox bitcoin exchange by Settling Defendants and

Sunlot that will be presented to and approved by the Japanese Bankruptcy Court, that shall be

consistent with this Agreement and incorporate the terms on the addendum attached hereto as

Exhibit A, and that shall apply those terms consistently to all affected Mt. Gox accountholders worldwide.

1.20    **"Notice"** means the notice of this proposed Class Action Settlement Agreement, Mt. Gox Rehabilitation Plan, and Final Approval Hearing, which is to be sent to Settlement Class substantially in the manner set forth in this Agreement, is consistent with the requirements of Due Process, and is substantially in the form of Exhibits B and C hereto.

1.21    **"Notice Date"** means the date by which the Notice Plan set forth in Paragraph 4.2 is complete, which shall be a date no later than twenty-eight (28) days after receipt of the Class List from the Japanese Bankruptcy Court.

1.22    **"Notice Plan"** means the proposed plan of disseminating notice to members of the Settlement Class of the proposed Settlement Agreement and of the Final Approval Hearing developed by the Settlement Administrator in consultation with the Parties.

1.23    **"Objection/Exclusion Deadline"** means the date by which a written objection to this Settlement Agreement or a request for exclusion submitted by a Person within the Settlement Class must be postmarked, which shall be designated as a date no later than forty-five (45) days after the Notice Date.

1.24    **"Parties"** means Plaintiffs Gregory Greene, Joseph Lack and Settling Defendants Jed McCaleb and Gonzague Gay-Bouchery, as well as Sunlot.

1.25    **"Person"** shall mean, without limitation, any individual, corporation, partnership, limited partnership, limited liability company, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and their spouses, heirs, predecessors, successors, representatives, or assigns.

11

1.26    **"Plaintiffs"** means Gregory Greene, Joseph Lack and the Settlement Class

Members, collectively.

1.27    **"Preliminary Approval"** means the Court's certification of the Settlement Class

for settlement purposes, preliminary approval of the Settlement Agreement, and approval of the

form of the Notice and of the Notice Plan.

1.28    **"Released Claims"** means any and all actual, potential, filed, known or unknown,

fixed or contingent, claimed or unclaimed, suspected or unsuspected, claims, demands,

liabilities, rights, causes of action, contracts or agreements, extracontractual claims, damages (of

every kind and nature), punitive, exemplary or multiplied damages, expenses, costs, attorneys'

fees or obligations (including "Unknown Claims" as defined below), whether in law or in

equity, accrued or unaccrued, direct, individual or representative, of every nature and description

whatsoever, whether based on any federal, state, local, statutory or common law or any other

law, rule or regulation, including the law of any jurisdiction outside the United States, against the

Released Parties, or any of them, arising out of the facts, transactions, events, matters,

occurrences, acts, disclosures, statements, misrepresentations, omissions or failures to act

belonging to any and all Plaintiffs relating in any way to the Mt. Gox Exchange and Mt.Gox KK,

MtGox, Inc., Tibanne KK or Mt. Gox NA, or any of their related individuals or entities,

including without limitation all claims that were asserted or could have been asserted in the

Action.

1.29    **"Released Parties"** means Settling Defendants Jed McCaleb and Gonzague Gay-

Bouchery, as well as Sunlot, MTGOX INC., a Delaware corporation, Mt. Gox KK, a Japanese

corporation, and Mt. Gox North America, Inc., a New York corporation, and any and all of their

respective present or past heirs, executors, estates, administrators, predecessors, successors,

12

assigns, parents, subsidiaries, affiliates, associates, employers, employees, agents, consultants,

independent contractors, insurers, directors, managing directors, officers, employees, partners,

principals, members, accountants, financial and other advisors, investment bankers, underwriters,

shareholders, lenders, auditors, investment advisors, legal representatives, successors in interest,

assigns and Persons, firms, trusts, corporations, officers, directors, other individuals or entities in

which any of the Settling Defendants has a controlling interest or which is affiliated with any of

them, or any other representatives of any of these Persons and entities. This definition

specifically <u>excludes</u>: Tibanne KK, Mark Karpeles, and any and all financial, legal, or

accounting firms who worked (or are working) with any of the defendants including the John

Doe individuals or entities alleged in the Action, even if their names or identities are not known

or have not been explicitly alleged, including—with the sole exceptions of, where applicable, the

Released Parties—their respective present or past heirs, executors, estates, administrators,

predecessors, successors, assigns, parents, subsidiaries, associates, employers, employees,

agents, consultants, independent contractors, insurers, directors, managing directors, officers,

partners, principals, members, attorneys, accountants, financial and other advisors, investment

bankers, underwriters, shareholders, lenders, auditors, investment advisors, legal representatives,

successors in interest, assigns and Persons, firms, trusts, corporations, officers, directors, other

individuals or entities in which any of the such Persons has a controlling interest or which is

affiliated with any of them, or any other representatives of any of these Persons and entities.

     1.30    **"Releasing Parties"** means Plaintiffs; those Settlement Class Members who do

not opt out of the Settlement Class (whether or not such members submit claims); to the extent

the Settlement Class Member is not an individual, all of its present, former, and future direct and

indirect parent companies, affiliates, subsidiaries, divisions, agents, franchisees, successors,

predecessors-in-interest, and all of the aforementioned's present, former, and future officers,

directors, employees, shareholders, attorneys, agents, independent contractors; and, to the extent

the Settlement Class Member is an individual, any present, former, and future spouses, as well as

the present, former, and future heirs, executors, administrators, representatives, agents, attorneys,

partners, successors, predecessors-in-interest, and assigns of each of them.

1.31   **"Settlement Agreement" or "Agreement"** means the settlement contemplated

by this Settlement Agreement.

1.32   **"Settlement Administration Expenses"** means the expenses incurred by the

Settlement Administrator in providing Notice to and processing requests for information by the

Settlement Class, as well as any costs incurred in sending the CAFA notices described in

Paragraph 4.2(g) below, with such expenses to be paid by Sunlot as part of the Mt. Gox

Rehabilitation Plan.

1.33   **"Settlement Administrator"** means Epiq Systems, Inc., selected by the Parties

and approved by the Court to oversee the distribution of Notice to the Settlement Class as set

forth in this Settlement Agreement.

1.34   **"Settlement Benefit"** means the benefits a Settlement Class Member may receive

pursuant to this Settlement Agreement.

1.35   **"Settlement Class"** means all Persons in the United States and its territories who

had bitcoins or Fiat Currency stored with the Mt. Gox Exchange on February 24, 2014. Excluded

from the class are (1) MTGOX, Inc., Mt. Gox KK, Tibanne KK, Mt. Gox North America, Inc.,

Mizuho Bank, Ltd., Mark Karpeles, and any entity in which their parents have a controlling

interest and their current and former employees, officers, and directors, (2) the Judge or

Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate

14

family, (3) Persons who execute and file a timely request for exclusion, (4) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims, and (5) the Settling Defendants.

1.36    **"Settlement Class Member"** or **"Class Member"** means a Person who falls within the definition of the Settlement Class as set forth above and who has not submitted a valid request for exclusion.

1.37    **"Settling Defendants"** means Jed McCaleb and Gonzague Gay-Bouchery.

1.38    **"Steering Committees"** means the following four of committees of attorneys working on behalf of the Settlement Class: (1) U.S. Committee led by Robert A. Clifford of The Clifford Law Offices and Bret Lusskin of Law Office of Bret Lusskin, Esq.; (2) the Bankruptcy Committee led by Scott Kitei of Honigman Miller Schwartz and Cohn LLP; (3) the Canadian Committee led by Theodore P. Charney of Charney Lawyers; and (4) the International Committee led by Scott A. Kamber of KamberLaw, LLC.

1.39    **"Sunlot"** means Sunlot Holdings Limited, a Cyprus registered corporation, composed of a consortium of investors including Brock Pierce (Crypto Currency Partners), William Quigley (Clearstone Venture Partners), and Matthew Roszak (SilkRoad Equity) who collectively manage over one billion dollars of invested capital and have access to significant cash and credit facilities through public and private investment vehicles.

1.40    **"Sunlot's Counsel"** means counsel to Silk Road Equity, Michael G. Rhodes of Cooley LLP.

1.41    **"Texas Bankruptcy Court"** means the Bankruptcy Court for the Northern District of Texas where the Chapter 15 petition in *In re MtGox Co., Ltd.*, No. 14-31229-sgj15 (Bankr. N.D. Tex.) is pending.

