# EXHIBIT B

**Exhibit B**

**Objections and Questions
Regarding the Sunlot Proposal**

**Mt. Gox Rehabilitation Plan
Addendum to Class Action Settlement Agreement[1]**

A.1.    This Rehabilitation Plan ("Plan") is an addendum to the Class Action Settlement Agreement ("Agreement") dated April 28, 2014 by the Parties to that Agreement. This Plan shall be consistent with both the Agreement and be incorporated into the plan formally submitted to the Japanese bankruptcy court.

*General Comments/Questions:*

*The Sunlot Proposal presumes that the prior conversion of Mt. Gox's civil rehabilitation proceeding to the present Japanese bankruptcy/liquidation proceeding will somehow be reversed. Naturally, any process that is led by Mr. Karpeles or his known and unknown affiliates, counsel, agents, associates, or fronts (collectively the "Karpeles Suspects") would face widespread opposition; as a result, we assume that Kobayashi-san would remain in control of the Japanese insolvency proceeding, even if the civil rehabilitation proceeding were somehow restored as contemplated.*

*CoinLab asked the proponents of the Sunlot Proposal why they believed that the change in the Japanese process is necessary or appropriate, and in response the proponents appeared to dodge the question, simply alleging (without explanation) that a restored civil rehabilitation proceeding would maximize creditor recoveries better than a liquidation. Why? Apparently, because such a rehabilitation would allow Sunlot to obtain the benefits of the deal without facing competitive bidding and without having to provide other customary creditor protections.*

*CoinLab disputes Sunlot's arguments and assumptions in favor of its proposed rehabilitation process, which appears to have been designed solely to benefit Sunlot and not creditors generally. If Kobayashi-san's team considers the Sunlot approach, CoinLab requests an opportunity to demonstrate the following to the trustee's team and, if necessary, to litigate the issues in the Japanese or U.S. Chapter 15 court:*

*1.    A competitive bidding process in the Japanese bankruptcy liquidation will produce better results for creditors than would the Sunlot Proposal. While Sunlot may have support from some depositors, those depositors are likely uninformed and may incorrectly believe that Sunlot is the only viable alternative. In fact, there may be other better opportunities for the trustee to consider. For example, as set forth in CoinLab's letter to Kobayashi-san, CoinLab has proposed to assist in the investigation to find the*

---

[1] This Addendum is excerpted from the Sunlot Proposal, with CoinLab's comments set forth in italics. CoinLab has added heading numbers/letters in certain instances to the Addendum to avoid cross-reference confusion.

B-1

*stolen bitcoins and identify culpable parties, and is willing to share that information with the trustee, without charging the $10 million fee that Sunlot is seeking and without taking 10% of any recoveries. Moreover, CoinLab is well qualified—and certainly better qualified than Sunlot—to conduct that investigation.*

2.  *The Sunlot stock proposal is poorly structured from a tax and legal perspective, and creditors would be better off with an expertly structured asset sale. This issue invites many questions about why Sunlot is proposing a stock transaction rather than an asset sale. CoinLab urges the trustee to explore the following issues:*

    a.  *Sunlot does not appear interested in resolving the serious questions about which assets are owned by Mt. Gox itself and which are owned by Mt. Gox's parent, Tibanne KK, and its affiliates. Why? Does Sunlot have a side deal with Karpeles, Tibanne (which is owned by Karpeles), or other Karpeles Suspects? Is the stock deal simple a façade for the requested shift from the Japanese bankruptcy process to a civil rehabilitation?*

    b.  *There is a serious risk that governmental authorities will focus on tax, currency, or money-laundering regulatory compliance and other issues, as well as potential criminal issues, that may result from Sunlot's stock ownership of MtGox. Indeed, MtGox already lost $5 Million to the U.S. Department of Homeland Security under Mr. Karpeles's control, and other governmental authorities apparently have MtGox in their targets. Sunlot may believe that it can obtain comfort orders from the Tokyo District Court, and perhaps from the U.S. Bankruptcy Court, to avoid or reduce this exposure; however, any such orders would likely offer creditors little to no protection as a practical matter (even if obtained over objections by CoinLab or other creditors). Tax liabilities alone would likely ruin creditor recoveries. This again raises the question of why a stock deal is appropriate (other than the fact that it helps Sunlot in its battle for control of MtGox). The trustee and other creditors should be wary of Sunlot clearly putting its own interests ahead of those of creditors.*