1.42    **"Unknown Claims"** means claims that could have been raised in the Action and

that the Plaintiffs or any or all other Persons and entities whose claims are being released, or any

of them, do not know or suspect to exist, which, if known by him, her or it, might affect his, her

or its agreement to release the Released Parties or the Released Claims or might affect his, her or

its decision to agree, object or not to object to the Settlement.  Upon the Effective Date, Plaintiffs

and all other Persons and entities whose claims are being released shall be deemed to have, and

shall have, expressly waived and relinquished, to the fullest extent permitted by law, the

provisions, rights and benefits of § 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
> TO EXIST IN HIS OR HER FAVOR AT THE TIME OF
> EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM
> OR HER MUST HAVE MATERIALLY AFFECTED HIS OR
> HER SETTLEMENT WITH THE DEBTOR.

Upon the Effective Date, Plaintiffs and all other Persons and entities whose claims are being

released, also shall be deemed to have, and shall have, waived any and all provisions, rights and

benefits conferred by any law of any state or territory of the United States, or principle of

common law, or the law of any jurisdiction outside of the United States, which is similar,

comparable or equivalent to § 1542 of the California Civil Code. Plaintiffs acknowledge that

they may discover facts in addition to or different from those that they now know or believe to be

true with respect to the subject matter of this release, but that it is their intention to finally and

forever to settle and release the Released Claims, notwithstanding any Unknown Claims they

may have, as that term is defined in this Paragraph.

2.      **SETTLEMENT RELIEF**

2.1     **Mt. Gox Rehabilitation Plan.** Sunlot, with the consent of the Settling

Defendants, will present, support, seek and obtain approval of, and implement the Mt. Gox

Rehabilitation Plan to the Japanese Bankruptcy Court and, if appropriate, the Texas Bankruptcy

Court.

2.2     **Complete Cooperation.** On final and formal approval and acceptance of the Mt.

Gox Rehabilitation Plan by the Japanese Bankruptcy Court and, if appropriate, the Texas

Bankruptcy Court, Sunlot shall:

        (a)      agree to investigate and seek civil prosecution of any Person other than

the Settling Defendants determined by the PricewaterhouseCoopers audit or other investigation

to be in any way involved in the lost or stolen Mt. Gox Exchange bitcoins and Fiat Currency;

        (b)      return *pro rata* to the Mt. Gox Exchange wallets of the Settlement Class

and all other Persons with registered accounts on the Mt. Gox Exchange any bitcoins or Fiat

Currency recovered through their investigation or prosecution; and

        (c)      along with the Settling Defendants, agree to provide Plaintiffs and Class

Counsel all reasonably necessarily information in their possession or control related to the

Action and Plaintiffs' claims against Tibanne KK, Mark Karpeles, Mizuho and any other Persons

now known as John Does in the Action, provided that the scope of the information Sunlot and

the Settling Defendants agree to provide is no broader than what would otherwise be

discoverable in the Action. Settling Defendants will provide the information described above,

upon written request delivered to their respective legal counsel. The obligation of Settling

Defendants to provide information described above shall terminate within one (1) year of the

Effective Date or upon the dismissal or other conclusion of the Action, whichever occurs earlier.

2.3    **Continued Prosecution of Action.** To avoid duplicate efforts and excess recoveries:

(a)    Plaintiffs agree that where Sunlot seeks prosecution of identified Persons as described in Paragraph 2.2(a), and where such prosecution would substantially overlap and be duplicative of the continued prosecution of the Action, Plaintiffs will dismiss the Action against the remaining defendants to allow Sunlot to move forward with its prosecution;

(b)    Settling Defendants agree that, consistent with their agreement to provide Plaintiffs with certain information as described in Paragraph 2.2(c), they agree to provide Sunlot with such information in furtherance of any Sunlot prosecution of identified Persons as described in Paragraph 2.2(a); and

(c)    Plaintiffs agree that where some or all of the Action continues and results in money going to the affected Mt. Gox accountholders, such money would be credited to the Settlement Class members as if it was recovered and paid through the Mt. Gox Rehabilitation Plan.

3.    **RELEASES**

3.1    The obligations incurred pursuant to this Settlement Agreement shall be a full and final disposition of the Action and any and all Released Claims, as against all Released Parties.

3.2    Upon the Effective Date, the Releasing Parties, and each of them, shall be deemed to have, and by operation of the Final Judgment shall have, fully, finally, and forever released, relinquished and discharged all Released Claims against the Released Parties, and each of them.

4.    **NOTICE TO THE CLASS**

4.1    Upon entry of an order granting Preliminary Approval, the Settlement Administrator shall cause the Notice describing the Final Approval Hearing and the terms of the

Settlement embodied in this Settlement Agreement be disseminated to potential Settlement Class

Members as provided herein. Such notice shall comport with due process and be effectuated

pursuant to a Notice Plan, the costs of which shall be Settlement Administration Expenses.

    4.2    The Notice Plan shall include:

    (a)    *Class List*.  Within no later than five (5) business days after the execution

of this Settlement Agreement, the Parties shall request that the Japanese Bankruptcy Court

release to the Settlement Administrator and Class Counsel a list of all names, telephone numbers,

U.S. Mail Addresses, and email addresses associated with each member of the Settlement Class

registered with the Mt. Gox Exchange.

    (b)    *Confidentiality of the Class List*.  The Settlement Administrator and Class

Counsel shall keep the Class List and all personal information obtained therefrom, including the

identity, email addresses, and U.S. mailing addresses strictly confidential. The Parties and the

Settlement Administrator agree that the Class List may not be used for any purpose other than

effectuating the terms of this Agreement or duties arising there under, including the provision of

Class Notice in the manner set forth in this paragraph.

    (c)    *Direct Notice by Mail and Email.* The Settlement Administrator shall send

Notice substantially in the form attached as Exhibit B to each address by First Class U.S. Mail

and email no later than twenty-eight (28) days after receipt of the Class List from the Japanese

Bankruptcy Court or on such other date determined by the Court.

    (d)    *Press release*. Within fourteen (14) days of the entry of an order granting

Preliminary Approval, the Settlement Administrator or Class Counsel shall distribute a press

release to local, national, and syndicated news organizations discussing the terms of the

Settlement Agreement that in no way disparages the Settling Defendants. The press release shall

be subject to the prior approval of the Settling Defendants, to the extent Settling Defendants are

referenced therein, and such approval shall not be unreasonably withheld.

(e)    *Internet Publication Notice.* Within ten (10) days following the entry of

the Preliminary Approval, Notice shall be provided on a website at www.[website].com, which

shall be administered by the Settlement Administrator and shall be substantially in the form of

Exhibit C hereto.

(f)    *Publication Notice.*  The Settlement Administrator shall supplement the

direct notice through a one-time 1/8 page advertisement in *Investors Business Daily*.

(g)    *CAFA Notice.*  Pursuant to 28 U.S.C. § 1715, not later than ten (10) days

after the Agreement is filed with the Court, the Settlement Administrator shall serve upon the

Attorneys General of each U.S. State, the Attorney General of the United States, and other

required government officials, notice of the proposed settlement, which shall include (1) a copy

of the most recent complaint and all materials filed with the complaint or notice of how to

electronically access such materials; (2) notice of all scheduled judicial hearings in the Action;

(3) all proposed forms of Notice to the Settlement Class; and (4) a copy of this Agreement. To

the extent known, the Defendants shall serve upon the above-referenced government official the

names of class members who reside in each respective state and the share of the claims of such

members to the entire settlement, or if not feasible, a reasonable estimate of the number of class

members residing in each state and the estimated proportionate share of the claims of such

members to the entire Agreement.

4.3    The Notice shall advise the Settlement Class of their rights, including the right to

be excluded from, comment upon, and/or object to the Settlement Agreement or its terms. The

Notice shall specify that any objection to the Settlement Agreement, and any papers submitted in

support of said objection, shall be considered by the Court at the Final Approval Hearing only if,

on or before the Objection/Exclusion Deadline approved by the Court and specified in the

Notice, the Person making an objection files notice of an intention to do so and at the same time

(a) files copies of such papers he or she proposes to be submitted at the Final Approval Hearing

with the Clerk of the Court, (b) files any objection through the Court's CM/ECF system if the

objection is from a Settlement Class Member represented by counsel,  and (c) sends copies of

such papers by mail, hand, or overnight delivery service to Class Counsel, Sunlot's Counsel,

McCaleb's Counsel, and Gay-Bouchery's Counsel.