    c.  *What conflicts of interest would Sunlot have from acting in the capacities of both (i) the operator of the bitcoin exchange, and (ii) the investigator pursuing the stolen bitcoins? What conflicts does Sunlot have on account of its prior (and perhaps current) dealings with Mr. Karpeles and his team? Why should creditors trust Sunlot as a credible substitute for a disinterested fiduciary like Kobayashi-san? Why should creditors consider Sunlot as a credible investigator and recovery agent for the stolen bitcoins? Why should Sunlot be entitled to $10 million to fund expenses and a 10% fee—particularly when CoinLab is offering its assistance for free so that the investigation and recovery effort is planned wisely in advance with better information?*

    d.  *There has been inadequate information shared with creditors about the risks and burdens of the Sunlot Proposal. Accordingly, the Japanese trustee's team, as well as the Tokyo District Court, should allow for a full and open debate about the proposal before any action is taken. The notice of settlement provided in the Chicago Class Action proceeding is not a substitute for such full disclosure requirements in the Japanese and U.S. Chapter 15 proceedings.*

B-2

sf-3412133

       *e.*     *There is reason to suspect that the information provided by Sunlot in support of its proposal may not be reliable (and indeed, may be based on data provided by the Karpeles suspects). For example, Sunlot has stated that a majority of creditors favor the Sunlot Proposal. On what basis does Sunlot make this assertion, particularly given that the Japanese trustee or other legitimate authorities have not released creditor information? Any such creditor data likely was provided by the Karpeles suspects, and therefore lacks credibility.*

*These and other issues discussed herein raise serious concerns about the Sunlot proposal, none of which have been adequately disclosed. Creditors need sunlight, not Sunlot.*

2.     The Plan outlines the general structure of the rehabilitation plan with the goal of returning to Mt. Gox account holders Bitcoin and Fiat ("Customer Assets") held by Mt. Gox at the time that the exchange was shut down and taken over by the Japanese bankruptcy officials (the "Supervisor"), and an equitable restitution plan that seeks to make customers whole and compensate them for their losses incurred by the Mt. Gox Exchange.

    *Comments/Questions:*

    *See comments to A1 above and in CoinLab's letter to the trustee. The goal stated above would be acceptable, in theory, if it were expanded to ensure maximum recovery for allowed claims of all legitimate creditors (as the law requires), provided that insiders and other Karpeles suspects are excluded. (Curiously, the Sunlot Proposal provides no such exclusion for insiders—a particularly important fact given that Sunlot itself and/or certain related parties are reported to be equity holders of MtGox.)*

    *While the goal itself may be acceptable generally, there is simply no support for Sunlot's allegation that its proposal can best achieve that goal (or even achieve it at all). To the contrary, in CoinLab's expert view (based on its experience setting up bitcoin exchanges), the Sunlot Proposal is actually counterproductive as to the professed goal. Among other concerns, priority tax claims and governmental problems will likely divert recoveries from legitimate creditors under the Sunlot approach. Sunlot does not disclose these very real risks and burdens to creditors (as it would be required to in a U.S. Chapter 11 disclosure statement or a securities offering perspective – see, e.g., 11 U.S.C. § 1125 by analogy). CoinLab's letter to the trustee proposes a superior approach, by offering to assist the trustee in finding the missing bitcoins and identifying guilty parties as targets for potential recovery.*

3.     Further, the Plan details the responsibilities of Sunlot Holdings Ltd. ("Sunlot") to manage implementation and execution of the Plan and the formation of a new bitcoin exchange ("New Gox").

    *Comments/Questions:*

    *Sunlot has failed to demonstrate that it is qualified, free from serious conflicts of interest, or otherwise the best choice for carrying out its proposed plan. Indeed, as an entity incorporated in Cypress, with potential connections to the Karpeles suspects, and in light*

B-3

sf-3412133

*of its proposed multi-faceted role as buyer, manager, and implementer, there is reason to believe that Sunlot would be a poor choice indeed—particularly as a reported equity holder of MtGox.*

*CoinLab is willing to assist the trustee in formulating a better recovery plan and in finding appropriate parties to fill the various roles necessary in implementing that plan. CoinLab itself may be willing to compete for certain roles as well, if necessary to avoid the kinds of conflicts and concerns raised by the Sunlot Proposal mistake. CoinLab also is willing to share its expertise with the trustee in setting up a successful bitcoin exchange, if needed, and can explain MtGox's failings and how to avoid them in the future. Sunlot's apparent attempt to follow in MtGox's shoes is not only unwise but dangerous to legitimate creditors.*