      4.4     Any Settlement Class Member who intends to object to this Agreement must

include in the written objection his/her/its name and address, include all arguments, citations, and

evidence supporting the objection (including copies of any documents relied on), state that he or

she is a Settlement Class Member, provide the username and email associated their Mt. Gox

Exchange account, provide a signature, and provide a statement indicating whether the objector

intends to appear at the Final Approval Hearing with or without counsel. Any Settlement Class

Member who fails to timely file a written objection with the Court and notice of his or her intent

to appear at the Final Approval Hearing in accordance with the terms of this section and as

detailed in the Notice, and at the same time provide copies to designated counsel for the Parties,

shall not be permitted to object to this Agreement at the Final Approval Hearing, and shall be

foreclosed from seeking any review of this Agreement by appeal or other means and shall be

deemed to have waived his, her, or its objections and be forever barred from making any such

objections in the Action or any other action or proceeding.  To be valid, the objection must be

filed with the Court and sent to Class Counsel, Sunlot's Counsel, McCaleb's Counsel, and Gay-

Bouchery's Counsel on or before the Objection/Exclusion Deadline approved by the Court and

specified in the Notice.

4.5      A Settlement Class Member may request to be excluded from the Settlement

Class by sending a written request postmarked on or before the Objection/Exclusion Deadline

approved by the Court and specified in the Notice. In order to exercise the right to be excluded, a

Class Member must timely send a written request for exclusion to the Settlement Administrator

providing his/her name and address, provide the username and email associated their Mt. Gox

Exchange account, the name and number of the case, and a statement that he/she/it wishes to be

excluded from the Settlement Class for purposes of this Settlement. A request to be excluded that

does not include all of this information, or that is sent to an address other than that designated in

the Notice, or that is not postmarked within the time specified, shall be invalid, and the Person(s)

serving such a request shall be a member(s) of the Settlement Class and shall be bound as

Settlement Class Members by the Agreement, if approved. Any member of the Settlement Class

who validly elects to be excluded from this Agreement shall not:  (i) be bound by any orders or

the Final Judgment; (ii) be entitled to relief under this Settlement Agreement; (iii) gain any rights

by virtue of this Agreement; or (iv) be entitled to object to any aspect of this Agreement.  The

request for exclusion must be personally signed by the Person requesting exclusion.  So-called

"mass" or "class" opt-outs shall not be allowed.

5.      **SETTLEMENT ADMINISTRATION**

5.1      The Settlement Administrator shall, under the supervision of the Court, administer

the Notice provided for by this Settlement Agreement in a rational, responsive, cost effective and

timely manner. The Settlement Administrator shall maintain reasonably detailed records of its

activities under this Settlement Agreement. The Settlement Administrator shall maintain all such

records as are required by applicable law in accordance with its normal business practices and

such records will be made available to Class Counsel and Defendants' Counsel upon request.

The Settlement Administrator shall also provide reports and other information to the Court as the

Court may require. The Settlement Administrator shall provide Class Counsel, Sunlot's Counsel,

McCaleb's Counsel, and Gay-Bouchery's Counsel with information concerning Notice,

administration and implementation of the Settlement Agreement, including testimony regarding

the sufficiency of the Notice if necessary.

5.2     The Settlement Administrator shall receive exclusion requests and other requests

from the Settlement Class and promptly provide Class Counsel, Sunlot's Counsel, McCaleb's

Counsel, and Gay-Bouchery's Counsel with copies thereof upon receipt. If the Settlement

Administrator receives any exclusion forms or other requests from Settlement Class Members

after the deadline for the submission of such forms and requests, the Settlement Administrator

shall promptly provide copies thereof to Class Counsel, Sunlot's Counsel, McCaleb's Counsel,

and Gay-Bouchery's Counsel.

## 6.     TERMINATION OF SETTLEMENT

6.1     Subject to Paragraph 9 below, the Plaintiffs, on behalf of the Settlement Class, or

Sunlot, shall have the right to terminate this Settlement Agreement by providing written notice of

the election to do so ("Termination Notice") to all other Parties hereto within ten (10) days, of

any of the following events: (i) the Japanese Bankruptcy Court's refusal to approve in an

material respect the Mt. Gox Rehabilitation Plan; (ii) the Texas Bankruptcy's Court refusal to

dismiss the proceedings, or recognize or approve the Mt. Gox Rehabilitation Plan implemented

by the Japanese Bankruptcy Court; (iii) the Court's refusal to grant Preliminary Approval of this

Agreement in any material respect; (iv) the Court's refusal to grant final approval of this

Agreement in any material respect; (v) the Court's refusal to enter the Final Judgment in this

Action in any material respect; (vi) the date upon which the Final Judgment is modified or reversed in any material respect by the Court of Appeals or the Supreme Court; or (vii) the date upon which an Alternative Judgment, as defined in Paragraph 9.1 of this Agreement is modified or reversed in any material respect by the Court of Appeals or the Supreme Court.

## 7.    PRELIMINARY APPROVAL ORDER AND FINAL APPROVAL ORDER

7.1     Promptly after the execution of this Settlement Agreement, Class Counsel shall submit this Agreement together with its Exhibits to the Court and shall move the Court for Preliminary Approval of the settlement set forth in this Agreement, certification of the Settlement Class for settlement purposes only, appointment of Class Counsel and the Class Representatives, and entry of an order granting Preliminary Approval, which shall set a Final Approval Hearing date and approve the Notice for dissemination in accordance with the Notice Plan, substantially in the form Exhibits A and B hereto.

7.2     At the time of the submission of this Settlement Agreement to the Court as described above, Class Counsel shall request that, after Notice is given, the Court hold a Final Approval Hearing and approve the settlement of the Action as set forth herein.

7.3     After Notice is given, the Parties shall request and obtain from the Court a Final Judgment.  The Final Judgment will (among other things):

(a)     find that the Court has personal jurisdiction over all Settlement Class Members and that the Court has subject matter jurisdiction to approve the Settlement Agreement, including all exhibits thereto;

(b)     approve the Settlement Agreement and the proposed settlement as fair, reasonable and adequate as to, and in the best interests of, the Settlement Class Members; direct the Parties and their counsel to implement and consummate the Settlement Agreement according

24

to its terms and provisions; and declare the Settlement Agreement to be binding on, and have *res judicata* and preclusive effect in all pending and future lawsuits or other proceedings maintained by or on behalf of Plaintiffs and all other Settlement Class Members, Releasing Parties, and their heirs, executors and administrators, successors and assigns;

(c)    find that the Notice and the Notice Plan implemented pursuant to the Settlement Agreement (1) constitute the best practicable notice under the circumstances, (2) constitute notice that is reasonably calculated, under the circumstances, to apprise Settlement Class Members of the pendency of the Action, their right to object to or exclude themselves from the proposed Agreement and to appear at the Final Approval Hearing, (3) are reasonable and constitute due, adequate and sufficient notice to all persons entitled to receive notice, and (4) meet all applicable requirements of the Federal Rules of Civil Procedure, the Due Process Clause of the United States Constitution and the rules of the Court;

(d)    find that the Class Representatives and Class Counsel adequately represented the Settlement Class for purposes of entering into and implementing the Agreement;

(e)    dismiss the Action as to the Settling Defendants and Released Parties (including all individual claims and Settlement Class claims presented thereby) on the merits and with prejudice, without fees or costs to any party except as provided in the Settlement Agreement and the Mt. Gox Rehabilitation Plan;

(f)    incorporate the Release set forth above, make the Release effective as of the date of the Final Judgment, and forever discharge the Released Parties as set forth herein;

(g)    permanently bar and enjoin all Settlement Class Members who have not been properly excluded from the Settlement Class from filing, commencing, prosecuting,

25

intervening in, or participating (as class members or otherwise) in, any lawsuit, bankruptcy

proceeding, or other action in any jurisdiction based on the Released Claims;

(h)        authorize the Parties, without further approval from the Court, to agree to

and adopt such amendments, modifications and expansions of the Settlement Agreement and its

implementing documents (including all exhibits to this Agreement) as (1) shall be consistent in

all material respects with the Final Judgment, or (2) do not limit the rights of Settlement Class

Members; and

(i)        without affecting the finality of the Final Judgment for purposes of appeal,

retain jurisdiction as to all matters relating to administration, consummation, enforcement and

interpretation of the Settlement Agreement and the Final Judgment, and for any other necessary

purpose relating to the Settlement.