*CoinLab is particularly concerned about Sunlot's failure to disclose its relationships with the Karpeles suspects and their allies and professionals. Full disclosure is essential as a condition precedent to any serious consideration of a recovery plan. Such disclosure should also include a detailed business plan, including addressing the many tax and governmental regulatory compliance issues, financing commitments, security assurance questions, competency and qualification assurances, and many other disclosures. The Sunlot Proposal addresses none of these concerns.*

4.      Nothing herein shall be interpreted to provide the Mt. Gox Account Holders, by virtue of this agreement, will receive any preferential treatment over any other putative creditors, and the Supervisor shall be responsible for the resolution of any such claims brought by additional creditors who have come forward or may come forward.

*Comments/Questions:*

*The goals stated in the first clause appear to acknowledge the legal mandate in Japan and in the U.S. Chapter 15 case (and other legal systems implicated in this process) that equal-priority creditors must receive equal and proportional recoveries and rights. Unfortunately, that goal is negated by most of the provisions of the Sunlot Proposal. At this time, the full scope of creditors' claims is unknown (other than CoinLab's $75 million claim, as documented in its pending litigation in Seattle against MtGox and its parent). Moreover, as discussed above, there is a serious risk that the Sunlot Proposal will trigger tax and other governmental actions that depress recoveries of the depositors and other legitimate creditors.*

*Under the Sunlot Proposal, Sunlot would take everything of value in the MtGox estate for the sole benefit of the "Mt Gox Account Holders" (as Sunlot defines them), leaving CoinLab and the rest of the legitimate creditors (including creditors who fail to file proof of claims in Japan, resulting in a windfall for Sunlot) to resolve their claims with Kobayashi-san—who would be left with few remaining estate assets of value. In other words, the inherently conflicting provisions of paragraph 4 above cannot be reconciled. There cannot be two insolvency estates: one with all the real assets, run by Sunlot for the benefit of its subset of depositor allies, and the Japanese bankruptcy estate, with nothing left to provide proportional and equivalent recoveries for the remaining creditors.*

B-4

sf-3412133

> *This approach is brazenly unfair for creditors, and Sunlot has failed to be open and transparent about these risks and other critical issues. Indeed, Sunlot's attempt to label every recovered bitcoin (or proceeds therefrom) as a "Customer Asset" that is only is available to the depositors identified by Sunlot creates a host of problems for creditors. Applicable law does not permit Sunlot to "gift" those bitcoins—which are property of the bankruptcy estate—to the allies and creditors it favors, or to those continuing as Sunlot customers in the New Gox exchange, while leaving other creditors with little to no recovery.*
>
> *Sunlot should not be permitted to empower its allies and favored creditors to vote on a Japanese rehabilitation plan that disproportionately favors their recovery at the expense of others. Moreover, the U.S. Chapter 15 court cannot approve the Sunlot Proposal for the same reason. See, e.g.,* In re Vitro S.A.B. de CV, *701 F.3d 1031 (5th Cir. 2012) (rejecting a similar approach by Mexican insiders).*

5. Nothing herein shall prevent the Parties from agreeing to modify these or other terms to the extent required by the Supervisor, so long as any such modifications substantially further the purposes of this Plan and the Agreement, and that such changes are otherwise consistent with the goals of the Plan and the Agreement.

> *Comments/Questions:*
>
> *This provision appears to reflect Sunlot's awareness that its proposal cannot realistically be achieved in accordance with applicable law. In effect, Sunlot appears to invite negotiation with the Japanese trustee over at least some objectionable parts of the proposal. But Sunlot should not be permitted to negotiate with the Japanese trustee based on such an outrageously low offer, particularly with Sunlot purporting to act on behalf of a group of creditors. CoinLab itself is a creditor—indeed, the largest individual creditor of the MtGox estate, with the most bitcoin industry knowledge and expertise—and CoinLab certainly has ceded no negotiating power or rights to Sunlot.*
>
> *In short, the risk of starting negotiations from such a low initial bid could hurt creditors, particularly if they are compelled to accept negotiations on an expedited basis leaving little time for improvement of the offer or exploration of alternatives. In order to avoid this result, creditors may take defensive actions in both the U.S. and Japan if they are not permitted to have a meaningful role in those negotiations.*

**B.** **Caveats and Pre-requisites**

1. Under this plan, the Supervisor shall appoint and compensate PwC (or equivalent alternative agreed by Sunlot, if reasonable terms can not be agreed with PwC) to provide an audit of customer accounts, customer assets, and provide an accounting report on how Customer Assets were stolen ("Audit"). Sunlot and Class Counsel shall oversee the Audit and ensuing report.