## 8.    CLASS COUNSEL'S ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES; INCENTIVE AWARD.

8.1        Settling Defendants and Sunlot agree that Class Counsel shall be entitled to a Fee

Award in an amount to be determined by the Court and to be paid out of the proceeds going to

the Settlement Class at the same time and in the same manner as the relief afforded to the

Settlement Class in this Agreement and the Mt. Gox Rehabilitation Plan. Defendants and Sunlot

are not responsible for Class Counsel's allocation of the Fee Award amongst the Steering

Committee or counsel.  Any of the Settling Defendants may appear and be heard with respect to

Class Counsel's Fee Award petition.

9.     **CONDITIONS OF SETTLEMENT, EFFECT OF DISAPPROVAL, CANCELLATION OR TERMINATION.**

9.1     The Effective Date of this Settlement Agreement shall not occur unless and until each of the following events occurs and shall be the date upon which the last (in time) of the following events occurs:

(a)     This Agreement has been signed by Plaintiffs, Settling Defendants, Sunlot, Class Counsel, McCaleb's Counsel, and Gay-Bouchery's Counsel;

(b)     The Court has entered the Preliminary Approval Order;

(c)     The Japanese Bankruptcy Court has finally and formally approved the Mt. Gox Rehabilitation Plan and there are no further proceedings to review or challenge such determinations;

(d)     The Texas Bankruptcy Court has approved or recognized the Japanese Court's approval of the Mt. Gox Rehabilitation Plan, or dismissed the proceedings;

(e)     The Court has entered an order finally approving the Agreement, following notice to the Settlement Class and a Final Approval Hearing, as provided in the Federal Rules of Civil Procedure, and has entered the Final Judgment, or a judgment substantially consistent with this Agreement; and

(f)     The Final Judgment has become Final, as defined above, or, in the event that the Court enters an order and final judgment in a form other than that provided above ("Alternative Judgment") and that has the consent of the Parties, such Alternative Judgment becomes Final.

9.2     If some or all of the conditions specified in Paragraph 9.1 are not met (for example, and for the sake of clarity and not limitation only, the Japanese Bankruptcy Court does not finally and formally approve the Mt. Gox Rehabilitation Plan), or in the event that this

Settlement Agreement is not approved by the Court, or the settlement set forth in this Agreement

is terminated or fails to become effective in accordance with its terms, then this Settlement

Agreement shall be canceled and terminated subject to Paragraph 9.3 unless Class Counsel,

Sunlot's Counsel, McCaleb's Counsel and Gay-Bouchery's Counsel mutually agree in writing to

proceed with this Agreement. If any Party is in material breach of the terms hereof, any other

Party, provided that it is in substantial compliance with the terms of this Agreement, may

terminate this Agreement on notice to all of the Settling Parties at any time prior to the Effective

Date. Notwithstanding anything herein, the Parties agree that the Court's failure to approve, in

whole or in part, the attorneys' fees payment to Class Counsel set forth in Paragraph 8.1 above

shall not prevent the Agreement from becoming effective, nor shall it be grounds for termination.

9.3     If this Agreement is terminated or fails to become effective for the reasons set

forth in Paragraphs 6.1, 6.2, 9.1, or 9.2 above, the Parties shall be restored to their respective

positions in the Action as of the date of the signing of this Agreement. In such event, any Final

Judgment or other order entered by the Court in accordance with the terms of this Agreement

shall be treated as vacated, *nunc pro tunc*, and the Parties shall be returned to the *status quo ante*

with respect to the Action as if this Agreement had never been entered into, and no part of this

Agreement may be used to establish any Settling Defendant's liability or wrongdoing or

otherwise against any Settling Defendant.

9.4     Settling Defendants believe that in addition to factual defenses to the claims

raised in the Action, they each have valid challenges regarding the lack of proper service or

jurisdiction (including, but not limited to lack of personal jurisdiction), as well as potential

objections to certification of a class for purposes of litigation the merits of the Action. Settling

Defendants expressly retain their right to raise any argument or defense, including lack of proper service or jurisdiction, which is unaffected by this Agreement.

10.    **MISCELLANEOUS PROVISIONS**

10.1    Upon the execution of this Agreement, all Parties agree that the Action (including any motions, discovery or other pleadings) shall be stayed and held in abeyance pending further order of the Court.

10.2    The Parties (a) acknowledge that it is their intent to consummate this Settlement Agreement; and (b) agree, subject to their fiduciary and other legal obligations, to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of this Agreement and to exercise their reasonable best efforts to accomplish the foregoing terms and conditions of this Agreement.  Class Counsel and Settling Defendants' Counsel agree to cooperate with one another in seeking Court approval of the Preliminary Approval Order, the Settlement Agreement, and the Final Judgment, and promptly to agree upon and execute all such other documentation as may be reasonably required to obtain final approval of the Agreement.

10.3    The Parties intend this Settlement Agreement to be a final and complete resolution of all disputes between them with respect to the Released Claims by Plaintiffs and the Settlement Class, and each or any of them, on the one hand, against the Released Parties, and each or any of the Released Parties, on the other hand. Accordingly, the Parties agree not to assert in any forum that the Action was brought by Plaintiffs or defended by Settling Defendants, or each or any of them, in bad faith or without a reasonable basis.

10.4    The Parties have relied upon the advice and representation of counsel, selected by them, concerning their respective legal liability for the claims hereby released.  The Parties have read and understand fully the above and foregoing agreement and have been fully advised as to

the legal effect thereof by counsel of their own selection and intend to be legally bound by the same.

10.5    Whether or not the Effective Date occurs or this Settlement Agreement is terminated, neither this Agreement nor the settlement contained herein, nor any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement:

(a)    is, may be deemed, or shall be used, offered or received against the Released Parties, or each or any of them, as an admission, concession or evidence of, the validity of any Released Claims, the truth of any fact alleged by the Plaintiff, the deficiency of any defense that has been or could have been asserted in the Action, the violation of any law or statute, the reasonableness of the settlement amount or the Fee Award, or of any alleged wrongdoing, liability, negligence, or fault of the Released Parties, or any of them;

(b)    is, may be deemed, or shall be used, offered or received against the Settling Defendants, as an admission, concession or evidence of any fault, misrepresentation or omission with respect to any statement or written document approved or made by the Released Parties, or any of them;

(c)    is, may be deemed, or shall be used, offered or received against Plaintiffs or the Settlement Class, or each or any of them, as an admission, concession or evidence of, the infirmity or strength of any claims raised in the Action, the truth or falsity of any fact alleged by the Settling Defendants, or the availability or lack of availability of meritorious defenses to the claims raised in the Action;

(d)    is, may be deemed, or shall be used, offered or received against the Released Parties, or each or any of them, as an admission or concession with respect to any liability, negligence, fault or wrongdoing as against any Released Parties, in any civil, criminal

30

or administrative proceeding in any court, administrative agency or other tribunal.  However, the settlement, this Agreement, and any acts performed and/or documents executed in furtherance of or pursuant to this Agreement and/or Settlement may be used in any proceedings as may be necessary to effectuate the provisions of this Agreement.  However, if this Settlement Agreement is approved by the Court, any party or any of the Released Parties may file this Settlement Agreement and/or the Final Judgment in any action that may be brought against such party or parties in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim;

(e)     is, may be deemed, or shall be construed against Plaintiffs and the Settlement Class, or each or any of them, or against the Released Parties, or each or any of them, as an admission or concession that the consideration to be given hereunder represents an amount equal to, less than or greater than that amount that could have or would have been recovered after trial; and

(f)     is, may be deemed, or shall be construed as or received in evidence as an admission or concession against Plaintiffs and the Settlement Class, or each and any of them, or against the Released Parties, or each or any of them, that any of Plaintiffs' claims are with or without merit or that damages recoverable in the Action would have exceeded or would have been less than any particular amount.

10.6    The headings used herein are used for the purpose of convenience only and are not meant to have legal effect.

10.7    The waiver by one party of any breach of this Agreement by any other party shall not be deemed as a waiver of any other prior or subsequent breaches of this Agreement.

10.8    All of the Exhibits to this Settlement Agreement are material and integral parts
thereof and are fully incorporated herein by this reference.