B-5

*Comments/Questions:*

*A creditors' committee, which includes CoinLab (or a U.S. Chapter 15 examiner), working with Kobayashi-san in Japan would offer better oversight of any such audit than Sunlot. Indeed, there is no reasonable basis for Sunlot to act on behalf of other creditors. Sunlot has not been the winning high bidder in any court-approved auction process (nor could it be expected to prevail in any such context). Instead, as CoinLab has proposed in its letter to the trustee, CoinLab and the trustee should conduct the initial investigation of the bitcoin thefts and then share those results with the court and appropriate parties. At the time those results are shared, then PWC (or other auditors acceptable to the applicable court) could be appointed in order to conduct a better-defined audit, acting independently of Sunlot. All key data resulting from the audit should then be made available to all serious bidders, if there is to be a competitive sale.*

*An audit process that is controlled by Sunlot is hardly independent and is clearly unacceptable. Either the audit is 100% controlled by the disinterested Japanese trustee (or a Chapter 15 examiner) or it must be controlled by a representative creditors' committee that includes CoinLab. Moreover, it is critical that Sunlot not choose or direct the specific auditor conducting the audit, to avoid improper influence.*

*Again, it is wholly improper for Sunlot to play any oversight or other role in this process if the audit is expected to be fair and independent. Indeed, Sunlot's suspected relationships with the Karpeles suspects makes them an ill-fitting option here. By contrast, CoinLab, itself a significant creditor, licensee, and industry expert, would be motivated to act fairly in facilitating the audit, although any independent third party would help ensure the fairness of the process.*

2. All past and current legal responsibilities are either settled or released through this process, and Sunlot and/or New Gox will be protected by the courts and such releases against any future claims against any liabilities incurred up until the time Sunlot assumes control over the current and remaining Mt. Gox assets and business and when New Gox is established.

*Comments/Questions:*

*CoinLab objects to this blanket—and indeed blind—release for Sunlot, New Gox, and any other parties that the Sunlot Proposal vaguely references. What investigation has been conducted to evaluate the wrongs being released? What deals already exist (or will be struck immediately prior to the release) between Sunlot or New Gox and Karpeles suspects (or their fronts or allies)? Only after a thorough investigation can there be discussion of releases. Moreover, as discussed in* In re Vitro S.A.B. de CV, *supra, and under 11 U.S.C. § 524(e), no third-party releases are permitted under U.S. law, and Sunlot cannot compel CoinLab or other creditors to release their own claims against Sunlot, New Gox, or anyone else.*

*Moreover, Sunlot's insistence on "future releases" is wholly objectionable. Consider this hypothetical: effective moments before the future effective date of the Sunlot/New*

B-6

*Gox releases, Sunlot/New Gox could settle with Karpeles suspects or others who may have hidden bitcoins, which they turn over as part of the settlement. What happens then? Do Sunlot/New Gox get to keep those bitcoins? Do the "settling" wrongdoers then have the ability to share those bitcoins in jurisdictions lacking an effective rule of law to hold them accountable? These and other questions illustrate how dangerous the Sunlot Proposal is. Indeed, what is to stop the bitcoin thieves from becoming competing buyers, and then using the stolen bitcoins themselves to pay the purchase price in exchange for releases that enable them to retain the remaining bitcoins free of claims?*

3. As a result, Sunlot and New Gox shall be free and unencumbered by any claims or liabilities, with exception of its specified responsibilities and obligations with respect to the bitcoin and fiat to be paid to the appropriate Mt. Gox account holders to be verified by the Audit ("Mt. Gox Account Holders").