10.9    This Agreement and its Exhibits set forth the entire agreement and understanding
of the Parties with respect to the matters set forth herein, and supersede all prior negotiations,
agreements, arrangements and undertakings with respect to the matters set forth herein.  No
representations, warranties or inducements have been made to any party concerning this
Settlement Agreement or its Exhibits other than the representations, warranties and covenants
contained and memorialized in such documents.  This Agreement may be amended or modified
only by a written instrument signed by or on behalf of all Parties or their respective successors-
in-interest.

10.10   Except as otherwise provided herein, each Party shall bear its own costs.

10.11   Plaintiffs represents and warrants that they have not assigned any claim or right or
interest therein as against the Released Parties to any other Person or party and that they are fully
entitled to release the same.

10.12   Each counsel or other Person executing this Settlement Agreement, any of its
Exhibits, or any related settlement documents on behalf of any party hereto hereby warrants and
represents that such Person has the full authority to do so and has the authority to take
appropriate action required or permitted to be taken pursuant to the Agreement to effectuate its
terms.

10.13   This Agreement may be executed in one or more counterparts.  All executed
counterparts and each of them shall be deemed to be one and the same instrument provided that
counsel for the Parties to this Agreement all exchange original signed counterparts.  A complete
set of original executed counterparts shall be filed with the Court if the Court so requests.

10.14   This Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties hereto and the Released Parties.

10.15   The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of this Agreement, and all Parties hereto submit to the jurisdiction of the Court solely for purposes of implementing and enforcing the settlement embodied in this Agreement.

10.16   This Settlement Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

10.17   This Settlement Agreement is deemed to have been prepared by counsel for all Parties, as a result of arms' length negotiations among the Parties with the aid of a neutral mediator.  Whereas all Parties have contributed substantially and materially to the preparation of this Agreement, it shall not be construed more strictly against one party than another.

10.18   Where this Settlement Agreement requires notice to the Parties, such notice shall be sent to the undersigned counsel:

[THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK.  SIGNATURE PAGE FOLLOWS.]

IN WITNESS WHEREOF, the parties hereto have caused this Settlement Agreement to be executed by their duly authorized attorneys.

Dated:  April 26, 2014

EDELSON P.C.

By _____

Jay Edelson
Attorneys for Plaintiffs Gregory Greene, Joseph Lack individually and as representatives of the Settlement Class

Dated:  April 28, 2014

KELLER, SLOAN, ROMAN & HOLLAND LLP

By _____

Stan G. Roman (*Pro hac vice* to be filed)
Attorneys for Defendant Jed McCaleb

Dated:  April 28, 2014

JENNER & BLOCK LLP

By _____

Paul B. Rietema
Attorneys for Defendant Jed McCaleb

34

Dated: April 28, 2014                    CHUHAK & TECSON, P.C.

                                         By _____
                                         Daniel J. Fumagalli
                                         Attorneys for Defendant Gonzague Gay-Bouchery


Dated: April 28, 2014                    COOLEY LLP

                                         By _____
                                         Michael G. Rhodes (*Pro hac vice* to be filed)
                                         Attorneys for non-party Silk Road Equity as manager
                                         of Sunlot Holdings Limited

# Exhibit A

# Mt. Gox Rehabilitation Plan
## Addendum to Class Action Settlement Agreement

This Rehabilitation Plan ("Plan") is an addendum to the Class Action Settlement Agreement ("Agreement") dated April 28, 2014 by the Parties to that Agreement. This Plan shall be consistent with both the Agreement and be incorporated into the plan formally submitted to the Japanese bankruptcy court.

The Plan outlines the general structure of the rehabilitation plan with the goal of returning to Mt. Gox account holders Bitcoin and Fiat ("Customer Assets") held by Mt. Gox at the time that the exchange was shut down and taken over by the Japanese bankruptcy officials (the "Supervisor"), and an equitable restitution plan that seeks to make customers whole and compensate them for their losses incurred by the Mt. Gox Exchange.

Further, the Plan details the responsibilities of Sunlot Holdings Ltd. ("Sunlot") to manage implementation and execution of the Plan and the formation of a new bitcoin exchange ("New Gox").

Nothing herein shall be interpreted to provide the Mt. Gox Account Holders, by virtue of this agreement, will receive any preferential treatment over any other putative creditors, and the Supervisor shall be responsible for the resolution of any such claims brought by additional creditors who have come forward or may come forward.

Nothing herein shall prevent the Parties from agreeing to modify these or other terms to the extent required by the Supervisor, so long as any such modifications substantially further the purposes of this Plan and the Agreement, and that such changes are otherwise consistent with the goals of the Plan and the Agreement.

### Caveats and Pre-requisites

1. Under this plan, the Supervisor shall appoint and compensate PwC (or equivalent alternative agreed by Sunlot, if reasonable terms can not be agreed with PwC) to provide an audit of customer accounts, customer assets, and provide an accounting report on how Customer Assets were stolen ("Audit"). Sunlot and Class Counsel shall oversee the Audit and ensuing report.

2. All past and current legal responsibilities are either settled or released through this process, and Sunlot and/or New Gox will be protected by the courts and such releases against any future claims against any liabilities incurred up until the time Sunlot assumes control over the current and remaining Mt. Gox assets and business and when New Gox is established.

3. As a result, Sunlot and New Gox shall be free and unencumbered by any claims or liabilities, with exception of its specified responsibilities and obligations with respect to the bitcoin and fiat to be paid to the appropriate Mt. Gox account holders to be verified by the Audit ("Mt. Gox Account Holders").

### Restitution Plan

1. Sunlot will acquire all Mt Gox shares from Supervisor for 1000 JPY, and agree to all terms and stipulations as provided for in this Agreement.

2. Supervisor will deposit all Mt. Gox held bitcoin to Sunlot for redistribution to Mt. Gox Account Holders' *pro rata* per the PwC Audit, which Sunlot will make immediately available with no restrictions to customers.

3. Supervisor will deposit Mt. Gox held fiat, minus the Restitution Fund amount with Sunlot for immediate redistribution to Mt. Gox Account Holders, with no restrictions.

4. Supervisor will administer the Restitution Fund and make disbursements as per agreed schedule and approved expenses.

5. Sunlot will setup a Class Action Administrator or Trustee to represent Mt. Gox Account Holders' interests and hold any security interests, fiat, or bitcoin as needed by the Plan.

6. Equity-Entitlement Plan

    a. Sunlot/New Gox will establish a structure under which the Trustee/Administrator, for the benefit of the Mt. Gox Account Holders, is entitled to receive (i) *pro rata* cash payments equal to 16.5% of any dividends paid by Sunlot/New Gox to its stockholders and (ii) a *pro rata* share of the net proceeds received by the shareholders of Sunlot/New Gox equity securities in any good faith exit transaction (*i.e.*, any transaction in which a majority of the equity ownership of New Gox is exchanged for cash or other liquid assets) equal to the proceeds allocable to a holder of a 16.5% interest in Sunlot/New Gox's equity securities.

    b. This arrangement will be structured such that it does not involve the issuance of securities by Sunlot/New Gox or the Trustee/Administrator, and the Trustee/Administrator will have no participation in the management or operation of Sunlot/New Gox.

    c. In the event that Sunlot/New Gox conducts an initial public offering of its equity securities while this arrangement is in place, a Mt. Gox Account Holder shall, at his or her discretion, receive on a *pro rata* basis either common stock of Sunlot/New Gox representing in aggregate a 16.5% interest in Sunlot/New Gox's equity securities or the equivalent value (at the IPO price) in cash.

    d. Nothing will restrict the ability of Mt. Gox Account Holders from selling or transferring their interests (as described herein) to Sunlot/New Gox, or otherwise.

    e. All equity percentages described above will be based upon Sunlot/New Gox's initial capitalization table.

f. Sunlot/New Gox will be in a fiduciary relationship with Mt. Gox Account Holders, and shall have a fiduciary duty to act towards them on the same good faith basis as they act towards Sunlot/New Gox shareholders.

7. Mt. Gox Account Holders can convert any recovered funds between BTC and Fiat commission free. Any Fiat transmission fees will remain.

## Restitution Fund

1. In order to be eligible for payments from the Restitution Fund, or any other cash or equity based payments described herein, customers will need to go through level 2 KYC verification, including proof of identification, bitcoin wallet address verification, and bank account verification, as a natural person or legal entity.

2. Restitution Fund allocations will be *pro rata* for valid customer accounts as per the Audit.

3. These funds will be deposited into the respective Mt. Gox Account Holders' New Gox Accounts, on the *pro rata* agreed basis.