*Comments/Questions:*

*The concerns identified above concerning paragraph 2 apply here as well. Again, Sunlot is not assuming fiduciary obligations to CoinLab or other creditors generally, but only seeks to act on behalf of the "Mt. Gox Account Holders" it chooses to pay "as appropriate" after the controlled audit. Indeed, Sunlot is attempting to evade the entire claims allowance process, both under U.S. and Japanese law, such that neither CoinLab nor other prejudiced creditors would be able to dispute Sunlot's designation of "appropriate" distributions. Why should Sunlot have such power? How can such power be given so blindly without investigation and appropriate court oversight or oversight by a fiduciary? How can this be reconciled with the pledge, in section A.4 above, not to provide "preferential treatment" to Sunlot's friends and allies?*

*Moreover, since it is critical that the Sunlot Proposal be subject to overbidding, what is to prevent the wrongdoers who stole the bitcoins from using some of those bitcoins to pay the purchase price—thereby giving them this unprecedented power to determine which creditors to pay? It would be a far better approach to permit the normal court process to determine the allowance of claims in order to share in pro-rata recoveries.*

C. **Restitution Plan**

1. Sunlot will acquire all Mt Gox shares from Supervisor for 1000 JPY, and agree to all terms and stipulations as provided for in this Agreement.

*Comments/Questions:*

*It is critical that Sunlot's proposal be subject to overbidding—and indeed, given how little value Sunlot is offering, CoinLab and other bidders should be able to overbid easily. Not only can a legitimate and qualified buyer readily pay more than Sunlot's trivial 1000 JPY, but legitimate buyers could also significantly improve the other Sunlot terms and conditions (as discussed herein and in CoinLab's letter to the trustee).*

*For example, if CoinLab were permitted to assist the trustee in the investigation of the missing bitcoins, CoinLab would not demand the $10 million / 10% fee that Sunlot is*

*seeking. The trustee could then use the saved funds to conduct an appropriate audit of accounts in order to provide for a traditional and fair claims allowance process in the bankruptcy court.*

2. Supervisor will deposit all Mt. Gox held bitcoin to Sunlot for redistribution to Mt. Gox Account Holders' *pro rata* per the PwC Audit, which Sunlot will make immediately available with no restrictions to customers.

*Comments/Questions:*

*See the comments and questions discussed above. All bitcoins recovered on behalf of the bankruptcy estate, as well as the approximately 200,000 recently allegedly "found" by Karpeles, must be distributed in accordance with applicable law by the bankruptcy court on allowed claims—not just to those "Mt. Gox Account Holders" deemed appropriate by Sunlot.*

3. Supervisor will deposit Mt. Gox held fiat, minus the Restitution Fund amount with Sunlot for immediate redistribution to Mt. Gox Account Holders, with no restrictions.

*Comments/Questions:*

*As explained above and in CoinLab's letter to the trustee, CoinLab objects to any such delegation to Sunlot of the trustee's duty to investigate and dispute or allow claims and to make distributions on allowed claims. Sunlot certainly cannot be permitted to distribute fiat currency (real money) to those parties Sunlot determines to be "appropriate" "Mt Gox Account Holders," particularly without other creditors having an opportunity to object to improper distributions or to share in estate assets on a pro-rata basis. In light of the need for competitive overbidding (and, indeed, the right to challenge the Sunlot Proposal generally), Sunlot certainly cannot be given carte blanche to make immediate distributions in its discretion "with no restrictions."*

*The "Restitution Fund" is discussed below.*

4. Supervisor will administer the Restitution Fund and make disbursements as per agreed schedule and approved expenses.

*Comments/Questions:*

*CoinLab's objections to Sunlot's control of the "Restitution Fund" are discussed in section D below. The trustee should not blindly delegate such power to Sunlot, particularly not absent a thorough investigation, opportunity for creditors to object to the process or overbid, and other protections for creditors in compliance with applicable law.*

5. Sunlot will setup a Class Action Administrator or Trustee to represent Mt. Gox Account Holders' interests and hold any security interests, fiat, or bitcoin as needed by the Plan.

*Comments/Questions:*

*While CoinLab does not intend to interfere with how the Class Counsel deal with their clients in the Class Action, it is wholly improper to grant Sunlot the power of appointment contemplated here. Any such power of appointment should be the result of competitive bidding.*

6. Equity-Entitlement Plan

    a. Sunlot/New Gox will establish a structure under which the Trustee/Administrator, for the benefit of the Mt. Gox Account Holders, is entitled to receive (i) *pro rata* cash payments equal to 16.5% of any dividends paid by Sunlot/New Gox to its stockholders and (ii) a *pro rata* share of the net proceeds received by the shareholders of Sunlot/New Gox equity securities in any good faith exit transaction (*i.e.*, any transaction in which a majority of the equity ownership of New Gox is exchanged for cash or other liquid assets) equal to the proceeds allocable to a holder of a 16.5% interest in Sunlot/New Gox's equity securities.