4. Restitution Funds will come from one of the following sources

    a. Cash payments paid out to Restitution Fund

    b. Proceeds from any Recovery Efforts less Recovery Holdback.

    c. An approved buy-out as per buy-out schedule for accelerated pre-payment of remaining restitution fund

5. If a customer account remains unclaimed for six (6) months from the date of Agreement, unclaimed Customer Assets in that account will be transferred to Restitution Fund and the customer will be removed from *pro rata* payments. Accounts that are removed from fund will reduce top line balance of Restitution Fund.

## Recovery Commitments

1. Sunlot shall commit to use commercially reasonable best efforts, and the resources of the Restitution Fund, to recover Customer Assets through ongoing investigation and legal prosecution both in Japan and internationally (as necessary), including, for example, hiring investigators, lawyers, accountants, or any other entities or services that may increase the likelihood of recovering Customer Assets ("Recovery Efforts").

2. $10 million USD in fiat currency shall be allocated from current Mt. Gox fiat assets held by the Supervisor to provide upfront funding for the administration and recovery of former Mt. Gox bitcoin and fiat assets (the "Restitution Fund").

3. As an incentive and additional compensation, Sunlot shall retain an upside percentage in the amount of 10% of recovered Customer Assets ("Recovery Holdback") obtained through its recovery efforts, which will include claims against those accountable for customer losses.

## Pricing Model

For the purposes of establishing the size of the Restitution Fund and customer loss calculations, a bitcoin exchange rate of 1 BTC to $500 USD will be used. For conversion between USD and other Fiat currencies, the published exchange rates as of February 25, 2014 will be used.

All bitcoin and Fiat customer assets currently under the protection of the Tokyo District Court Civil Rehabilitation and Bankruptcy Proceedings will be valued in both BTC and Fiat for the purposes of establishing *pro rata* distributions.

## Customer Moving Accounts

Sunlot will operate New Gox in a Global Local Model, which means all accounts will come under the same global protection. Customers will be able to open accounts in any New Gox jurisdiction, subject to New Gox KYC requirements applicable for the respective jurisdictions. Customers will be able to transfer balances between New Gox jurisdictions.

**IN WITNESS WHEREOF**, each of the Parties hereto have caused this Plan to be executed on their behalf by their duly authorized representatives, all as of the date(s) set forth below.

**SUNLOT HOLDINGS LTD.**

Signature: _____

Printed Name:  John Betts

Title:  CEO   John Betts

Date: CEO April 28, 2014

April 28, 2014

**EDELSON PC**

Signature: _____

Printed Name:  Jay Edelson

Title:  Managing Partner

Date:  April 28, 2014

# Exhibit B

**IF YOU HAD BITCOINS OR GOVERNMENT CURRENCY STORED WITH MT. GOX ON FEBRUARY 24, 2014, A PARTIAL CLASS ACTION SETTLEMENT MAY AFFECT YOUR RIGHTS**

## NOTICE OF CLASS ACTION AND PROPOSED PARTIAL SETTLEMENT

A proposed class action settlement has been reached in a lawsuit related to the closure of Bitcoin Exchange Mt. Gox, which resulted in the loss of consumers' bitcoins and currency.

You are receiving this notice because you have been identified as being a possible Class Member. Your legal rights may be affected whether you act or don't act. Please read this notice carefully. Visit www.website.com to read the full notice and the settlement agreement.

### What is the Lawsuit About?

This lawsuit claims that defendants Mt. Gox KK, MtGox Inc., Tibanne KK, Mark Karpeles, Mizuho Bank Ltd., Jed McCaleb, Mt. Gox North America, Inc., and Gonzague Gay-Bouchery engaged in wrongdoing resulting in the collapse of Mt. Gox and its later filing for bankruptcy in Japan and the United States. Defendants McCaleb and Gay-Bouchery (the "Setting Defendants") have agreed to settle this case and the court has decided that the plaintiffs can represent a group or "class" of persons whose lost bitcoins and currency when Mt. Gox closed for purposes of this settlement. The case will continue against Tibanne KK, Mark Karpeles, Mizuho Bank Ltd and others found to have been responsible for the lost bitcoins and currency.

The Settling Defendants deny that they engaged in any wrongdoing or violated any law, and the Court has not determined who is right. Rather, the parties have agreed to settle the lawsuit in order to reopen Mt. Gox and provide compensation to those affected.

### Who is a Class Member?

You are a class member if you live in the United States and had bitcoins or government-issued currency stored with the Mt. Gox Exchange on February 24, 2014 when it stopped all transactions.

### What Do I Get From the Settlement?

Mt. Gox is set to be liquidated though bankruptcy in Japan. The Settlement requires the Settling Defendants, along with investment group Sunlot Holdings Limited, to take certain steps in an attempt to stop the liquidation and implement a reorganization plan that will: (1) provide for the return of proportional amounts of the 200,000 recovered bitcoins and government-issued currency to affected Mt. Gox account holders' wallets; (2) provide proceeds in proportional amounts from bitcoins or money obtained from further lawsuits; (3) provide proportional payments equivalent to 16.5% on any dividends paid or upon sale; and (4) in the event of an IPO 16.5% of the shares of common stock in the reorganized Mt. Gox (or the cash equivalent) will be distributed in proportion to the amounts lost. Settling Defendants will also cooperate with the investigation into those responsible.

The Settlement and reorganization plan are available at www.website.com.

### What are My Other Options?

You will be a member of the Class unless you exclude yourself from the settlement. If you do not wish to be a member of the Class, you may exclude yourself by mailing a valid request for exclusion to the Settlement Administrator, and it must be postmarked no later than **[Objection/Exclusion Deadline]**. Be sure to include your name and address, provide the username and email associated with your Mt. Gox Exchange account, and a statement that you wish to be excluded from

the Class in *Greene et al v. MTGOX, Inc. et al*, Case No. 14-cv-01437. If you choose to exclude yourself, you give up your right to object to the settlement, but retain any rights you may currently have to sue the settling defendants and released Mt. Gox entities over the legal issues in the lawsuit.

You and/or your lawyer have the right to appear before the Court and object to the proposed settlement. Objecting is telling the Court you don't something about the settlement. You can object ONLY if you stay in the Class. If you exclude yourself, you have no basis to object because the case no longer affects you. Your written objection must be filed with the Court referencing Case No. 14-cv-01437 and sent by prepaid first class U.S. mail to the attorneys for all parties to the lawsuit and postmarked no later than **[Objection/Exclusion Deadline]**. Specific instructions about how to object to, or exclude yourself from, the Settlement are available at www. [website].com.

If you do nothing you will be in the Class, and if the Court approves the Settlement, you will also be bound by all orders and judgments of the Court. If approved, your claim relating to the lost bitcoin and fiat currency that are the subject of this case against the Settling Defendants and released Mt. Gox entities, will be fully and finally resolved and released.

### Who Represents Me?

The Court has appointed a team of lawyers that brought the suit, lead by Jay Edelson of Edelson PC, to represent the class: These attorneys are referred to as Class Counsel. If you want to be represented by your own lawyer in this case, you may hire one at your expense.

At the hearing to determine the fairness of the settlement, Class Counsel will ask the Court for attorneys' fees and expenses to be paid out of the proceeds going to the Settlement Class for investigating the facts, litigating the case, and negotiating the settlement. They will request that whatever fees the Court awards be paid at the same time and in the same manner as the relief afforded to the Settlement Class in this Agreement and the Mt. Gox reorganization plan.

### When will the Court Consider the Proposed Settlement?

The Court will hold the Final Approval Hearing to determine the fairness of the settlement at **[time]** on **[date]** at the Everett McKinley Dirksen U.S. Courthouse, Room 2125, 219 S. Dearborn St., Chicago, IL 60604 before Judge Gary Feinerman. At that hearing, the Court will hear any objections concerning the fairness of the settlement that have been properly raised, as set forth above. The hearing may be postponed to a different date or time without notice. You are not required to come to this hearing.

### How Do I Get More Information?

This notice is intended only as a summary of the lawsuit and proposed settlement. It is not a complete statement of the lawsuit or the proposed settlement. For more information about the proposed settlement and a copy of the full Notice go to www. website.com, contact the Settlement Administrator at [toll free #] or [address]or call Class Counsel at 1-866-354-3015.

By Order of the Court Dated: [Date]

# Exhibit C

# If you had bitcoins or government currency stored with Mt. Gox on February 24, 2014, a partial class action settlement may affect your rights.