*Comments/Questions:*

*As discussed above, any disproportionate payment of the purchase price "as appropriate" to only "Mt. Gox Account Holders" designated by Sunlot, particularly without competitive overbidding, is wholly inappropriate. Moreover, there are serious questions about how parties wishing to contest Sunlot's treatment of their rights under the proposed plan could enforce their rights in Cypress, the country of Sunlot's formation, since the Sunlot Proposal contains no clear dispute resolution mechanism or designation of an appropriate jurisdiction for the resolution of disputes.*

*More importantly, Sunlot has proposed what appears to be an unregistered securities offering of stock and investment contracts in noncompliance with applicable securities laws of the U.S. (and presumably Japan and other jurisdiction), without proper disclosure or reporting. Sunlot (and any competing overbidders) should be required to comply with such laws, and we urge the trustee to find an appropriate means to value overbids that are in compliance with applicable law. Even if Sunlot somehow finds protection from securities laws in Cypress, no competing bidder should be required to organize in Cypress or take the related legal risks and burden in order to remain competitive.*

    b. This arrangement will be structured such that it does not involve the issuance of securities by Sunlot/New Gox or the Trustee/Administrator, and the Trustee/Administrator will have no participation in the management or operation of Sunlot/New Gox.

*Comments/Questions:*

*Sunlot claims that its proposal does not involve a securities offering, but this appears to be at odds with reality. More importantly, creditors bear the risk if governmental*

B-9

sf-3412133

*authorities disagree with this characterization and elect to challenge the transaction for violation of applicable securities laws.*

*Similarly, because securities compliance issues are the responsibility of the trustee, how can the Sunlot Proposal immunize the trustee for supporting a plan that fails to comply with securities laws? Simply put, Sunlot cannot be permitted to pursue a plan in violation of securities laws, because all overbidders should be able to compete without having to choose between effective competition and compliance with the law.*

  c. In the event that Sunlot/New Gox conducts an initial public offering of its equity securities while this arrangement is in place, a Mt. Gox Account Holder shall, at his or her discretion, receive on a *pro rata* basis either common stock of Sunlot/New Gox representing in aggregate a 16.5% interest in Sunlot/New Gox's equity securities or the equivalent value (at the IPO price) in cash.

*Comments/Questions:*

*Clearly, the Sunlot Proposal is already an "initial public offering of equity securities," despite Sunlot's characterization to the contrary. Additionally, as described above, all legitimate creditors must be treated equally, and sale proceeds cannot be allocated solely to Sunlot's favored "Mt. Gox Account Holders."*

  d. Nothing will restrict the ability of Mt. Gox Account Holders from selling or transferring their interests (as described herein) to Sunlot/New Gox, or otherwise.

*Comments/Questions:*

*As noted above, applicable securities laws do not permit unregistered securities to be freely tradable. Mt Gox Account Holders should thus be warned about their legal exposure if they attempt to redistribute the securities. Even where there is a deposit or distribution of bitcoins or other assets, the likely legal encumbrances that will exist (despite Sunlot's purported attempt to eliminate encumbrances) should be adequately disclosed. Additionally, competitors should be able to compete without having to make unrealistic assurances to depositor creditors; Sunlot should not gain a competitive advantage by making irresponsible promises.*

  e. All equity percentages described above will be based upon Sunlot/New Gox's initial capitalization table.

*Comments/Questions:*

*As anyone familiar with venture capital and tech financing knows, this is another bait and switch. The promised 16-1/2% securities are based upon an "initial capitalization table," which would permit massive dilution by subsequent securities offerings that will be needed in order to fund Sunlot's operations. Sunlot does not disclose how large that dilution may be, nor does Sunlot disclose how much funding it expects to have at the time of calculating the initial capitalization table. Furthermore, this aspect too is inconsistent*

*with applicable securities laws and impedes competition by responsible companies that raise their funding prior to any dilution.*

    f.    Sunlot/New Gox will be in a fiduciary relationship with Mt. Gox Account Holders, and shall have a fiduciary duty to act towards them on the same good faith basis as they act towards Sunlot/New Gox shareholders.