*A Federal Court authorized this notice. You are <u>not</u> being sued. This is <u>not</u> a solicitation from a lawyer.*

- A partial settlement of a class action lawsuit has been reached related to the closure of Bitcoin digital currency exchange Mt. Gox and resulting loss of consumers' bitcoins and currency. The lawsuit is against defendants Mt. Gox KK, MtGox Inc., Tibanne KK, Mark Karpeles, Mizuho Bank Ltd., Jed McCaleb, Mt. Gox North America, Inc., and Gonzague Gay-Bouchery, who plaintiffs claim engaged in wrongdoing resulting in the collapse of Mt. Gox and its later filing for bankruptcy in Japan and the United States. A proposed Settlement has been reached with Jed McCaleb and Gonzague Gay-Bouchery (the "Settling Defendants"), who deny that they engaged in any wrongdoing.

- You are included in the settlement if you live in the United States and had bitcoins or government-issued currency stored with the Mt. Gox Exchange on February 24, 2014 when it stopped all transactions.

- Mt. Gox is set to be liquidated though bankruptcy in Japan. The Settlement requires the Settling Defendants, along with investment group Sunlot Holdings Limited, to take certain steps in an attempt to stop the liquidation and implement a reorganization plan that will: (1) provide for the return of proportional amounts of the 200,000 recovered bitcoins and government-issued currency to affected Mt. Gox account holders' wallets; (2) provide proceeds in proportional amounts from bitcoins or money obtained from further lawsuits; (3) provide proportional payments equivalent to 16.5% on any dividends paid or upon sale; and (4) in the event of an IPO 16.5% of the shares of common stock in the reorganized Mt. Gox (or the cash equivalent) will be distributed in proportion to the amounts lost. Settling Defendants will also cooperate with the investigation into those responsible.

| Your Legal Rights and Options in this Partial Settlement: | |
|---|---|
| **Do Nothing** | By doing nothing, you automatically receive the benefits of the Settlement with the Settling Defendants resulting from the reorganization of Mt. Gox. But, you give up any rights to separately sue the Settling Defendants and related parties about the legal claims that were brought or could have been brought in this lawsuit. |
| **Ask to be Excluded from the Settlement** | If you ask to be excluded from the Settlement with the Settling Defendants, you will keep any rights you have to separately sue the Settling Defendants at your own expense. |
| **Object to the Settlement** | Write to the Court explaining why you don't like the partial Settlement with the Settling Defendants. |
| **Go to the Settlement Hearing** | Ask to speak in Court about the Settlement. |

These rights and options—**and the deadlines to exercise them**—are explained in this Notice.

Questions? Call 1-800-000-0000 Toll Free, or Visit www.[website].net

1

## BASIC INFORMATION

**1. Why was this Notice issued?**

A Court authorized this Notice to let you know about a proposed Settlement with certain Settling Defendants. You have legal rights and options that you may act on before the Court decides whether to approve the proposed Settlement. This Notice explains the lawsuit, the Settlement, and your legal rights.

Judge Gary Feinerman of the United States District Court for the Northern District of Illinois is overseeing this class action. The lawsuit is known as *Greene et al v. MTGOX, Inc. et al*, 14-cv-01437. The people who sued are called the Plaintiffs. The companies and individuals they sued, Mt. Gox KK, MtGox Inc., Tibanne KK, Mark Karpeles, Mizuho Bank Ltd., Jed McCaleb, Mt. Gox North America, Inc., and Gonzague Gay-Bouchery, are called the Defendants. Jed McCaleb and Gonzague Gay-Bouchery have agreed to settle the lawsuit. The lawsuit is currently scheduled to proceed against Tibanne KK, Mark Karpeles, and others found to be responsible for the missing/stolen bitcoins and government currency.

**2. What is a class action and who is involved?**

In a class action, one or more people called "Class Representatives" (in this case, Gregory Greene and Joseph Lack) sue on behalf of a group of people who have similar claims. Together, these people are called a "Class" or "Class Members." After the Plaintiffs agreed to settle the case with the Settling Defendants, the Court recognized it as a case that should be treated as a class action for settlement purposes. In a class action, the court resolves the issues for all Class Members, except for those who exclude themselves.

## THE CLAIMS IN THE LAWSUIT AND THE PARTIAL SETTLEMENT

**3. What is the lawsuit about?**

Plaintiffs filed this lawsuit after Mt. Gox stopped all transactions and they were unable to access their bitcoins and government-issued currency held by Mt. Gox. Plaintiffs claim that Defendants breached their contracts—as well as their fiduciary duties and express trust agreements—by failing to safeguard and segregate Class members' bitcoins and government-issued currency being held by Mt. Gox as promised in Mt. Gox's Terms of Use. Plaintiffs also allege that by failing to implement industry-standard protocols to detect and prevent the improper access and misuse of exchange Class Members' bitcoins and government-issued currency held on Mt. Gox, Defendants breached the duty of care owed to Class Members.

Plaintiffs claim Defendants (1) committed for consumer fraud, common law fraud, civil conspiracy, and RICO violations by continuing to accept and deposit wire transfers into Mt. Gox until the exchange shut down, despite their knowledge that Class Members' funds would lost or stolen; (2) acted in together in causing the loss or theft of the bitcoins and government-issued currency of Class members; and (3) misrepresented to Class Members that they could securely trade and withdraw their bitcoins and government-issued currency from Mt. Gox, up until the day it closed. Mt. Gox has filed for bankruptcy in Japan and the United States, which stops the lawsuit from proceeding against it.

The Settling Defendants deny they violated any law. The Court has not decided who is right. Rather the Plaintiffs and Settling Defendants have agreed to settle this lawsuit.

More information about the lawsuit can be found in the "Court Documents" section of this website.

**4. Why is there a Settlement with Some Defendants?**

The Court has not decided whether Plaintiffs or the Settling Defendants should win this lawsuit. Instead, the Class Representative agreed to settle this case with the Settling Defendants in exchange for (a) an agreement with Settling Defendants, along with investment group Sunlot Holdings Limited, to present to Japanese Bankruptcy court a plan to stop the liquidation of Mt. Gox and implement a reorganization plan that will provide more to the members of the Settlement Class than they would have received through the Japanese Bankruptcy, along with the ability to potentially recoup all losses through the continued operation of the Mt. Gox bitcoin exchange. The Settling Defendants have also agreed to provide cooperation that will help Plaintiffs in their case against Tibanne KK, Mark Karpeles, Mizuho Bank Ltd, and others found to be responsible for the missing/stolen bitcoins and government currency.

## WHO IS INCLUDED IN THE PARTIAL SETTLEMENT

You need to determine whether you are affected by the proposed Settlement.

**5. Am I part of the partial Settlement?**

The Court decided that everyone who fits the following description is part of the Settlement Class: all people or entities in the United States and its territories, who had bitcoins or government-issued currency stored with the Mt. Gox Exchange on February 24, 2014.

However, the following people and entities are not included: (1) MTGOX, Inc., Mt. Gox KK, Tibanne KK, Mt. Gox North America, Inc., Mizuho Bank, Ltd., Mark Karpeles, and any entity in which their parent companies have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) Persons who execute and file a timely request for exclusion, (4) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims, and (5) the Settling Defendants.

Mt. Gox has provided the names, telephone numbers, mailing addresses, and email addresses of those with affected Mt. Gox accounts. You may have been sent a summary notice of this partial settlement through the mail and email.

# THE SETTLEMENT WITH THE SETTLING DEFENDANTS

### 6. What does the Settlement provide?

The Settlement requires the Settling Defendants, along with investment group Sunlot Holdings Limited, to present to Japanese Bankruptcy court a plan to stop the liquidation of Mt. Gox and implement a reorganization plan that will:

- Hire PricewaterhouseCoopers to perform an accounting of Mt. Gox to determine the amounts lost by each affected Mt. Gox account holder and to further investigate the lost bitcoins and government-issued currency;

- Investigate and seek civil prosecution of anyone (excluding the Settling Defendants) found to be responsible for the missing/stolen bitcoins and government currency will continue here and in Japan. Settling Defendants have agreed to provide cooperation that will help the reorganized Mt. Gox in its case against those found to be responsible for the missing/stolen bitcoins and government currency;

- Return proportional amounts of 200,000 recovered bitcoins and government-issued currency to affected Mt. Gox account holders' wallets;

- Affected account holders will be provided proportional payments equivalent to 16.5% on any dividends paid or proportional payment of 16.5% of the proceeds upon sale; and

- Should the new reorganized Mt. Gox have an IPO, affected Mt. Gox account holders are entitled to a proportional share of 16.5% of the stock in the reorganized new Mt. Gox or the equivalent value (at the IPO price) in cash.