*Comments/Questions:*

*While it is indeed critical for anyone acting on behalf of creditors to comply with fiduciary duties on behalf of those creditors, it is unclear what that means in Cypress, where Sunlot is formed—particularly since the Sunlot Proposal uses Cypress shareholder rights as the standard for creditors. In any event, such a fiduciary should act on behalf of all legitimate creditors, not just Mt Gox Account Holders, under both applicable U.S. and Japanese law; however, nothing in the Sunlot Proposal suggests that Sunlot intends to satisfy such duties.*

7.    Mt. Gox Account Holders can convert any recovered funds between BTC and Fiat commission free. Any Fiat transmission fees will remain.

*Comments/Questions:*

*Any unique benefits allocated only to Mt Gox Account Holders must be valued and disclosed, so that overbidding competitors and other legitimate creditors can offer more fair values.*

**D.**     **Restitution Fund**

1.    In order to be eligible for payments from the Restitution Fund, or any other cash or equity based payments described herein, customers will need to go through level 2 KYC verification, including proof of identification, bitcoin wallet address verification, and bank account verification, as a natural person or legal entity.

*Comments/Questions:*

*While such requirements may be relevant for purposes of distributions, it is critical that they be applied by a neutral fiduciary through a traditional claims allowance process. Sunlot cannot substitute its own judgment for that of the trustee, free of legal oversight or opportunity for objection by creditors. In particular, Sunlot should not be permitted to allow the claims of Karpeles suspects or other objectionable parties simply in its own discretion.*

*More importantly, any competing bidder for the MtGox replacement exchange will need to be able to comply with applicable laws in order to avoid the problems the Karpeles suspects previously created for MtGox, such as problems with the U.S. Department of Homeland Security and other governmental authorities.*

2. Restitution Fund allocations will be *pro rata* for valid customer accounts as per the Audit.

*Comments/Questions:*

*Again, all allowed creditor claims must share distributions equally on a pro-rata basis—distributions should not be limited to those depositors deemed "appropriate" by Sunlot. Furthermore, the Sunlot Proposal offers no means by which creditors can object to the allowance of claims of Karpeles suspects, which necessarily would result in the dilution of potential distributions to legitimate creditors. As a result, CoinLab opposes any delegation of the claims allowance and distribution process to Sunlot. The trustee alone should be responsible for that process in accordance with Japanese law, or if the trustee wishes to delegate that responsibility as to U.S. claims, then it should be to a court-approved U.S. Chapter 15 examiner in accordance with 11 U.S.C. § 1522.*

3. These funds will be deposited into the respective Mt. Gox Account Holders' New Gox Accounts, on the *pro rata* agreed basis.

*Comments/Questions:*

*Again, distributions must be made to all allowed claims. It is unacceptable to use Sunlot as the only distribution channel.*

4. Restitution Funds will come from one of the following sources

    a. Cash payments paid out to Restitution Fund

    b. Proceeds from any Recovery Efforts less Recovery Holdback.

    c. An approved buy-out as per buy-out schedule for accelerated pre-payment of remaining restitution fund

*Comments/Questions:*

*There are many objections to this paragraph, discussed throughout. In any event, any such delegation of decision-making to Sunlot is improper. Furthermore, any "buyout" "approval" should be subject to approval by the Trustee, the Tokyo District Court, or a suitable independent fiduciary in order to assure fairness and to avoid favoritism by Sunlot. The mere fact that Sunlot proposes to act as the exchange operator gives rise to potential conflicts of interest for making distributions, since, among other concerns, Sunlot could favor certain customers of the exchange.*

5. If a customer account remains unclaimed for six (6) months from the date of Agreement, unclaimed Customer Assets in that account will be transferred to Restitution Fund and the customer will be removed from *pro rata* payments. Accounts that are removed from fund will reduce top line balance of Restitution Fund.

*Comments/Questions:*

*Unclaimed customer account funds should be treated in accordance with applicable law pursuant to a procedure approved by the Tokyo District Court. Delegation to Sunlot to make decisions concerning unclaimed funds is wholly inappropriate. Among other concerns, legal escheat issues and other local law complications should be addressed, and they will be of concern to legitimate overbidders as well.*

**E.  Recovery Commitments**

1. Sunlot shall commit to use commercially reasonable best efforts, and the resources of the Restitution Fund, to recover Customer Assets through ongoing investigation and legal prosecution both in Japan and internationally (as necessary), including, for example, hiring investigators, lawyers, accountants, or any other entities or services that may increase the likelihood of recovering Customer Assets ("Recovery Efforts").