After investigating and prosecuting this action, Class Counsel believe that although the Settlement supporting the reorganization presents risk to the Settlement Class, that the Settlement Class will receive more through this settlement than if Mt. Gox is liquidated through the Japanese Bankruptcy Court. Class Counsel believes this is so because the Japanese Bankruptcy Court would use the 200,000 recovered bitcoins to pay all creditors of Mt. Gox, not just those who lost access to their bitcoins when Mt. Gox closed. Additionally, the distribution of whatever bitcoins remain would likely be substantially delayed by the Bankruptcy process. The Settlement also presents the opportunity for the Settlement Class to recoup more than they lost, which could never happen through liquidation. If the reorganization is not implemented, this Settlement will not take effect.

A copy of the Settlement Agreement, including the reorganization plan, is available in the "Court Documents" Section of the settlement website.

# THE LAWYERS REPRESENTING YOU

### 7. Do I have a lawyer in this case?

Yes, the Court has appointed Jay Edelson of Edelson PC as the lead attorney to represent you and other Class Members as Class Counsel. There are also the following four of committees of attorneys working on your behalf: (1) U.S. Committee led by Robert Clifford of the Clifford Law Offices and Bret Lusskin of Law Office of Bret Lusskin, Esq., (2) the Bankruptcy Committee led by Scott Kitei of Honigman Miller Schwartz and Cohn LLP; (3) the Canadian Committee led by Theodore P. Charney of Charney Lawyers; and (4) the International Committee led by Scott A. Kamber of KamberLaw, LLC.

### 8. Should I get my own lawyer?

You don't need to hire your own lawyer because Class Counsel is working on your behalf. But, if you want your own lawyer, you will have to pay that lawyer. For example, you can ask your lawyer to appear in Court for you if you want someone other than Class Counsel to represent you.

### 9. How will the lawyers be paid?

The Court will determine the proper amount of any attorneys' fees and expenses to award Class Counsel. Class Counsel will seek reimbursement of their fees and expenses in an amount to be determined by the Court and to be paid out of the proceeds going to the Settlement Class. They will request that whatever fees the Court awards be paid at the same time and in the same manner as the relief afforded to the Settlement Class in this Agreement and the Mt. Gox reorganization plan.

## YOUR RIGHTS AND OPTIONS

### 11. What happens if I do nothing?

By doing nothing, you are staying in partial Settlement. But, unless you exclude yourself, you won't be able to start a lawsuit or be part of any other lawsuit against the Settling Defendants or released Mt. Gox entities for the claims being resolved by this Settlement.

### 12. What happens if I ask to be excluded?

If you exclude yourself from the Settlement, you will keep your right to start your own lawsuit against the Settling Defendants and released Mt. Gox entities. You will not be legally bound by the Court's judgments related to the Settlement Class and Settling Defendants in this class action.

### 13. How do I ask to be excluded?

You can ask to be excluded from the Settlement. To do so, you must send a letter stating that you want to be excluded from the Settlement in *Greene et al v. MTGOX, Inc. et al*, 14-cv-01437. Your letter must also include your name and address, provide the username and email associated your Mt. Gox Exchange account, and your signature. You must mail your exclusion request no later than **[objection / exclusion deadline]**, to:

Mt. Gox Settlement Administrator
PO Box 0000
City, ST 90210-0000

You can't exclude yourself on the phone or by fax or email.

### 14. If I don't exclude myself, can I sue the Settling Defendants for the same thing later?

No. Unless you exclude yourself, you give up any right to sue the Settling Defendants and released Mt. Gox entities for the claims that were brought or could have been brought in this lawsuit and resolved by this Settlement and the reorganization of Mt. Gox.

### 15. How do I object to the Settlement?

If you're a Class Member, you can object to the Settlement if you don't like any part of it. You can give reasons why you think the Court should not approve it. The Court will consider your views. To object, you must file a letter or brief with the Court stating that you object to the Settlement in *Greene et al v. MTGOX, Inc. et al*, 14-cv-01437. Your letter or brief must also: (1) identify all of the reasons for your objections (including citations and supporting evidence) and attach any materials you are relying on to make your objections; (2) your name and address, provide the username and email associated your Mt. Gox Exchange account; and (3) indicate whether you want to appear and speak at the final fairness hearing, with or without your own lawyer. Your objection and any supporting papers must be filed with the Court and mailed or delivered to Class Counsel, Sunlot's Counsel, McCaleb's Counsel and Gay-Bouchery's Counsel, at the following addresses, postmarked no later than **[Date], 2014**.

| | |
|---|---|
| **Court** | *Greene et al v. MTGOX, Inc. et al*, 14-cv-01437<br>c/o Clerk of the Court<br>Everett McKinley Dirksen U.S. Courthouse<br>219 South Dearborn Street<br>Chicago, IL 60604 |
| **Class Counsel** | Jay Edelson<br>Edelson PC<br>Suite 1300<br>350 North LaSalle Street<br>Chicago, Illinois 60654 |
| **McCaleb's Counsel** | Stan Roman and Ethan Jacobs<br>Keller, Sloan, Roman & Holland LLP<br>555 Montgomery Street, 17th Floor<br>San Francisco, California 94111 |
| **Gay-Bouchery's Counsel** | Daniel J. Fumagalli<br>Michael Allen Eurich<br>Chuhak & Tecson, P.C.<br>30 South Wacker Drive, Suite 2600<br>Chicago, IL 60606 |
| **Sunlot's Counsel** | Michael G. Rhodes<br>Cooley LLP<br>101 California Street, 5th Floor<br>San Francisco, California 94111-5800 |

Class Counsel will file with the Court and post on the settlement website its request for attorneys' fees two weeks prior to
[**objection/opt-out deadline**].

### 16. What's the difference between objecting to the Settlement and excluding myself?

Objecting is simply telling the Court that you don't like something about the Settlement. You can object to the Settlement only
if you stay in the Class (i.e. don't exclude yourself from the Settlement). Excluding yourself is telling the Court that you don't
want to be part of the Settlement. If you exclude yourself from the Settlement, you have no basis to object because the
Settlement no longer affects you.

## THE COURT'S FAIRNESS HEARING

### 17. When and where will the Court decide whether to approve the Settlement with Trifecta?

The Court will hold the Fairness Hearing at __ a.m. on [**date**], 2014 at the Everett McKinley Dirksen U.S. Courthouse, Room
2125, 219 S. Dearborn St., Chicago, IL 60604 before Judge Gary Feinerman. The purpose of this hearing will be for the Court
to determine whether to approve the Settlement with the Settling Defendants as fair, reasonable, adequate, and in the best
interests of the Class. At that hearing, the Court will listen to any objections and arguments concerning the fairness of the
Settlement. The hearing may be postponed to a different date or time without notice, so it is a good idea to check
www.website.net or call 1-800-000-0000. If you timely objected to the Settlement and told the Court that you intend to appear
and speak at the Fairness Hearing you will receive notice of any change in the date of the Fairness Hearing.

### 18. Do I have to come to the hearing?

No. Class Counsel will answer any questions the Court may have. But, you are welcome to come at your own expense. If you
send an objection, you don't have to come to Court to talk about it. As long as you filed and mailed your written objection on
time, the Court will consider it. You may also pay another lawyer to attend, but you don't have to.

### 19. May I speak at the hearing?

Yes. You may ask the Court for permission to speak at the Fairness Hearing. To do so, you must include a statement in your
letter or brief objecting to the Settlement saying that it is your "Notice of Intent to Appear in *Greene et al v. MTGOX, Inc. et al*,
14-cv-01437." You must also include your name, address, telephone number and signature as well as the name and address of

your lawyer, if one will be appearing for you. Your objection and notice of intent to appear must be filed with the Court and mailed to Class Counsel no later than **[date], 2014**.

## GETTING MORE INFORMATION

| 20. How do I get more information? |
| --- |

Go to www.website.net for Court Documents and updated information about the lawsuit and the Settlement as it becomes available. You may also write to the Mt. Gox Settlement Administrator, PO Box 0000, City, ST 90210-0000 or call the Mt. Gox Settlement Administrator at [1-000-000-0000] or Class Counsel at 1-866-354-3015.