*Comments/Questions:*

*CoinLab objects to the delegation to Sunlot of any such Recovery Efforts, particularly absent full disclosure, competitive bidding, and other creditor protections under both Japanese law and 11 U.S.C. §§ 1506 and 1522.*

*It is critical that the Recovery Efforts be fair and legally appropriate, and that they are conducted by the most competent and trustworthy party. What, then, makes Sunlot the best choice for that role? Sunlot has made no showing that it is a better party to handle this process than the Japanese trustee or—if the trustee wishes to delegate the recovery job, better than CoinLab or other potential creditors. What is to prevent Sunlot, for example, from simply settling cheaply with the Karpeles suspects or other guilty parties? What proof has Sunlot made about its competence or lack of conflicts of interest, including those arising from its prior (or current) associations with the Karpeles suspects?*

*Even more importantly, it is clear that the trustee has more powers, credibility, and rights in a Recovery Effort than Sunlot would have. That alone is a significant obstacle which Sunlot cannot overcome.*

*Consider a scenario illustrating another key problem with Sunlot's role in the Recovery Efforts. Assume that Sunlot has acquired MtGox stock and information through its relationships with insiders, leading to the current knowledge of the whereabouts of an additional 100,000 Bitcoins. Would Sunlot then immediately receive 10,000 Bitcoins (its 10% fee) upon "recovery" of those Bitcoins?*

2. $10 million USD in fiat currency shall be allocated from current Mt. Gox fiat assets held by the Supervisor to provide upfront funding for the administration and recovery of former Mt. Gox bitcoin and fiat assets (the "Restitution Fund").

sf-3412133

*Comments/Questions:*

*As a creditor, CoinLab objects to this funding of Sunlot's Restitution Fund as an improper expenditure of estate funds. CoinLab could, if necessary, accomplish more in connection with the recovery effort much more cost-effectively than Sunlot, as described in CoinLab's letter to the trustee. Before pricing the Recovery Effort, it would be wise to begin with a more informed starting point, which CoinLab's proposed assistance with investigation could provide.*

3. As an incentive and additional compensation, Sunlot shall retain an upside percentage in the amount of 10% of recovered Customer Assets ("Recovery Holdback") obtained through its recovery efforts, which will include claims against those accountable for customer losses.

*Comments/Questions:*

*See CoinLab's comments in section E.2 above. There is no compelling reason to pay Sunlot this 10% fee. CoinLab objects to that expenditure, and can do far better for less, as we can discuss further at the convenience of the Japanese trustee.*

**F.** **Pricing Model**

For the purposes of· establishing the size of the Restitution Fund and customer loss calculations, a bitcoin exchange rate of 1 BTC to $500 USD will be used. For conversion between USD and other Fiat currencies, the published exchange rates as of February 25, 2014 will be used.

*Comments/Questions:*

*The relevant time to determine the bitcoin exchange rate is at the time of distribution—not the date arbitrarily selected by Sunlot. Indeed, setting the exchange rates as set forth above has the potential to truly harm bitcoin creditors if the price rises (to $2,000, for example) before the distributions are made. Likewise, it will harm creditors who are owed Fiat currency if the price drops (to $200, for example) while the exchange rate stays the same.*

All bitcoin and Fiat customer assets currently under the protection of the Tokyo District Court Civil Rehabilitation and Bankruptcy Proceedings will be valued in both BTC and Fiat for the purposes of establishing pro rata distributions.

*Comments/Questions:*

*Before deciding this pricing issue, many key facts should be resolved first, as addressed above. We are happy to offer strategic advice to the trustee on this point when we discuss this further.*

**G.    Customer Moving Accounts**

Sunlot will operate New Gox in a Global Local Model, which means all accounts will come under the same global protection. Customers will be able to open accounts in any New Gox jurisdiction, subject to New Gox KYC requirements applicable for the respective jurisdictions. Customers will be able to transfer balances between New Gox jurisdictions.

*Comments/Questions:*

*Many key facts should be resolved first, as addressed above. We are happy to offer strategic advice to the trustee on this point when we discuss this further.*

**IN WITNESS WHEREOF**, each of the Parties hereto have caused this Plan to be executed on their behalf by their duly authorized representatives, all as of the date(s) set forth below.

**SUNLOT HOLDINGS LTD.**

Signature: _____

Printed Name: _____

Title: _____

Date: _____


**EDELSON PC**

Signature: _____

Printed Name: _____

Title: _____

Date: _____